**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-11592 |
| PBTC RECOVERY PARTNERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HUNTER PENN aka ALEX COLVIN, NILS TROSTERUD, SISSEL TROSTERUD, QUANTUM RESOURCE GROUP QRG AS, NORDCAP ADVISORS AS, AND JOHN DOES 1-10,<br><br>Defendants. | Adv. Pro. No. ______ |

**APPENDIX IN SUPPORT OF MOTION BY PBTC RECOVERY PARTNERS, LLC FOR PRELIMINARY INJUNCTION AND RELATED RELIEF**

NIXON PEABODY LLP
Richard C. Pedone (BBO # 630716)
Morgan C. Nighan (BBO # 679546)
Daniel P. McMonagle (BBO # 713426)
53 State Street
Boston, MA 02109
Telephone: (617) 345-1000
Email: rpedone@nixonpeabody.com
mnighan@nixonpeabody.com
dmcmonagle@nixonpeabody.com

-and-

Christopher Fong (*pro hac vice*)
55 West 46th Street
New York, NY 10036
Email: cfong@nixonpeabody.com

*Counsel to PBTC Recovery Partners, LLC*

Dated: October 12, 2026

**TABLE OF CONTENTS**

Bill of Sale by and between the Bankruptcy Trustee and PBTC .......................... Exhibit A

Sale Order ................................................................................................ Exhibit B

Transcript of the Section 341 Meeting held on October 8, 2024 ........................... Exhibit C

Transcript of the Section 341 Meeting held on December 27, 2024..................... Exhibit D

Bankruptcy Trustee's Demand for Turnover of Property of the Bankruptcy Estate to Hunter Penn dated November 25, 2024 ................................................................ Exhibit E

Emails dated December 11 and December 12, 2024 between Nils Trosterud and Tony Barletta Jr. ........................................................................................................ Exhibit F

Screenshots of the iMessage conversations between Chris Green and Jason Kahan during the period on or around December 3, 2024, and December 10, 2024 to December 12, 2024 ........................................................................................................ Exhibit G

Contingent Services Agreement between NordCap and the Debtor dated February 3, 2025 ........................................................................................................ Exhibit H

First Addendum to Contingent Services Agreement between NordCap and the Debtor dated February 7, 2025 ........................................................................ Exhibit I

Second Addendum to Contingent Services Agreement between NordCap and the Debtor dated February 11, 2025 ...................................................................... Exhibit J

Bankruptcy Trustee's Demand for Turnover of Property of the Bankruptcy Estate to Nils Trosterud dated February 27, 2025 ...................................................... Exhibit K

Bankruptcy Trustee's Demand for Turnover of Property of the Bankruptcy Estate to NordCap Advisors AS dated February 27, 2025.................................................. Exhibit L

Bankruptcy Trustee's Demand for Turnover of Property of the Bankruptcy Estate to Chris Green dated November 25, 2024 ............................................................... Exhibit M

Screenshot of the Telegram conversation between Hunter Penn and Chris Sava dated on or around April 2023 .......................................................................... Exhibit N

Emails dated November 25, 2024, December 5, 2024, December 30, 2024, and January 8, 2025 between Hunter Penn and Ken Cuccinelli................................................. Exhibit O

Litigation hold notices from PBTC's counsel to Hunter Penn, Nils Trosterud, and NordCap by email dated July 8, 2026 .................................................................... Exhibit P

Letters from PBTC's counsel to NordCap, Nils Trosterud, Quantum and Hunter Penn dated July 31, 2026 (exhibits omitted) .................................................................. Exhibit Q

Certificates of Service for Bankruptcy Case .........................................................Exhibit R

# EXHIBIT A

# BILL OF SALE

Donald Lassman, as Chapter 7 trustee (the "***Seller***") for the estate (the "***Estate***") of Jason M. Kahan (the "***Debtor***") in Case Number 1:24-bk-11592 (the "***Bankruptcy Case***") pending in the United States Bankruptcy Court for the District of Massachusetts (the "***Bankruptcy Court***"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to that certain Asset Purchase Agreement dated as of May 6, 2026 (the "***Agreement***"), by and between the Seller and Pioneer Funding Group LLC ("***Pioneer***"), and pursuant to that certain Assignment and Assumption Agreement dated as of June 24, 2026, by and between Pioneer and PBTC Recovery Partners, LLC (the "***Buyer***"), pursuant to which Pioneer assigned to Buyer all of Pioneer's right, title, interest, and obligations as Buyer under the Agreement, does hereby sell, convey, assign, transfer and deliver to Buyer on the date hereof, all of the Estate's and the Debtor's right, title and interest in and to the Assets set forth on **Exhibit A** hereto.

THE ASSETS ARE TRANSFERRED "AS IS" AND "WHERE IS" AND FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES.

EXCEPT AS PROVIDED IN THE AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, VALUATION OF THE ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.

BUYER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO THE BUYER THE ASSETS IN SELLER'S OR ITS COUNSEL'S POSSESSION; BUT THAT SELLER DOES NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE EXTENT THE SELLER IS NOT IN POSSESSION OF AN ASSET SOLD HEREUNDER, BUYER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS, AT ITS SOLE EXPENSE.

This Bill of Sale is entered into pursuant to the Agreement and is subject to the terms thereof. Buyer acknowledges and understands that Seller is the Chapter 7 trustee of the Estate and that Seller enters this Bill of Sale solely in his capacity as Chapter 7 trustee of the Estate and not in his personal capacity. and no liability or obligations shall accrue to him personally as a result of this Bill of Sale.

**[*Remainder of Page Intentionally Left Blank*]**

IN WITNESS WHEREOF, the Parties hereto have caused this Bill of Sale to be fully executed as of July 17, 2026.

**DONALD LASSMAN, CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF JASON M. KAHAN, AND NOT INDIVIDUALLY, AS SELLER**

By: ____________________________
Name: DONALD LASSMAN
Title: Chapter 7 Trustee

**PIONEER FUNDING GROUP LLC, AS BUYER**

By: ____________________________
Name: ____________________________
Title: ____________________________

IN WITNESS WHEREOF, the Parties hereto have caused this Bill of Sale to be fully executed as of July 17, 2026.

**DONALD LASSMAN, CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF JASON M. KAHAN, AND NOT INDIVIDUALLY, AS SELLER**

By: ______________________
Name: ______________________
Title: ______________________

PBTC RECOVERY PARTNERS, LLC
**~~PIONEER FUNDING GROUP LLC,~~**
**AS BUYER**

By: [signature]
Name: Adam Stein-Sapir
Title: Authorized Signatory
7/16/26



4927-5590-9266

# EXHIBIT A TO BILL OF SALE

## ASSETS

A. The rights, title and interests of Seller, the Estate and the Debtor in the Bitcoin wallets and Bitcoin addresses, including private keys, in which they hold any interest, including, but not limited to, the below wallets (collectively, the "***BTC Wallets***"):

1. BTC Address 1 (0.00132677 BTC): [redacted]l0hz
2. BTC Address 2 (414.99999583 BTC): [redacted]59df
3. BTC Address 3 (494.22956166 BTC): [redacted]ej6c
4. BTC Address 4 (185.10000000 BTC): [redacted]yrlk
5. BTC Address 5 (100.00010330 BTC): [redacted]gx4x
6. BTC Address 6 (100.00010330 BTC): [redacted]qssr
7. BTC Address 7 (0.00010000 BTC): [redacted]st7y
8. BTC Address 8 (496.89998888 BTC): [redacted]p0ug
9. BTC Address 9 (0 BTC): [redacted]rz5c
10. BTC Address 10 (0 BTC): [redacted]u6pN
11. BTC Address 11 (0 BTC): [redacted]psci

B. The rights, title and interests of the Seller, the Estate and the Debtor in any cryptocurrency in which they hold any interest, including, but not limited to (i) currently located in the BTC Wallets, and/or (ii) which have been transferred out of the BTC Wallets since their inception ((i) and (ii) together, the "***Estate Bitcoin***").

C. All of the Seller's, the Estate's and the Debtor's legal and equitable rights, interests, title, and standing to pursue any and all claims, suits, and causes of action, including but not limited to all causes of arising under Chapter 5 of the Bankruptcy Code including under 11 U.S.C. §§ 542 and 548, relating to recovering the BTC Wallets and the Estate Bitcoin and access thereto from any party, including, but not limited to Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors SA and any other third party who may have access and/or control over the BTC Wallets and Estate Bitcoin.

D. All of the Seller's, the Estate's and the Debtor's legal and equitable rights, interests and title to non-executory contracts, whether known or unknown, which concern or relate to the BTC Wallets.

E. The Seller's and the Estate's rights and standing to seek and obtain recognition, domestication and/or enforcement of the Sale Order in any jurisdiction.

# QUITCLAIM ASSIGNMENT

This QUITCLAIM ASSIGNMENT (the "***Assignment***") is being entered into by and between Donald Lassman, as Chapter 7 trustee (the "***Assignor***") for the estate (the "***Estate***") of Jason M. Kahan (the "***Debtor***"), in Case Number 1:24-bk-11592 (the "***Bankruptcy Case***") pending in the United States Bankruptcy Court for the District of Massachusetts (the "***Bankruptcy Court***"), in favor of PBTC Recovery Partners, LLC (the "***Assignee***").

**WHEREAS**, Assignor has agreed to assign to Assignee all of the Estate's and the Debtor's right, title and interest in and to the Assets described on **Exhibit A** to this Assignment, pursuant to that certain Asset Purchase Agreement dated as of May 6, 2026 (the "***Agreement***"), by and between the Assignor and Pioneer Funding Group LLC ("***Pioneer***"), and pursuant to that certain Assignment and Assumption Agreement dated as of June 24, 2026 by and between Pioneer and Assignee, Pioneer assigned to Assignee all of its right, title, interest, and obligations, to and under the Agreement.

**NOW THEREFORE**, pursuant to the Agreement and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Agreement.

2. Assignor hereby assigns and transfers to Assignee all of the Estate's and Debtor's right, title and interest in and to the Assets.

**TO HAVE AND TO HOLD** the Assets unto Assignee, its successors and assigns, forever, subject, however, to all the terms and conditions of this Assignment.

3. EXCEPT AS PROVIDED IN THE AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER TO ASSIGNEE AS TO THE RIGHTS, TITLE AND/OR INTEREST HELD BY THEM, RESPECTIVELY, IN THE ASSETS OR OTHER PROPERTY TRANSFERRED HEREBY. ADDITIONALLY, EXCEPT AS PROVIDED IN THE AGREEMENT, ALL WARRANTIES. EXPRESS OR IMPLIED ARE HEREBY DISCLAIMED, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES OF MERCHANTABILITY, SUITABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE.

[***Remainder of Page Intentionally Left Blank***]

IN WITNESS WHEREOF, the Parties hereto have caused this Assignment to be fully executed as of July 17, 2026.

**DONALD LASSMAN, CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF JASON M. KAHAN, AND NOT INDIVIDUALLY, AS ASSIGNOR**

By: [signature]
Name: DONALD LASSMAN
Title: Chapter 7 Trustee

**PBTC RECOVERY PARTNERS, LLC, AS ASSIGNEE**

By: ____________________________
Name: __________________________
Title: ___________________________

IN WITNESS WHEREOF, the Parties hereto have caused this Assignment to be fully executed as of July 17, 2026.

**DONALD LASSMAN, CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF JASON M. KAHAN, AND NOT INDIVIDUALLY, AS ASSIGNOR**

By: ___________________________
Name: _________________________
Title: __________________________

PBTC RECOVERY PARTNERS, LLC
~~**PIONEER FUNDING GROUP LLC,**~~
**AS ASSIGNEE**

By: [signature]
Name: Adam Stein-Sapir
Title: Authorized Signatory
7/16/26

# EXHIBIT A TO ASSIGNMENT

A. The rights, title and interests of Seller, the Estate and the Debtor in the Bitcoin wallets and Bitcoin addresses, including private keys, in which they hold any interest, including, but not limited to, the below wallets (collectively, the "***BTC Wallets***"):

1. BTC Address 1 (0.00132677 BTC): [redacted]l0hz
2. BTC Address 2 (414.99999583 BTC): [redacted]59df
3. BTC Address 3 (494.22956166 BTC): [redacted]ej6c
4. BTC Address 4 (185.10000000 BTC): [redacted]yrlk
5. BTC Address 5 (100.00010330 BTC): [redacted]gx4x
6. BTC Address 6 (100.00010330 BTC): [redacted]qssr
7. BTC Address 7 (0.00010000 BTC): [redacted]st7y
8. BTC Address 8 (496.89998888 BTC): [redacted]p0ug
9. BTC Address 9 (0 BTC): [redacted]rz5c
10. BTC Address 10 (0 BTC): [redacted]u6pN
11. BTC Address 11 (0 BTC): [redacted]psci

B. The rights, title and interests of the Seller, the Estate and the Debtor in any cryptocurrency in which they hold any interest, including, but not limited to (i) currently located in the BTC Wallets, and/or (ii) which have been transferred out of the BTC Wallets since their inception ((i) and (ii) together, the "***Estate Bitcoin***").

C. All of the Seller's, the Estate's and the Debtor's legal and equitable rights, interests, title, and standing to pursue any and all claims, suits, and causes of action, including but not limited to all causes of arising under Chapter 5 of the Bankruptcy Code including under 11 U.S.C. §§ 542 and 548, relating to recovering the BTC Wallets and the Estate Bitcoin and access thereto from any party, including, but not limited to Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors SA and any other third party who may have access and/or control over the BTC Wallets and Estate Bitcoin.

D. All of the Seller's, the Estate's and the Debtor's legal and equitable rights, interests and title to non-executory contracts, whether known or unknown, which concern or relate to the BTC Wallets.

E. The Seller's and the Estate's rights and standing to seek and obtain recognition, domestication and/or enforcement of the Sale Order in any jurisdiction.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor. | Chapter 7<br>Case No. 24-11592-JEB |

**ORDER (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (II) GRANTING RELATED RELIEF**

This matter came before the Court on the motion [Dkt. No. 260] (the "Sale Motion") filed by Donald Lassman, the Chapter 7 trustee (the "Trustee") in the above-captioned chapter 7 case (the "Case") of Jason M. Kahan (the "Debtor"), seeking entry of an order, pursuant to Section 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-5 and 6004-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the District of Massachusetts (the "MLBR") authorizing and approving the sale (the "Sale") of certain assets of the Debtor's estate. This order (the "Sale Order") constitutes the findings of fact and conclusions of law on the Sale Motion pursuant to Federal Rule 52(a), made applicable to this proceeding by Bankruptcy Rule 7052 and 9014. Any finding of fact deemed a conclusion of law is adopted as such, and vice versa.

Pursuant to the Sale Motion, the Trustee sought approval of an Asset Purchase Agreement, dated May 6, 2026 (the "APA"), by and between the Trustee and Pioneer Funding Group LLC ("Pioneer") attached as Exhibit D to the Sale Motion. Pioneer subsequently assigned its rights under the APA to PBTC Recovery Partners, LLC ("PBTC" or "Buyer") ("Stalking Horse Bidder" shall mean Pioneer prior to the assignment and PBTC after the assignment). As

set forth in the Sale Motion and the APA, the Trustee sought to sell the assets of the estate set forth on Exhibit A to the APA, including the Recovery Actions (as defined in Section 3.1 of the APA) (collectively, the "Purchased Assets") to the Stalking Horse Bidder for $350,000, subject to the opportunity for objections and higher offers. As more particularly detailed in the APA, the Purchased Assets included the Estate Bitcoin (as defined in the APA), including Bitcoin wallets, Bitcoin addresses, and any cryptocurrency in such wallets or transferred from such wallets.

On June 3, 2026, the Court entered the *Order (A) Approving Procedures Governing Trustee's Proposed Sale Of Certain Of The Debtor's Assets Pursuant To Section 363 Of The Bankruptcy Code, Free And Clear Of Liens, Claims, Encumbrances And Other Interests, (B) Approving Form And Manner Of Notice Of Sale, And (C) Granting Related Relief* (the "Sale Procedures Order"). The Sale Procedures Order sets forth the deadlines for filing objections to the Sale Motion. In addition, the Sale Procedures Order sets forth the procedures and deadlines for the submission of competing bids and further rounds of bidding. To participate in bidding, a competing bid was required to be a Qualified Bid (as defined in the Sale Procedures Order) and provide certain documents and information. The Sale Procedures Order also included the procedures for further bidding at any hearing on the Sale Motion, including the requirement that each further bid must also be a Qualified Bid.

The Court scheduled a hearing on the Sale Motion for July 1, 2026. As provided in the Sale Procedures Order, the hearing could be adjourned from time to time without further notice other than an announcement in open court. Pursuant to the Sale Procedures Order, the Court approved the *Notice Of (A) Proposed Sale Of Certain Assets Of The Debtor's Estate Pursuant To Section 363 Of The Bankruptcy Code, Free And Clear Of Liens, Claims, Encumbrances And Interests, (B) Sale Procedures, (C) Deadlines For Submitting Overbids Or Objections, And (D)*

*Hearing Date* [Dkt. No. 275] dated June 3, 2026 (the "Notice"). On June 4, 2026, the Trustee served the Sale Motion and the Notice on all creditors and on potential interested purchasers.

On June 26, 2026, the Debtor filed an objection (the "Objection") to the Sale Motion. In addition, two potential counteroffers were filed. Samara CR Holdings, LLC ("Samara"), submitted a bid (the "Samara Bid") to purchase the Purchased Assets for $415,500 executed by the Debtor as manager of Samara. In accordance with the Sale Procedures Order, Samara submitted a statement by the Debtor under oath that the Debtor and Ryan Moore were the only interested parties involved in the bid. Ironwood Recovery Holdings LLC also submitted a bid (the "Ironwood Bid"). The Ironwood Bid expressly stated that it was not seeking to purchase the Estate Bitcoin, but was limited to the Recovery Actions.

The Trustee and the Stalking Horse Bidder filed an objection to the designation of the Ironwood Bid as a Qualified Bid. The Stalking Horse Bidder filed an objection to the designation of Samara as a Qualified Bidder.

The Court held a hearing on the Sale Motion commencing on July 1, 2026, which was continued to July 8, 2026, and July 10, 2026 (collectively, the "Sale Hearing"). At the Sale Hearing, the Trustee made an offer of proof regarding the marketing efforts of the Trustee with respect to the Purchased Assets. No party sought to cross-examine the Trustee or seek further evidence on the issue of marketing. The Court accepted the offer of proof as evidence of the Trustee's efforts to market the Purchased Assets. The Court also took judicial notice of the record of the Case and the record of related cases involving the Debtor, including *In re Jason Kahan*, Case No. 23-11830 (Bankr. D. Mass.), *Harrington v. Kahan*, Adv. Proc. No. 24-01111 (Bankr. D. Mass.), and the bankruptcy case filed by the Debtor's spouse, *In re Olga Bassa*, Case No. 24-1040 (Bankr. D. Mass.) (Collectively, the foregoing cases are referred to as the "Related

Cases”). Having considered the arguments at the hearing, the evidence proffered by the Trustee, the record of the Case and the Related Cases, the Court overruled the Objection by the Debtor.

At the Sale Hearing, the Court then addressed the issues regarding the counteroffers. The Court sustained the objections of the Trustee and the Stalking Horse Bidder to the Ironwood Bid and struck the Ironwood Bid. After further argument, the Court initially overruled the objection of the Stalking Horse Bidder to the Samara Bid, but reserved the issue of whether Samara was entitled to the protections of Section 363(m) as a good faith purchaser. As more fully set forth below, after considering further evidence, the Court subsequently reconsidered its initial ruling and found that the Samara Bid was not a Qualified Bid entitled to participate in further bidding.

After the initial ruling on the Samara Bid, the Court permitted further bidding to determine the highest and best bid through a round of sealed bids. Samara submitted a further bid of $6,100,000 (the “Samara Second Bid”), and PBTC submitted a further bid of $1,050,000 (the “PBTC Second Bid”). The Trustee accepted the Samara Second Bid as the highest and best bid and the PBTC Second Bid as the back-up bid. The Trustee did not request that the Court approve the bids at the July 1, 2026, hearing, nor did he provide any offer of proof or evidence that Samara had the financial ability to consummate the sale or funding for the Samara Second Bid.

At the July 1, 2026, hearing, Samara made an offer of proof on the issue of whether they were a good faith purchaser within the meaning of Section 363(m) of the Code. The Trustee declined to make an offer of proof that Samara was a good faith purchaser. PBTC requested an opportunity to cross-examine the Debtor on behalf of Samara on the issue.

PBTC made an offer of proof on the issue of whether they were a good faith purchaser within the meaning of Section 363(m) of the Code. The Trustee also made an offer of proof on the issue of the good faith of PBTC. Samara requested an opportunity to cross-examine a

representative of PBTC on the issue.

Although the Trustee had not requested that the Court approve the bids at the hearing, the Court entered an order dated July 2, 2026 (the "July 2 Order"), stating that the Court had approved the Samara Second Bid as the highest bid and the PBTC Second Bid as the backup bid. The Court continued the Sale Hearing to July 8, 2026, to consider the issue of the good faith of the bidders.

At the continued hearing on July 8, 2026, PBTC raised additional issues regarding the Samara Second Bid and the Samara Bid. In particular, PBTC objected to the Court's prior ruling that the Samara Second Bid was the successful bid, highlighting the failure of the Trustee to ask for approval or set forth evidence on the record that Samara was reasonably likely to perform the Second Bid. PBTC referred to the Sale Procedures Order, which required that the bids submitted during the auction be Qualified Bids. PBTC also raised concerns that the Trustee and Samara had declined to produce documents that PBTC had requested prior to the hearing. The Court reserved for later determination the additional issues raised by PBTC.

The Court conducted an evidentiary hearing on the good faith of the bidders. At the hearing, the Court treated the prior offers of proof of the bidders to be the direct testimony for each bidder on the issue of good faith under Section 363(m). Adam Stein-Sapir testified on behalf of PBTC. At the conclusion of his testimony, Samara declined to offer further argument on the issue of PBTC's good faith. As more fully set forth on the record, and incorporated in the findings below, the Court found that PBTC was a good faith buyer entitled to the protections of Section 363(m).

The Debtor testified on behalf of Samara. In addition to the testimony of the Debtor and the exhibit that had been submitted, the Court heard further argument by Samara and PBTC on

the good faith of Samara. As more fully set forth on the record, and incorporated in the findings below, based on the evidence, the Court found that Samara was not a good faith buyer and not entitled to the protections of Section 363(m).

As more fully set forth on the record, and incorporated in the findings below, based on the evidence and the record of the Sale Hearing, the Court held that the finding that the Samara Second Bid was the highest and best bid was not supported by the record and its ruling was improvidently granted. As an alternative basis, the Court granted the oral motion of PBTC to reconsider the ruling. The Court continued the hearing to later in the day to consider further evidence. Neither the Trustee nor Samara objected to the continuance of the hearing or the request for evidence on the issue. Neither the Trustee nor Samara requested additional time to response to the reconsideration of the issue or to continue the hearing.

After a break, the Court resumed the evidentiary hearing. The Trustee and the Debtor testified and additional exhibits were submitted, including the documents submitted to the Trustee with the Samara Bid. During the break, the Trustee provided PBTC with the documents that Samara had submitted to demonstrate its financial ability to consummate the sale. The Trustee testified that the documents submitted with the Samara Bid were the only evidence that he considered to determine that the Second Samara Bid was a Qualified Bid and that Samara was reasonably likely to close consummate the sale pursuant to the bid. The documents consisted of a letter from an individual named Kyle Biancardi that authorized a bid on behalf of an entity named NARG LLC to participate in a bid with Samara up to $3,000,000, and a bank statement dated a month earlier with such funds in the name of NARG LLC. The Debtor testified that neither the Debtor nor the other principal of Samara, Ryan Moore, had funds to support the bid. Accordingly, the Court found that the Trustee had no support to show that Samara had the

requisite funding to be capable of funding a bid of $6,100,000.

As more fully set forth on the record, and incorporated in the findings below, based on the evidence and the record of the Sale Hearing, the Court found that the Samara Second Bid was not a Qualified Bid. The Court also found that the Samara Second Bid could not be approved as the highest and best bid since Samara did not have the financial ability to close the Samara Second Bid at the time it was made. In addition, as more fully set forth on the record, and incorporated in the findings below, the Court found cause to reconsider its initial finding that Samara was a Qualified Bidder for the Samara Bid. The Court found that the Samara Bid was not a Qualified Bid since, *inter alia*, (i) Samara had failed to disclose that Biancardi and NARG LLC were also interested parties in the bid, and (ii) the documents failed to show that Samara had the funding for the bid. Based on its rulings, the Court struck the Samara Bid and the Samara Second Bid.

After the Court struck the Samara Bid and the Samara Second Bid, the Trustee accepted and the Court approved PBTC as the Successful Bidder pursuant to the terms of the APA. After the rulings, the Court continued the hearing to a nonevidentiary hearing on July 10, 2026, to consider the proposed sale order. Samara filed a request for the Court to revisit the rulings that the Samara Bid and the Second Samara Bid were not Qualified Bids. The Court heard further argument and afforded Samara and the Trustee an opportunity to make an offer of proof of additional evidence that it would submit if the Court reopened the evidence. Neither Samara nor the Trustee proffered evidence that Samara had in place the funding for the Second Samara Bid of $6,100,000 at the time it was made on July 1, 2026. The only evidence that Samara proffered was an agreement dated July 9, 2026, eight days after the auction and almost two weeks after the Samara Bid was submitted, that Samara had a commitment to fund the Second Samara Bid. The

Court declined to reinstate its initial rulings.

Having considered the Sale Motion, the APA, the Objection, the evidence and testimony submitted at the Sale Hearing, the record of these proceedings and the related proceedings which the Court took judicial notice, good cause being shown

**IT IS FOUND THAT:**

A. The Court has jurisdiction to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

B. Venue of this Case and in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. The statutory predicates for the relief granted herein are included in Sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and MLBR 2002-1 and 6004-1.

D. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

E. For the reasons set forth on the record at the Sale Hearing, which are incorporated by reference as if fully set forth herein, PBTC is the Successful Bidder to purchase the Purchased Assets on the terms of the APA for $350,000.

**Marketing and Sale Process**

F. On August 7, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code and commenced this chapter 7 case in the United States Bankruptcy Court for the District of Massachusetts (this "Court").

G. In January of 2026, the Trustee commenced the marketing of the Purchased

Assets for sale. The Trustee provided notice to over 100 persons, and ultimately received five bids. After extensive negotiations over a period of months, the Trustee and the Stalking Horse Bidder negotiated and finalized in good faith and at arm’s length the APA and all related documents necessary to consummate the transactions and agreements contemplated therein (the “Sale Transaction”).

H. The Court entered the Sale Procedures Order on June 3, 2026, which approved the Notice.

I. After the Court entered the Sale Procedures Order, the Trustee served the Notice by first-class and electronic mail to all creditors in the Debtor’s bankruptcy case and all persons and other parties who the Trustee believed might have been interested in purchasing the Purchased Assets, including persons who had directly or indirectly expressed an interest in the Purchased Assets during the course of the Debtor’s bankruptcy case.

J. The Sale Procedures (as defined in the Sale Procedures Order) approved by this Court afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. The Trustee and his counsel conducted a marketing and sale process with respect to the Purchased Assets, and the Successful Bidder participated, each in a fair, good faith, and non-collusive manner.

K. For the reasons set forth on the record at the Sale Hearing, which is incorporated by reference as if fully set forth herein, the Ironwood Bid was not a Qualified Bid and is stricken.

L. For the reasons set forth on the record at the Sale Hearing, which are incorporated by reference as if fully set forth herein:

i. The finding in the July 2 Order that the Samara Bid was a Qualified Bid is vacated.

ii. The findings in the July 2 Order that the Second Samara Bid was approved as the highest bid and that the PBTC Second Bid was approved as the back-up Bid are vacated.

iii. The Samara Second Bid could not be approved as the highest and best bid since Samara did not have the financial ability to consummate the Samara Second Bid at the time it was made. The Second Samara Bid was also not a Qualified Bid as required under the Sale Procedures Order. The Second Samara Bid was stricken.

iv. The Samara Bid was not a Qualified Bid since, *inter alia*, (i) Samara had failed to disclose that Biancardi and NARG LLC were also interested parties in the bid, and (ii) the documents failed to show that Samara had financial funding for the bid. The Samara Bid was stricken.

v. Since the Samara Bid and the Ironwood Bid were stricken, the only Qualified Bid was the initial bid of PBTC.

vi. In accordance with the Sale Procedures Order, PBTC is the Successful Bidder on the terms of the initial APA, which shall be deemed the Successful Bid.

M. The Successful Bid of the Successful Bidder constitutes the highest and best offer for the Purchased Assets, and the Trustee's determination that the APA maximizes value for the benefit of the Debtor's estate and constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

N. The Successful Bid provides fair and reasonable terms for the purchase of the Purchased Assets, and reasonable opportunity has been given to any interested party to make a higher and better offer for the Purchased Assets. As more fully set forth on the record at the Sale Hearing, which are incorporated by reference as if fully set forth herein, the only offers

submitted have been found by this Court as not constituting a Qualified Bid. No other offers were submitted.

O. Approval of the Sale Motion and the Successful Bid, and the prompt consummation of the Sale Transaction contemplated thereby, will maximize the value of the Debtor's estate under the circumstances and are in the best interests of the Debtor's estate, creditors and other parties in interest.

P. The Successful Bidder has complied with all applicable orders of the Court in negotiating and entering into the APA.

**Sale Hearing**

Q. The Court conducted the Sale Hearing at which time the Court considered the Sale Motion, the evidence and testimony presented, and the statements and argument of counsel in support of granting the relief requested in the Sale Motion and approval of the APA and the transactions contemplated by the APA.

R. All objections to the Sale Motion or the relief requested therein that have not been adjourned, withdrawn, or resolved are overruled in all respects on the merits.

**Sound Business Purpose**

S. The Trustee has demonstrated good, sufficient, and sound business purposes and justifications for consummation of the Sale Transaction contemplated by the APA in accordance with the requirements of Section 363(b) of the Bankruptcy Code. The value of the Debtor's estate will be maximized through a sale of the Purchased Assets. Approval of the APA is necessary to preserve the value of the Debtor's assets. The Trustee has determined, in his reasonable business judgment that the Purchased Assets will have the greatest value if promptly sold to the Successful Bidder.

T. As a result, the proposed Sale Transaction pursuant to Sections 105(a) and 363 of the Bankruptcy Code, upon the terms and conditions set forth in the APA subject to this Sale Order, is the best alternative available to the Trustee for recovering value for the benefit of the Debtor's estate. The Sale Transaction contemplated by the APA maximizes the value of the Purchased Assets.

**Fair Purchase Price**

U. The total consideration to be provided by the Successful Bidder pursuant to the Successful Bid as set forth in the APA is the highest or otherwise best offer received by the Debtor and constitutes (i) fair value, (ii) fair, full, and adequate consideration, (iii) reasonably equivalent value, and (iv) reasonable market value for the Purchased Assets for purposes of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof or the District of Columbia. The terms of the Sale Transaction contemplated in the APA are fair and reasonable.

**Compliance With Notice Requirements**

V. As evidenced by the notices and affidavits of service filed in the case, and based upon representations of the Trustee's counsel at the Sale Hearing, the Notice was adequate and sufficient under the circumstances, and the Trustee provided sufficient notice of the Sale Motion, the Sale Hearing, and the Trustee's intent to consummate a sale of the Purchased Assets as contemplated by the APA and this Sale Order. The Notice was provided to all parties who the Trustee believes may be in possession or control of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors SA and the Debtor.

W. The Notice was provided in accordance with Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, and 9014, and MLBR 2002-5 and 6004-1. The Trustee has complied with all obligations to provide notice of the Sale Motion, the Sale Hearing, the APA, this Sale Order, and the Sale Transaction. Such Notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the APA, this Sale Order, or the Sale Transaction is or shall be required. All parties in interest had a full and fair opportunity to object to the relief granted in this Sale Order.

**Good Faith of the Buyer**

X. The Buyer is purchasing the Purchased Assets and has negotiated and entered into the APA at arm's length and in good faith and without collusion. Accordingly, the Buyer is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code, and the Buyer is, therefore, entitled to the full protections of such provision. Any designee or assignee of the Buyer that is an entity wholly owned by the Buyer shall be deemed a good faith purchaser entitled to all of the protections afforded by Section 363(m). The good faith of the Buyer is evidenced by, *inter alia*, the following facts:

i. The sale process conducted by the Trustee was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.

ii. The Buyer's Successful Bid is the product of good faith negotiations with the Trustee.

iii. No other potential bidder submitted a Qualified Bid for the Purchased Assets.

iv. All payments to be made by the Buyer and other agreements or arrangements in connection with the APA have been disclosed.

v. The Buyer has not violated the provisions of Section 363(n) of the Bankruptcy Code by any action or inaction.

vi. The Buyer is a third-party purchaser and is unrelated to the Debtor or the Trustee. Neither the Buyer nor any of its affiliates, subsidiaries, officers, directors, members, partners, principals, or any of their respective representatives, successors, or assigns is an "insider" of the Debtor, as that term is defined in Section 101(31)(A) of the Bankruptcy Code.

vii. The Trustee and the Buyer have engaged in substantial arm's length negotiations in good faith. The APA is the product of arm's length bargaining among the parties.

Y. The sale of the Purchased Assets pursuant to the APA and this Sale Order, all covenants therein and conditions thereto, and all relief requested in the Sale Motion are an integrated transaction, meaning that each component is an essential part of every other component and that the entire transaction can be consummated only if all of its components are consummated. Accordingly, the entire transaction is subject to, and is protected by, the provisions of Section 363(m) of the Bankruptcy Code.

**Sale Free and Clear**

Z. On and after the Closing of the Sale Transaction, no entity shall have any Lien, Claim and/or Interest (as defined herein) in or against the Purchased Assets.

AA. All Liens, Claims and/or Interests that existed against the Purchased Assets prior to the Closing, whether pre-petition or post-petition, shall, upon Closing, attach solely to the sale proceeds that the Trustee and the Debtor's estate receive under the Sale Transaction. Those Liens, Claims and/or Interests will attach to the proceeds of the Sale Transaction in the same order of relative priority and with the same validity, force, and effect that the holder of such

Lien, Claim and/or Interest had against the Purchased Assets prior to Closing (including, for the avoidance of doubt, as set forth in any other applicable Orders of this Court), and will be subject to any claims and defenses the Trustee or Debtor's estate may possess with respect thereto. The interests of the holders of such Liens, Claims and/or Interests are being adequately protected pursuant to the provisions of this Sale Order.

BB. Pursuant to Section 363(f) of the Bankruptcy Code, a trustee is authorized to sell property of the estate free and clear of any liens, claims, interests, and encumbrances if any of the following requirements is satisfied: (i) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (ii) the entity holding the alleged lien, claim, interest, or encumbrance consents; (iii) such interest is a lien, and the price at which such property is to be sold is greater than the aggregate value of all liens on such property (Section 363(f)(3) of the Bankruptcy Code); (iv) such lien, claim, interest, or encumbrance is subject to a bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such lien, claim, interest, or encumbrance.

CC. For the following reasons, the provisions of Section 363(f) of the Bankruptcy Code have been satisfied:

i. All alleged holders of liens or claims who did not object or withdrew their objections to the Sale Transaction contemplated by the APA are deemed to have consented. Alleged holders of liens or claims who did object either had their objections overruled or resolved or otherwise fall within one or more of the subsections of Section 363(f) of the Bankruptcy Code.

ii. The Trustee is not aware of any remaining interests in the Purchased Assets, and, if any such interests exist, they are in bona fide dispute as to the extent, validity, perfection, and viability of those interests.

iii. Other parties (if any) could be compelled to accept a money satisfaction of their liens, claims, interests, or encumbrances or such interest is a lien and the price at which such encumbered property is to be sold under the APA is greater than the aggregate value of all liens on such encumbered property.

DD. Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets will be transferred to the Buyer free and clear of all Liens, Claims, Interests and rights of setoff and recoupment, with all other applicable Liens, Claims and/or Interests to attach to the proceeds of the sale of the Purchased Assets in the order of their priority with the validity, force, and effect that they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Trustee and the Debtor's estate and all interested parties with respect to such Liens, Claims and/or Interests and with the net proceeds from the sale of the Purchased Assets to be available for the benefit of the Debtor's estate.

EE. Accordingly, the Trustee has satisfied the standard set forth in Section 363(f) of the Bankruptcy Code for selling the Purchased Assets free and clear of all Liens, Claims and/or Interests.

**Sale Free and Clear Required by the Buyer**

FF. In connection with the APA, the Buyer expressly negotiated for the protection of obtaining the Purchased Assets free and clear of all Liens, Claims, Interests and rights of setoff and recoupment (including, without limitation, any potential successor liability claims). The Buyer would have paid substantially less consideration for the Purchased Assets, or not

purchased the Purchased Assets at all, if the Buyer were not purchasing the Purchased Assets free and clear of any Liens, Claims, Interests and rights of setoff and recoupment.

**No Successor Liability**

GG. To the greatest extent permitted by law, neither the Buyer nor its affiliates, officers, directors, members, partners, and principals or any of their respective representatives, successors, or assigns shall be deemed, as a result of the consummation of the Sale Transaction contemplated by the APA or otherwise, to be liable for any claim based on successor liability, transferee liability, derivative liability, vicarious liability, or any similar theories under applicable state or federal law, or otherwise. The Buyer shall have no liability or obligation of the Trustee, the Debtor or the Debtor's estate and the Buyer is not otherwise, expressly or impliedly, assuming any of the debts or obligations of the Trustee, the Debtor or the Debtor's estate. No party may assert any rights of setoff or recoupment against the Buyer to the extent such rights were assertable against the Debtor or the Debtor's estate prior to the Closing of the Sale Transaction.

HH. The Buyer and the Trustee are not entering into the APA fraudulently or in order to escape liability for the Debtor's obligations.

**No Fraudulent Intent**

II. The APA was not entered into, and the Sale Transaction contemplated by the APA will not be consummated, for the purpose of hindering, delaying, or defrauding the Debtor's present or future creditors for purposes of the Bankruptcy Code, any other applicable laws of the United States, and any applicable laws of any state, territory, or possession thereof, or the District of Columbia. Neither the Debtor nor the Buyer is entering into the APA or consummating the Sale Transaction contemplated by the APA with any fraudulent or otherwise

improper purpose.

**Purchased Assets**

JJ. The Purchased Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of Section 541(a) of the Bankruptcy Code. As the duly appointed chapter 7 trustee of the Debtor's estate, the Trustee has all title, interest, and/or rights in the Purchased Assets required to transfer and to convey the Purchased Assets to the Buyer, as required by the APA.

KK. The Trustee acknowledges that some of the Purchased Assets are currently being improperly withheld by third parties. To the greatest extent permitted by law, the Buyer may initiate the Recovery Actions, including claims, causes of action, contested matters, adversary proceedings or other litigation in connection with recovery and access to the Purchased Assets. To the greatest extent permitted by law, the Buyer shall have the sole right to pursue and prosecute all Recovery Actions, at its own cost, and on its own behalf and as successor-in-interest to the Debtor's estate and the Debtor. Any and all proceeds and recoveries from any Recovery Actions shall be the sole property of the Buyer. The Trustee, the Debtor, the Debtor's estate and its creditors shall have no interest or claim to any proceeds and recoveries from the Recovery Actions. As provided in the APA, the Trustee shall provide reasonable good-faith cooperation to the Buyer in connection with its pursuit of the Recovery Actions, provided however that any such cooperation shall be at no cost or expense to the Trustee and the Debtor's bankruptcy estate and, at no time, shall the Trustee be required to join as a party to any litigation brought by the Buyer relating to the Recovery Actions. The Trustee further agrees not to interfere with the Buyer's Recovery Actions.

LL. Section 542(a) provides that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under

section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). The Purchased Assets are not of inconsequential value or benefit to the estate. To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS and NordCap Advisors SA, such third parties shall immediately deliver possession, control, and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law. To the extent permitted under applicable law, this Court shall retain jurisdiction over any action, suit or proceeding brought by the Buyer to compel turnover of the Purchased Assets, including but not limited to any action under 11 U.S.C.§ 542, any other provision of Chapter 5 of the Bankruptcy Code or applicable law.

**Prompt Consummation**

MM. To maximize the value of the Purchased Assets, it is essential that the Sale Transaction occur within the timeframe set forth in the APA. Time is of the essence in consummating the Sale Transaction contemplated by the APA. The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the APA, including, without limitation, the Sale Transaction. Accordingly, there is cause to grant relief from the stay established by Bankruptcy Rule 6004.

**Section 363 Sale**

NN. The proposed sale of the Purchased Assets to the Buyer pursuant to the APA constitutes a sale of property of the Debtor's estate outside the ordinary course of business within

the meaning of Section 363(b) of the Bankruptcy Code.

OO. Under the circumstances of the case, the sale of the Purchased Assets to the Buyer pursuant to Sections 105(a) and 363(b) and (f) of the Bankruptcy Code is both justified and appropriate.

PP. The sale of the Purchased Assets to the Buyer free and clear of any and all Liens, Claims, Interests and rights of setoff and recoupment upon the terms and conditions set forth in the APA is in the best interests of the Debtor's estate.

QQ. Given the circumstances of the case, the reasonable opportunity afforded other parties to make competing bids or offers for the Purchased Assets, and the adequacy and fair value of the consideration being paid by the Buyer under the APA, the proposed sale of the Purchased Assets to the Buyer constitutes a reasonable and sound exercise of the Trustee's business judgment and is approved.

**Retention of Jurisdiction**

RR. It is necessary and appropriate for the Court to retain jurisdiction to, among other things, (i) interpret and enforce the terms and provisions of this Sale Order and the APA, (ii) to adjudicate, if necessary, any and all actions, suits or proceedings brought by the Trustee or the Buyer to compel turnover of the Purchased Assets from third parties, including but not limited to any action under 11 U.S.C.§ 542, any other provision of Chapter 5 of the Bankruptcy Code or applicable law, to the extent permitted under applicable law, and (iii) to adjudicate, if necessary, any alleged right, title, or property interest, including ownership claims, relating to the Purchased Assets and the proceeds thereof, as well as the extent, validity, perfection, and priority of any alleged lien or claim relating to the Debtor's estate and/or the Purchased Assets, to the extent permitted under applicable law.

**IT IS ORDERED AS FOLLOWS:**

1. The Sale Motion is granted and approved as set forth and subject to the terms of this Sale Order.

**<u>The Sale Transaction is Approved</u>**

2. The Sale Transaction contemplated by the APA is approved as set forth and subject to the terms of this Sale Order.

3. The Trustee is authorized and directed to sell the Purchased Assets to the Buyer upon and subject to the terms and conditions set forth in the APA.

4. The Trustee is authorized and directed to perform, consummate, and implement the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take any and all further actions as may be necessary or appropriate to the performance of their respective obligations as contemplated by the APA or this Sale Order.

5. Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred, sold, and delivered to the Buyer free and clear of all Liens, Claims, Interests and rights of setoff and recoupment. All other Liens, Claims and/or Interests that existed against the Purchased Assets prior to the Closing shall attach to the sale proceeds the Trustee receives under the Sale Transaction. Those Liens, Claims and/or Interests will attach to the proceeds of the Sale Transaction in the same order of relative priority and with the same validity, force, and effect that the holder of such Lien, Claim and/or Interest had against the Purchased Assets prior to Closing (including, for the avoidance of doubt, in accordance with any other applicable Orders of this Court), and will be subject to any claims and defenses the Trustee may possess with respect thereto. The interests of the holders of such Liens, Claims and/or Interests are being adequately protected pursuant to the provisions of this Sale Order by

having their Liens, Claims and/or Interests, if any, in each instance against the Debtor's estate or any of the Purchased Assets, attach to the proceeds of the Sale Transaction ultimately attributable to the Purchased Assets in which such creditor or interest holder alleges an interest, in the same order of priority and with the same validity, force, and effect that such creditor or interest holder had prior to the Sale Transaction, subject to any claims and defenses the Trustee and the Debtor's estate may possess with respect thereto.

6. To the greatest extent permitted by law, as a result of the Sale Transaction contemplated by the APA, the Buyer will have no liability for any Liens, Claims and/or Interests against the Debtor's estate as a result of any application of successor liability or other theories.

7. Pursuant to Sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon Closing, and in accordance with the APA, the Purchased Assets shall be transferred to the Buyer free and clear of all liens, claims, encumbrances and interests, which are collectively referred to herein as the "Liens, Claims and/or Interests," which include, by way of illustration and without limitation, each of the following:

i. liens (as that term is defined in the Bankruptcy Code), including, without limitation, mechanics', materialmens', contractors' subcontractors', and other consensual and non-consensual liens and statutory liens, mortgages, hypothecations, charges, consents, judicial liens (as defined in the Bankruptcy Code), instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, Encumbrances, covenants, easements, servitudes, and liens and security interests granted under Sections 361, 363 and/or 364 of the Bankruptcy Code or an order of the Court;

ii. interests, obligations, liabilities, demands, agreements, guaranties, options, restrictions, contractual or other commitments;

iii. rights, including, without limitation, rights of first refusal, rights of offset, rights to use, contract rights, rights of recovery, and any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, consent, or termination of the Trustee's or the Buyer's interest in the Purchased Assets, or any similar rights, in each case with respect to the Sale Transaction;

iv. judgments and/or decrees of any court or foreign or domestic Governmental Authority or governmental entity (to the extent permitted by law);

v. charges or restrictions of any kind or nature, including, without limitation, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Purchased Assets;

vi. debts (as that term is defined in the Bankruptcy Code), including but not limited to, debts arising in any way in connection with any agreements, loan documents, credit agreements, indentures, acts, or failures to act of the Debtor;

vii. claims (as that term is defined in the Bankruptcy Code), including but not limited to, all rights to payment, damages, losses, demands, judgments, claims, causes of action, charges, assessments, liabilities, suits, investigations, litigation, third-party actions, claims for reimbursement, contribution claims, penalties, indemnity claims, exoneration or exculpation claims, Liabilities, setoff rights (to the greatest extent permitted by law), obligations, and claims and liabilities of any kind or nature under contract, agreement, understanding, or at law, in equity, or otherwise, whatsoever, whether or not reduced to judgment;

viii. to the maximum extent permitted by law, any other interest whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Debtor’s bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise.

8. No person or entity, including, without limitation, any federal, state, or local governmental agency, department, or instrumentality, shall assert by suit or otherwise against the Buyer or its successors in interest any Lien, Claim, Interest or right of setoff or recoupment that such person or entity had, have, or may have against the Debtor or the Debtor’s estate, or any Lien, Claim, Interest or right of setoff or recoupment relating to or arising from the Purchased Assets.

9. The Sale Order shall be binding in all respects upon the Trustee, the Debtor, the Debtor’s estate, the estate’s creditors, and all parties in interest, including any and all successors and assigns.

10. All entities holding Liens, Claims, Interests or rights of setoff or recoupment against the Purchased Assets shall be, and they hereby are, barred from asserting such Liens, Claims, Interests or rights of setoff or recoupment against the Buyer, its successors and assigns, and/or the Purchased Assets. All entities holding such Liens, Claims, Interests or rights of setoff or recoupment shall be deemed to have released the Purchased Assets to the Buyer and to have limited the assertion of their Liens, Claims, Interests or rights of setoff or recoupment against the Purchased Assets to the sale proceeds the Trustee and Debtor's estate receive for the sale of the Purchased Assets and any other available property of the Debtor's estate that does not constitute the Purchased Assets.

11. This Sale Order shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

12. All Liens, Claims and/or Interests of record against the Purchased Assets shall, upon Closing, be terminated as against the Purchased Assets, and all the entities described in the immediately preceding paragraph of this Sale Order are authorized and directed to (a) terminate all recorded Liens, Claims and/or Interests against the Purchased Assets from their records, official, and otherwise, in each case solely with respect to the Purchased Assets, and (b) accept

for filing or recording this Sale Order and all instruments made or delivered by the Trustee or the Buyer, and any other documents relating to the conveyance of the Purchased Assets to the Buyer.

13. If any person or entity that has filed statements, documents or agreements evidencing liens or claims on or in the Purchased Assets shall not have delivered to the Debtor or Trustee prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims and/or Interests that the person or entity has or may assert with respect to the Purchased Assets, the Trustee and the Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets or, at the Buyer’s request, such person or entity shall promptly execute and file such statements, instruments, releases, and other documents evidencing the release and/or satisfaction of such Liens, Claims and/or Interests.

14. To the greatest extent permitted by law, the Buyer may initiate Recovery Actions to recover and gain access to the Purchased Assets. The Buyer has the sole right to pursue and prosecute all Recovery Actions, at its own cost, and on its own behalf and as successor-in-interest to the Debtor’s estate and the Debtor. Any and all proceeds and recoveries from the Recovery Actions shall be the sole property of the Buyer. The Trustee, the Debtor, the Debtor’s estate and its creditors shall have no interest or claim to any proceeds and recoveries from the Recovery Actions. As provided in the APA, the Trustee shall provide reasonable good-faith cooperation to the Buyer in connection with its pursuit of the Recovery Actions, provided however that any such cooperation shall be at no cost or expense to the Trustee and the Debtor’s bankruptcy estate and, at no time, shall the Trustee be required to join as a party to any litigation

brought by the Buyer relating to the Recovery Actions. The Trustee further agrees not to interfere with the Buyer's pursuit of the Recovery Actions.

15. The Purchased Assets are not of inconsequential value or benefit to the estate. To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, and NordCap Advisors SA, such third parties shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law.

16. The Trustee and the Buyer, as applicable, are authorized to (a) take such action as may be necessary to implement the provisions of the APA and any other document executed in connection therewith, and (b) execute and file any necessary document with any governmental or regulatory unit. This Sale Order shall constitute all approvals and consents, if any, required by the laws of any state necessary to file, record, and accept such documents.

17. To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization and approvals with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Buyer as of the Closing.

18. The APA has been negotiated and executed, and the Sale Transaction contemplated by the APA has been undertaken, by the Trustee, the Buyer, and their respective representatives at arm's length, without collusion and in "good faith," as that term is defined in Section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the

validity of the Sale Transaction, whether or not the Buyer knew or knows of the pendency of the appeal, unless such authorization and such Sale Transaction are stayed pending appeal prior to closing. The Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of Section 363(m) of the Bankruptcy Code. Any designee or assignee of the Buyer that is an entity wholly owned by the Buyer shall be deemed a good faith purchaser entitled to all of the protections afforded by Section 363(m).

19. Neither the Trustee nor the Buyer has engaged in any conduct that would cause or permit the APA or the Sale Transaction to be avoided, or damages or costs to be imposed, under Section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Purchased Assets under the APA is fair and reasonable, and the Sale Transaction may not be avoided under Section 363(n) of the Bankruptcy Code.

20. To the extent there is a conflict between the terms of this Sale Order and the APA, the terms of this Sale Order shall control.

21. The Trustee is authorized to execute, acknowledge, and deliver such deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer, and to take such other actions as may be reasonably necessary to perform the terms and provisions of the APA and all other agreements related thereto and the Trustee is authorized to and shall take any other action that may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, and conveying any or all of the Purchased Assets.

**Additional Implementation Provisions**

22. The Court retains jurisdiction, even after the closing of the case, to interpret, implement, and enforce the terms and provisions of this Sale Order, the APA, and any other

Case 24-10594 Doc 323 Filed 07/27/26 Entered 07/27/26 17:16:07 Desc Main
Document Page 28 of 29

agreement executed in connection therewith. In addition, to the extent permitted under applicable law, the Court retains jurisdiction even after the closing of the case, with respect to all other matters arising from or related to the enforcement of this Sale Order, including to:

(a) protect the Buyer, or any of the Purchased Assets, against any Liens, Claims and/or Interests;

(b) resolve any disputes arising under or related to the APA, the Sale Transaction, or the Buyer's peaceful use and enjoyment of the Purchased Assets;

(c) adjudicate all issues concerning all Liens, Claims and/or Interests in and to the Purchased Assets, including the extent, validity, enforceability, priority, and nature of all such Liens, Claims and/or Interests; and

(d) adjudicate any and all issues and/or disputes relating to the Trustee's or the Buyer's right, title, or interest in the Purchased Assets and the proceeds thereof, including any action, suit or proceeding brought by the Trustee or the Buyer to compel turnover of the Purchased Assets, including but not limited to, and to the greatest extent permitted by law, any action under 11 U.S.C.§ 542, any other provision of Chapter 5 of the Bankruptcy Code related to the Purchased Assets or applicable law.

23. The provisions of this Sale Order are nonseverable and mutually dependent.

24. Except as may be expressly provided in this Sale Order or the Sale Procedures Order, nothing in this Sale Order shall alter or amend the APA and the obligations of the Trustee and the Buyer thereunder.

25. The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the efficacy of such provision.

26. This Order shall be effective and enforceable immediately. The Court finds that time is of the essence to the Buyer's ability to preserve and recover the Purchased Assets and that good cause has been shown to waive any stay of this Order. The provision of Bankruptcy Rule 6004(h) is waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the APA immediately upon entry of this Order.

Dated: July 17, 2026

Janet E. Bostwick
United States Bankruptcy Judge

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

In re: ) Chapter 7
)
JASON M. KAHAN, ) Case No. 24-11592-JEB
)
Debtor. )
--------------------)

Transcription of File:

TR0030_IT11815_2024-10-08 (16h52m26s)

October 8, 2024

(Beginning of Audio Recording)

MR. LASSMAN: This is the first meeting of creditors in the case of Jason M. Kahan, Case No. 24-11592. Mr. Kahan, I made some announcements prior to the case. Were you present to hear those?

MR. KAHAN: Yes. I was.

MR. LASSMAN: Okay. So, Mr. Kahan, if you could kindly raise your right hand. Mr. Kahan, do you solemnly swear the testimony you're about to give is true and correct?

MR. KAHAN: I do.

MR. LASSMAN: And can you please tell me your name?

MR. KAHAN: My name is Jason. Last name is Kahan.

MR. LASSMAN: Okay. And Mr. Kahan, do you have a copy of your last name?

MS. CRUICKSHANK: Mr. Lassman?

MR. LASSMAN: Yes.

MS. CRUICKSHANK: I'm sorry. This is Kate Cruickshank. I'm represent -- I accidentally disconnected myself when you went to ask for appearances. So I just wanted to let you know that I am here at on behalf of Harry Murphy, who's the trustee of WJH Elm Street Somerville LLC, the

corporation in Chapter 7 of which Mr. Kahan is the principal.

MR. LASSMAN: Oh, okay.

MS. CRUICKSHANK: I'm sorry for interrupting.

MR. LASSMAN: No. It's okay. Not a problem. Thank you for letting me know you're in attendance.

So, Mr. Kahan, do you have a copy of your electronic declaration form in front of you?

MR. KAHAN: Yes.

MR. LASSMAN: And does it contain your original signature? Mr. Kahan, I couldn't hear you. You may be too far from the phone.

MR. KAHAN: Yeah. Yes. It does. It does.

MR. LASSMAN: Okay. And had you reviewed all your bankruptcy papers before you signed that document?

MR. KAHAN: Yes. I have.

MR. LASSMAN: Okay. And was everything, was everything true and correct at that time?

MR. KAHAN: Yes. It was.

MR. LASSMAN: All right. And at this time, sir, is there anything that you feel you would like to -- anything you would like to change on your

bankruptcy petition at this time?

MR. KAHAN: Nope. I'm looking at my -- no. There's not.

MR. LASSMAN: Okay. All right. If you bear with me for just a moment, I'm looking for the identification that was sent to me by your counsel and just going to draw that up right now.

So, Mr. Kahan, can you please tell me the last four digits only of your Massachusetts driver's license?

MR. KAHAN: My driver's license is 1051.

MR. LASSMAN: And then the last four digits only of your Social Security number.

MR. KAHAN: 3987.

MR. LASSMAN: Okay. That matches the information supplied to me by your counsel in advance of the meeting.

Sir, if you -- what was the reason for this bankruptcy petition filing?

MR. KAHAN: Delay in auction.

MR. LASSMAN: An auction of what?

MR. KAHAN: Primary residence.

MR. LASSMAN: So I'm looking at your -- I'm reviewing your bankruptcy schedules now and foreclosure sale that you're referring to, was that

for the property in Boxford, Massachusetts?
MR. KAHAN: Yes. Yes. It was.
MR. LASSMAN: Okay. Do you have any motor vehicle, sir?
MR. KAHAN: I do not.
MR. LASSMAN: So how'd you get to your attorney's office today?
MR. KAHAN: I Ubered.
MR. LASSMAN: Attorney Levine,
MR. LEVINE: I'm going to interject. His license was suspended by the DOR.
MR. LASSMAN: Oh, okay. So, Mr. Kahan, you've heard what your counsel said. Would you agree with that?
MR. KAHAN: Yes. I would.
MR. LASSMAN: Okay. And why was your license suspended?
MR. KAHAN: For outstanding tax liability.
MR. LASSMAN: When did that suspension occur?
MR. KAHAN: So it's been on and off. It's kind of intermittent. And it's -- I believe it was about a year and a half to two years ago. I've been actively working with both DOR and the federal -- and the IRS for the past five or six years.

From a -- not from a tax perspective, but as a witness to -- an expert witness to what resulted in a conviction of a criminal that's in jail right now.

MR. LASSMAN: What would that have to do with your driver's license?

MR. KAHAN: Basically, I was advised to amend tax returns. My -- resulting in being a witness and having someone convicted with a tax evasion and multiple other things was a full-blown audit.

So I've been struggling from the time that I was audited. My CPA at the time recommended that I discharge all my legitimate expenses for my consulting engineering business, small consulting engineering business, which I did, you know, looking back was not the right thing to do.

I have an attorney engaged dealing with that, a couple different attorneys dealing with getting my amended tax returns done. I think it was from '16, '15. I haven't been able to fully clean up the mess that's as a result of what transpired from what was an identity theft.

MR. LASSMAN: Okay. So, when did this identity theft occur?

MR. KAHAN: Roughly 2010, I believe. It was between '10 and '12.

MR. LASSMAN: So you said that you had to discharge your expenses. I don't know what that means. Could you explain that to me?

MR. KAHAN: Well, I guess I can set the story. In roughly, 2010, it might have been before that I was approached by a colleague to purchase a property in Cambridge. An entity was established. That purchase never happened. That partner kept the entity open under my name, my Social, all my information for the next ten or twelve years.

Never paid taxes on any on that entity. Ran about -- I don't know the exact amount, somewhere above $60, $70 million throughout that account in my name.

I was approached by the IRS Criminal Investigation Division and quickly realized that it was not my entity, worked with them, identified multiple bank accounts that were opened up in my name, worked with the federal government and the prosecutors the prosecutors in Boston and the IRS criminal division.

To clean that up, while I was doing that, I was fully audited. My CPA at the time, who was probably 90 years old at the time, advised me the easiest path to go would be to discharge me, like, all

my expenses that were legitimate, you know, my consult- -- I have, you know, 1099 employees at the time that I write off. It's a legitimate expense. Had me just remove all my expenses, refile the tax returns because he thought it would be easier to do that while we're dealing with the prosecutors and the criminal case and the grand jury and testifying and all that stuff and deal with the tax liability later.

That tax liability was like $200,000, and I've been working with a series -- I worked with Rockford. They're in Connecticut. They're a CPA law firm. I worked with Attorney Walter Flowers at Beverly, several other attorneys to try and rectify this.

And the agents that I was working with, of course, are not promoted and not in the Boston office anymore, so it's not been easy to pull it together. I've had several CPAs engage, take large retainers, and not finish the job. Wired 40 something thousand dollars out of my account to report it.

It's been a difficult challenge. I'm pretty much there now. There, meaning completed with a cleanup, new CPA who has filed return. Of course, I can't get ahold of them with the deadline, but filed my current taxes. I think I'm -- I think my last

filing was in -- well, before we just filed 2020. So getting everything cleaned up and current, working with the IRS who has a levy on my primary residence, we had a -- not a settlement, but workout agreement with them.

And I was dealing with IRS first, and then we deal with DOR later. But my tax obligation to DOR is, like, $20 some odd thousand dollars, of that, you know, that came as a result of that amended tax return.

MR. LASSMAN: And what about the --

MR. KAHAN: I apologize for --

MR. LASSMAN: -- what about the liability of the IRS? You listed it at $400,000. Is that not accurate? Is it now some much smaller number?

MR. KAHAN: No. Right now, it's -- now, it's even higher. That's the IRS. DOR --

MR. LASSMAN: No. That's what I'm talking about. Let's talk about the IRS.

MR. KAHAN: IRS continues to grow because it's two different departments. We have a -- we have a -- I won't say settlement, but like, it was a $75,000 agreed upon payment. But it just -- it's a accruing interest, accruing penalties, and we're up to -- I haven't been able to take care of that.

MR. LASSMAN: I don't understand what you mean by we have a $75,000 payment. What does that mean?

MR. KAHAN: My attorney, who's a CPA tax, you know, the CPA that deals with the IRS, worked out a payment of $75,000 in lieu of, you know, under the under the circumstances, the situation with a file -- you know, a CPA advice of, you know, removing a legitimate tax, illegitimate expenses.

So what I was told to do is amend the taxes back to what they were and pay $75,000 and then kind of fresh start over. And I have not yet been able to do that, but that's the ultimate goal. While that's not being rectified, the interest is still accruing.

MR. LASSMAN: No, I understand that. So are you telling me that you plan to file amended returns, putting -- reversing the advice of the 90-year-old CPA to, put the expenses or claim the expenses, the deductions, legitimate deductions, and you're going to offer the IRS a payment of $75,000 in exchange for which it will say that all your past due obligations are satisfied and forward and remove its liens.

MR. KAHAN: That's the goal. I haven't quite gotten there yet, but we're really, really close. Closer than I've been.

MR. LASSMAN: When -- close to what?

MR. KAHAN: So it took me, I don't know, two or -- two years or three years to get all of my documentation from that CPA. It was my CPA for about twelve to thirteen years. He wouldn't give me any of my -- the work that he had done for me and my company at the time.

MR. LASSMAN: Yep.

MR. KAHAN: I got it. Had to get -- had to go and engage a new CPA and deal with this big mess that involves criminal activity, not on my part, but others.

Extremely difficult to find somebody that wanted to dive into this mess and deal with the IRS after I was just a star character witness. It's been a challenge. I'm and you know, I'm just a sole -- you know, I have a -- I'm a one man band and I don't have a corporation.

Everybody that I've interviewed, CPA wise, wants a couple $100,000 a retainer, which doesn't really make sense for me. I don't really have or can't justify spending that.

All of the criminal stuff and all of that has already gone away. It's pretty simple, and it's just a lot to get your arms around if you haven't been

my CPA for ten, twelve years prior.

MR. LASSMAN: Do you have the $75,000 set aside for the IRS?

MR. KAHAN: No. I don't.

MR. LASSMAN: Do you have any money set aside for the IRS?

MR. KAHAN: I do not. When you say set aside, no.

MR. LASSMAN: For the settlement. You said you have a settlement with them. You got to pay $75,000. Do you have any money set aside to pay them?

MR. KAHAN: I do not.

MR. LASSMAN: When does it have to be paid by? Is there a date, a month, a year, anything?

MR. KAHAN: It's -- no. So it should be paid in lump sum. The interest is accruing because I have not, you know, honored that on my side. So I have to go back and probably have my lawyer renegotiate the settlement agreement.

Obviously, everything's hinging on one important occurrence here that we'll probably get into on the next question. But --

MR. LASSMAN: So, do you have an interest in a project of any kind involving property at 141 Walnut Street in Somerville?

MR. KAHAN: Yes.

MR. LASSMAN: So tell me about that.

MR. KAHAN: It's a project that I bought before pandemic, refinanced multiple times, have been part of a lawsuit involving that with private lenders. So it's all probably documented and you know? And I still own it. It's -- the debt is extremely high on it.

And what I did to kind of save, you know, save anybody taking a real a major loss is entitle the project in value add so I could at least get the first position lender made whole.

MR. LASSMAN: I'm sorry. I have no idea what you just said. I don't understand a word you just said.

MR. KAHAN: So the property is the -- it's a project that it consists of an existing four-unit, large structure, weird structure. It's -- I think I've owned it for, like, six or seven years. It's been running at 12 percent or more, refinanced multiple times. I've recently entitled or permitted it through the City of Somerville.

I'm still going through that process, almost done, to convert it to 10 unit -- sorry, 12 units and then sell the project, which will essentially make the

bank or a current lender whole. Like, there's no equity in it if that's what you're asking.

MR. LASSMAN: What's the name of the entity that owns that?

MR. KAHAN: Let's see. Switched a couple times. I think it's -- got a strange one. Let me look it up. I think it's 141 Development.

MR. LASSMAN: You got a name there, maybe?

MR. KAHAN: I believe it's -- oh, yeah. Yeah. The official name, and I just need a -- need a couple. Right. Walnut Street 141 Development, LLC.

MR. LASSMAN: Say that again. Walnut?

MR. KAHAN: It is a member of Walnut Street. Street is spelled out 141 Development.

MR. LASSMAN: Okay. And you said there's a mortgage on the property?

MR. KAHAN: There is.

MR. LASSMAN: Did you personally guarantee it?

MR. KAHAN: Yes.

MR. LASSMAN: Is that listed on your bankruptcy petition?

MR. KAHAN: Actually, excuse me. I misspoke. I'm not 100 percent certain I have a personal guarantee on that -- on that project. I'm

not sure -- I could be incorrect.
MR. LASSMAN: Okay. Is that creditor listed on your bankruptcy?
MR. KAHAN: No. He's -- no.
MR. LASSMAN: Who is the creditor?
MR. KAHAN: MSA Mortgage.
MR. LASSMAN: Okay.
MR. KAHAN: Out of Winthrop.
MR. LASSMAN: And is it your testimony that the value of the project is more or less than the mortgage held by MSA Mortgage?
MR. KAHAN: Currently, significantly less.
MR. LASSMAN: So no equity. Is that correct? No equity?
MR. KAHAN: That's correct. No equity.
MR. LASSMAN: Okay. How about a property at Zero Malvern Avenue?
MR. KAHAN: Yep. Yes.
MR. LASSMAN: What's the name of the entity there, and is there equity?
MR. KAHAN: It's Zero Malvern LLC.
MR. LASSMAN: Okay.
MR. KAHAN: Same situation with that one. Right now, it's negative equity.
MR. LASSMAN: All right.

MR. KAHAN: I'm working with the lender to permit and entitle it.

MR. LASSMAN: Who's the lender?

MR. KAHAN: Lender is MSA Mortgage.

MR. LASSMAN: Oh, same lender.

MR. KAHAN: Yes.

MR. LASSMAN: How about 24, 26, 28 Cross Street?

MR. KAHAN: Yes. Same exact scenario.

MR. LASSMAN: Okay. And what's the name of the entity? I'm sorry. Are you looking for that?

MR. KAHAN: Yeah. I'm looking for that. I'm sorry.

MR. LASSMAN: While you are looking for that, I want to go back to Malvern Avenue. You said the name of the entity is Zero. Is that spelled out, Z-E-R-O?

MR. KAHAN: Spelled out. Yes.

MR. LASSMAN: Okay.

MR. LEVINE: It's listed in the statement of affairs, Don.

MR. LASSMAN: I see it. I see it. I don't see this one either. I don't see 24, 26, 28 Cross, though.

MR. KAHAN: But because I -- see if I may

have relinquished my interest in that, it's showing us -- I just need to give me one minute.

MR. LASSMAN: What are you looking at?

MR. LEVINE: His complete.

MR. KAHAN: I'm looking at my -- like, looking at the bank notes from the lender. I'm looking at the mortgages. Cross is 28 Cross LLC. Pretty easy.

MR. LASSMAN: Okay. Same lender?

MR. KAHAN: Same lender.

MR. LASSMAN: How about 16 Boston Avenue?

MR. KAHAN: 16 Boston Avenue, I am not a personal guarantor, and I am -- same lender, similar ordeal, but I'm not personal guarantor, and I don't have any of the percentage of the interest of that property.

MR. LASSMAN: Okay. So you have no interest in that?

MR. KAHAN: But it -- no. But I am work- -- but I am working on it currently for the same purpose of completing it, get it permitted, and getting the bank -- the bank paid in full.

MR. LASSMAN: Why do you care if you're not -- if you have no ownership interest and you're not personally liable on the debt? Why are you -- are

you getting paid for the work you're doing?

MR. KAHAN: No. But I raised it -- I put the sponsor in place there, permitted it, found the project, linked them up with the lender. So I have an obligation, ethically. I'm also the engineer of record on the project, so, like, I got to see it through.

And I don't want to I don't have anybody take a discount payment as long as everybody's fair with their interest. Everybody gets paid back.

MR. LASSMAN: So you don't expect to receive any money upon the liquidation of that property?

MR. KAHAN: No.

MR. LASSMAN: And is there any equity in 24, 26, 28 Cross that may come your way?

MR. KAHAN: No.

MR. LASSMAN: How about 62 Elmwood Street?

MR. KAHAN: Yes. I am not a personal guarantor. Same deal at 16 Boston.

MR. LASSMAN: So no interest?

MR. KAHAN: No interest. Nothing coming to me from that. I'm the design professional of record. I put the deal together.

MR. LASSMAN: Do you receive any compensation from your work on Elmwood or Boston Ave?

MR. KAHAN: I would have, but no. I'm not going to.

MR. LASSMAN: When you say you would have, what does that mean?

MR. KAHAN: So that's been bank, lender, and sponsor had their own issues with construction funding. More on the bank side. So I've sat for quite a while. Had it gone as planned, I would have been compensated for my work. But essentially, they're all in pre-foreclosure right now.

MR. LASSMAN: Oh, all those projects we just went over in pre-foreclosure?

MR. KAHAN: Every single project or anything that I'm tied to is in in -- all of MSA except for one, WGH is all in pre-foreclosure. And the goal here for me is to get all the first paid in full and move on. I'm not going to receive an offer from any of these. I'm just hoping not to have to be paying anything.

MR. LASSMAN: Okay. So you're in some lawsuits, or you have a number of lawsuits listed. I was curious, why are you being sued by Alexis G. Malkin?

MR. KAHAN: That's a frivolous condo association lawsuit for a project that I did seven

years and six years -- seven years ago.

MR. LASSMAN: Okay.

MR. KAHAN: For, like, some sort of siding deficiency.

MR. LASSMAN: How about CSLF Servicing LLC? They're suing you. What's that about?

MR. KAHAN: Well, that was a pandemic related commercial lending kind of mess that I -- doing each other there, but that lawsuit settled. I defaulted on the settlement.

MR. LASSMAN: Okay.

MR. KAHAN: So now it's back to the -- there's adjustment on that. But we got it settled for fair for both sides, and which I'm planning to take care of as soon as I stabilize.

MR. LASSMAN: Is that a CSL listed as a creditor on your bankruptcy? CSLF?

MR. KAHAN: Yes. Yes.

MR. LASSMAN: Financial Services doing business as a check exchange. Why are they suing you?

MR. KAHAN: That is for a similar scenario. That same CSLF was involved with that, cut a check -- it's a long story. Cut a check to a particular subcontractor who went to a check cashing facility for 50,000 and attempted to cash a check. I stopped

payment on it. I was working as a consultant for the lender.

It's kind of similar to what I'm doing, but they had -- they put me on to the LLC as the manager. It was a post-foreclosure workout, so I was working with the bank post foreclosure. So because I was on the entity of the LLC, I got sued by the check casher because I stopped payment on the check.

MR. LASSMAN: Precision -- Precision Pool Construction, why are they suing you?

MR. KAHAN: That's already been taken care of.

MR. LASSMAN: What's that mean?

MR. KAHAN: Like, $300 and it's already been paid.

MR. LASSMAN: QL Boston LLC?

MR. KAHAN: That's another condo association lawsuit that I never was properly served and ended up in a judgment. I found out later when they (inaudible) an attachment on my house.

MR. LASSMAN: Got it.

MR. KAHAN: So plan was to go back and fight that one.

MR. LASSMAN: Okay. You've estimated earning -- what's the status of your tax returns? I

think you said your last tax return was 2020, or was it some other year?

MR. KAHAN: So 2020 except that I've been working the last, you know, like I said, I don't want to testify that they've been filed until I get the word for my new CPA who has not called me back, but I am almost certain I've got 2022, 2023 filed. And 2021, '22, '23, all extensively bad years.

Don't have the mess from prior cleaned up, but at least got forward, you know, got those -- got those straightened out.

So I don't have them to hand to my attorney here, but as soon as -- I mean, we're facing an October 2015 deadline. He has not returned my call, but I should have that, like, I get to Attorney Levine, any day.

MR. LASSMAN: Attorney Levine, you'll send those to me when you get them, please?

MR. LEVINE: I will do that.

MR. LASSMAN: Okay. So, you say you have a claim against First Boston Associates, amount unknown. What is that?

MR. KAHAN: Not a claim. We -- so he's got a lien on my house that should be gone, which we have a -- we have a property that, it was, we did a CD on

it.

It has to -- it has to be sold in East Boston, that we have a contractual agreement on for whatever. I can send it to you. It's above and beyond. I don't have the numbers right in front of me, but or nor do I know the appraised value or what it's worth today. But I am supposed to be receiving above and beyond. I think it's 4,200,000 above that. 50 percent comes to me. But I don't control the sale of it.

MR. LASSMAN: Right. Right. So explain. Barry, have you seen the paperwork on this? I, again, do not understand anything the debtor just said.

MR. LEVINE: No. I'll have him give it to -- send it to me, and I'll send it to you once I get it.

MR. KAHAN: Okay.

MR. LEVINE: I have no clue.

MR. LASSMAN: So, Mr. Kahan, you're saying that there's a project in -- where's this project located?

MR. KAHAN: So it's 227. The spelling of the street is H-A-V-R-E, Street. It was a multifamily development that I developed, and I permitted and developed working with First Boston right before the

pandemic or right entering.

First Boston is a large, you know, private lender local where he's done, I don't know, 50 or more projects with, where he agreed to retain the property.

He has, you know, thousands of units in East Boston stabilized that he rents out. He would control that and hold on to it because it was not sellable at the time. The market was not there going into the pandemic. Nobody was buying.

He would retain it, rent it, and lease it out, and then, sell it, sell the property, and he would split whatever came above and beyond the contractual number, which I don't have in front of me, but I'll give to Attorney Levine.

So I can't tell you if there's going to be anything coming from there. If there's not, it's been about four or five years.

MR. LASSMAN: So, you negotiated a deal with him to allow him to warehouse the property, basically, until the market was better, then he sells it. And if he gets in excess of a certain amount, then there's a split of the funds over and above that.

MR. KAHAN: Exactly.

MR. LASSMAN: Okay. And how do you -- how does he account for what he receives?

Like, does this every day he sells you -- does he sell send you something every month? Oh, I sold three units today. We're now at 100,000. Like, how's that work?

MR. KAHAN: No. No. No. They're going to -- the intention is to sell the building as a whole, leased out. At least, I don't have any involvement.

He's the operator-owner of everything at the LLC that owns it. The contractual obligation is to -- there should be a time limit on it. I don't know it off the top of my head, but there's a predetermined number. I believe it's 4,200,000. We have an appraisal done, and then we put it on the market.

Other than that, he's collecting the rent, and I'm not getting -- I've got nothing out of that. It was a pretty significant loss that I'm hoping to regain when it's sold.

MR. LASSMAN: And do you know -- so the name do you have the name and address of this person so I can communicate -- I can communicate with this person? Is it in the documents you're going to be sending me?

MR. KAHAN: He's an attorney. Does it --

MR. LEVINE: Braunstein?

MR. KAHAN: Braunstein.

MR. LEVINE: Yeah. They represented by Rimmer and Braunstein.

MR. LASSMAN: So do you have any reason to believe -- do you have reason to believe --

MR. KAHAN: Alan.

MR. LEVINE: Alan Braunstein.

MR. LASSMAN: Oh, okay. Whoever. The only reason to believe that First Boston Associates would not -- would refute this agreement or dispute it in any way, or do you think it's just a question of when he gets around to selling the building?

MR. KAHAN: It is 100 percent memorialized the proper way. They would not -- they act and operate like a bank. They will talk to you, and I think it's just a function of when to sell it. They have it leased out to an airline? So it's fully leased out all the time is what I heard.

MR. LASSMAN: Okay.

MR. KAHAN: I don't know when.

MR. LEVINE: You know? It it's dead on its wall. He's making money on the building, so he's got no, no incentive to sell it.

MR. LASSMAN: Well, the only incentive is what you put in the agreement. You said there was a date by which he has to sell it.

MR. KAHAN: Yeah. That seems incentivized by that. You're right.

MR. LASSMAN: Okay.

MR. KAHAN: I don't know what that is, but we'll know within the next hour.

MR. LASSMAN: All right. So, yeah. Send those documents over to me, please.

MR. KAHAN: I will.

MR. LASSMAN: Okay. So, then, you have the you have the 100 custodian of Bitcoin listed. So, let's talk a little bit about that. Hold on one second.

Ready? Yeah. Hold on just a second. Get my file together here. Just pulling my file.

So, I guess my -- got a series of questions here, but my first question is, aside from the Bitcoin that is identified on your bankruptcy schedule, have you ever had, controlled, owned, purchased any other cryptocurrency of any kind?

MR. KAHAN: No. No. Never have and not an active investor. One time.

MR. LASSMAN: So, this Bitcoin, maybe, if you could tell me when you started using this, when this -- when this happened chronologically, I think is the best way to roll me through this.

MR. KAHAN: Okay. I'm going to try and abbreviate this crazy story. So I don't have the dates in front of me, but I purchased somewhere around the holidays, Christmas, New Year's of 2012.

MR. LASSMAN: Okay.

MR. KAHAN: I bought, you know, at a party or function with a much younger, younger brother, approximately $30,000 of cryptocurrency. And you know, in all honesty, my wife was not happy with that, so it took me about two to three weeks to figure out how to sell it, because it was not -- we had no experience in it.

I sold it. I'm pretty sure you have a report that has all this, but I'm doing my best. But I went up enough to have to pay the IRS, somewhere around $19,800, I think it was, somewhere around that.

So there was a profit on there. The profit there, I made money. I paid higher -- I took care of tax. I bought more after I replaced the money I used with my -- with our combined account back then. So wife was not mad at me buying more.

I bought more with the profit, took care of tax obligations. And then, that was all within between, December and March, like, 2012, 2013. It's all, like, you know, and the government's stuff,

treasury report.

From that point, I never was experienced in it. It went down significantly. It wasn't something I even --

MR. LASSMAN: Let me stop you there. Let me stop you there if you can remember. So when you said you bought more, where was the more? Where did it reside? Did you have an account? And --

MR. KAHAN: The more was -- yep. So it was in the custodian. One of them was Mount Gox (phonetic). One of them was Coinbase. Also should be in that Luca report.

Not 100 percent certain where it is besides, like, my --

MR. LASSMAN: No. At the time. At the time. At the time. I'm just saying at the time, your testimony would be --

MR. KAHAN: At the time, it was Mount Gox, and I lost -- I lost the access to it, 20- -- early 2013, and never thought about it again.

MR. LASSMAN: No. So stop there. Stop there. Stop there. So you bought some stuff with your brother, younger brother.

Wife wasn't happy. Sold it. Made some money, enough to pay the IRS and some profit. Had the

profit. You bought some more in December to March of 2012, 2013. Do you remember the value of what you invested at that time?

MR. KAHAN: So I replaced 30,000. I wish I had the Luca report in front of me. I think it was, like, it was somewhere it went around from, like, $15, a Bitcoin to, like, 37 and it went up.

MS. CRUICKSHANK: Okay.

MR. KAHAN: So I had 2,000 Bitcoin is what I purchased.

MR. LASSMAN: Okay.

MR. KAHAN: What I was left with after.

MR. LASSMAN: And this Bitcoin was deposited into a wallet at Mount Gox?

MR. KAHAN: Mount Gox or Coinbase was working with both of them.

MR. LASSMAN: Oh, you're working with both of them. Okay. So you had you had a wallet. You had a key. That was your Bitcoin. It was in your -- you controlled the credentials to get that Bitcoin back if you wanted to the next day because your wife would get mad again. Right?

MR. KAHAN: Exactly. You're smart. Exactly. I bought it again after she --

MR. LASSMAN: Yep. I understand. And so

then that 2,000 Bitcoin was in Coinbase or Mount Gox. It was in one of those two and then you forgot about it. Is that what your testimony is?

MR. KAHAN: I didn't forget about it. I never -- I always needed assistance to do anything with it, so everything happened on the holiday if you look at the chronologic -- chronology of it.

It was Christmas, New Year's, Saint Patrick's Day. It was all in my father's house at a at a function, you know, after a few cocktails. I'm just being 100 percent transparent.

After that, I never really could -- never accessed the account unless I had the assistance of my brother. And what happened at that time after, you know, I was warned by my wife not to buy more, I didn't win. I didn't gain. Broke even. Didn't lose.

I had just founded a company that scaled from 0 to 300, 400 employees. So, like, it was not on the, you know, chasing around cryptocurrency that I really didn't know anything about was not on the top of my list.

We were struggling with, you know, struggling to stabilize that company and get a controller and see if all of us -- so we were -- I lost my -- wasn't a key. It was a phrase or a

password to get in.

Have a couple emails back and forth with that exchange where they explained to me that it doesn't work. They don't have -- you can't recover your password. If you don't have it, it's gone.

And I don't -- you know, it took a while to understand that, but at the time, I was, you know, running a company that was, you know, rapidly expanding, and kind of out of control trying to get that. So it really was not important to me.

I didn't -- I didn't gain or lose. And I kind of out of sight of the mind, maybe --

MR. LASSMAN: So let me ask you a question.

MR. KAHAN: -- couple of emails and --

MR. LASSMAN: Let me ask you a question. So you have these 2,000 Bitcoin in one or other of these exchanges. And are you getting -- are there statements or anything of that kind that you were receiving and/or still have reflecting this ownership interest in these wallets or accounts?

MR. KAHAN: Part of -- yeah. Part of proving my custodial -- just to give you, like, a background too, I've been to the FBI. I've been to the United States Treasury, Criminal Investigations. I've been to anybody that listened to me, so I've been

through the proof of custodial ownership.

I have documents showing, like, I think it's a 1098 MISC, but it didn't -- you don't with crypto, you don't get --

MR. LASSMAN: Okay.

MR. KAHAN: It was different then. That was explained to me, but that should all be in the file, that could that -- may end up in another criminal or may not. But yeah, we -- I have a document. I think it was called a 1098 MISC, that just like, it didn't have the value if you were not getting charged interest. It was not like that. It wasn't like an interest bearing bank account. It just kind of sat there.

MR. LASSMAN: And this document, it --

MR. KAHAN: I didn't know what it was. Yeah.

MR. LASSMAN: The document, it was from when?

MR. KAHAN: I think I would get one every year.

MR. LASSMAN: Okay. So this was the document you were using to establish your ownership interest and had -- when did you lose the keys that you needed to access these items?

MR. KAHAN: 23rd, like, right after I bought -- shortly thereafter my second round. Okay. It was a key phrase or something like that.

MR. LASSMAN: So once you lose the keys, what do you do? Do you find a new key? What happens?

MR. KAHAN: You know, I even, like, I'm pretty certain that I filed an attorney general complaint against the -- like, back in '13. I tried to dig it up because they wouldn't reset my password for me --

MR. LASSMAN: Yeah.

MR. KAHAN: -- they explained to me that's not how it works. I had zero knowledge in it.

MR. LASSMAN: Okay. All right. So okay. Okay. So then let me ask you a question.

You don't have the key to this, so you can't get access to it. Right? That's what I'm hearing you say. Right?

MR. KAHAN: This Bitcoin, it's not still at the same place. There's a story continues with --

MR. LASSMAN: No. No. I know the story. Okay? I know the story. Okay? But let me ask you the question.

MR. KAHAN: Yep.

MR. DE GIACOMO: So what I'm asking you is

if you don't have access to it, how does anybody have access to it? Like, if you can't get it, nobody can get it. Right?

There's a key. Either you have the key or you don't. Right? Or am I wrong?

MR. KAHAN: In theory, yes. But that's not the case here. We -- the key we do have -- I don't have the keys, but the consultant I hired to help me with, in the very beginning in 2022, has the keys.

MR. LASSMAN: Wait. Wait. So let me -- so here's where I'm -- hold on a sec. Stop talking. So here's where I'm confused. And just because I don't do a lot of this, but let me -- I want to make sure that we -- that I have it right.

So what I'm hearing you say is that some -- in 2013, you set up these or these two accounts, and I guess there would be two keys and you lost those keys.

And then in 2022, a consultant found the keys. Is that a fair statement?

MR. KAHAN: Fair.

MR. LASSMAN: Fair. Okay. And the consultant is Hunter Penn?

MR. KAHAN: Yes.

MR. LASSMAN: Okay. And he found the keys because you hired him to do some things on your

computer and he came across these keys?

MR. KAHAN: I hired him to help with that identity theft thing that I mentioned to you.

MR. LASSMAN: Yep. Yep. I got it. And that's in 2022?

MR. KAHAN: He was not hired for -- yeah. He would -- yes. He was not hired for the Bitcoin.

MR. LASSMAN: I know that. I know that. You don't know anything about it. You hired him to help you with the identity theft. And did you say the identity theft originally happened in 2010, or was that another identity theft? I thought there was something in 2010 also.

MR. KAHAN: I think they're linked together. I've never -- I can't really tell you, but this is another banking hacker using my account. Not as big of a deal, but --

MR. LASSMAN: Okay.

MR. KAHAN: -- still has caused me tremendous issues.

MR. LASSMAN: Right. So you hire under Penn at the advice of a banker at Bank of America?

MR. KAHAN: Exactly.

MR. LASSMAN: Right. Okay. And this banker at Bank of America, does he still exist, or is he just

a cipher? He doesn't exist anymore.

MR. KAHAN: Nope. He's the branch manager at the Bank of America. We've already -- with that. In Beverly. Yeah. Okay.

MR. LASSMAN: He's still there.

MR. KAHAN: He will deny. And so he's still -- I don't know if he's still there, but they subsequently closed all my Bank of America accounts. But I believe he is.

MR. LASSMAN: Okay. But would he admit or deny that he's ever spoken to you about this?

MR. KAHAN: Him and the Bank of America corporate attorneys will adamantly deny. It was a card in the lobby of the ATM foyer.

MR. LASSMAN: Oh, I see. Oh, okay. Okay. No. That's fine. That's fine. So the Bank of America branch manager do not recommend them to you. It's someone you found based on a card in the foyer at the Bank of America branch.

MR. KAHAN: Yeah.

MR. LASSMAN: Okay.

MR. KAHAN: One of my other clients that has had luck with him. He didn't directly -- I mean, we -- I thought the same thing you're thinking. I like how you think. Because we thought it was some

sort of conspiracy there, but no, he -- that didn't -- wasn't the case. So I'm pretty sure his name is Trevor Brooks, and he is --

MR. LASSMAN: Okay.

MR. KAHAN: -- pretty sure he's still in the Bank of America.

MR. LASSMAN: All right. But he had nothing to do with it. Trevor didn't say go use Hunter Penn. Okay. All right. That's fine. That's fine.

MR. KAHAN: She just said there's some cards in the foyer.

MR. LASSMAN: All right. So you used a card, Hunter Penn. Have you met Hunter Penn?

MR. KAHAN: So I've met -- I don't believe so. Now knowing what I know, I've met someone that either works with him or for him. I bought -- you know, he's helped me, my mother, my sister, my best friend helped a lot of people around me, including me. I don't think I've actually really met him.

MR. LASSMAN: Okay. So have you physically so -- okay. So what is the word met mean? So did you -- have you ever seen someone that says they're a Hunter Penn?

MR. KAHAN: In the beginning when I purchased hardware, I had someone that drops --

dropped items off to me that claimed to be -- I don't really recall, but I thought it was him. We didn't have a conversation. I -- looking, I know it's not -- it was not him.

MR. LASSMAN: Okay.

MR. KAHAN: But I've never seen him, never met him person face to face.

MR. LASSMAN: Okay. Well, wait. How if you've never met him, how do you know that wasn't him?

MR. KAHAN: Because he's African American and the person that came in was White. So there --

MR. LASSMAN: Well, how do you know Hunter Penn? How do you know how do you know Hunter Penn is African American if you've never met him?

MR. KAHAN: Because we've engaged some of the best intelligence firms in The United States to track him down. And I know -- we know everything about him.

MR. LASSMAN: Oh, okay. Okay.

MR. KAHAN: He got a mother. He -- mother's in Atlanta. He's here at Mass. His brothers -- we -- I can give you anything you need about him.

MR. LASSMAN: Okay. Okay. So you don't know this personally. You know this based on reports you've read?

MR. KAHAN: Yes.

MR. LASSMAN: Okay. And so this gentleman also goes by another name, Alex Colvin. Is that right?

MR. KAHAN: That is right.

MR. LASSMAN: Okay. So you met Hunter. I'm sorry. You didn't meet him. You got his card.

You communicated with him in some manner. Somehow, he got your computer. Right? Yeah. Right? Or did he not pick it up? Did he go in remotely or he'd pick it up physically?

MR. KAHAN: Never. Everything was remotely. Never physically. I purchased hardware from him that was dropped off, but he never took my computer. It was always remotely.

MR. LASSMAN: Okay. So the hardware that you purchased from him, is that what he used to access your computer or is that something else?

MR. KAHAN: That's something else.

MR. LASSMAN: That's something else.

MR. KAHAN: It's about, yeah. It's like a, you know, firewall. It's about hackers from getting into my computer.

MR. LASSMAN: Okay. So he had access then to your computer remotely. Right?

MR. KAHAN: Yep.

MR. LASSMAN: And your testimony would be that during that period of time in 2022, is that the right time period?

MR. KAHAN: I believe it was 2022. Yep.

MR. LASSMAN: Okay. Okay.

MR. KAHAN: I know when he turned it --

MR. LASSMAN: Go ahead. I'm sorry.

MR. KAHAN: I know when he initially mentioned it to me and asked me the same questions you're asking me. If I was involved with crypto, I said no. He said, are you sure about that? You know? I said, I don't know.

I don't have anything, so I don't remember. I don't have any accounts. A week goes by, comes back, asks me again. I say the same answer that kind of goes back and forth. Then finally, he comes back and tells me he's like, I'm telling you, you were at some point involved with cryptocurrency.

How do I know that? Because I've done an asset -- what do you call it? All of my digital forms of security would be a Bank of America was, my computer was loaded with malware and people were you know, my bank accounts were taken over. It's common thing. It's happening in a lot of America.

He solved all that. It didn't -- you know, to safeguard my asset within my computer, he found wallet files that I would -- it was on my Google Drive that I've had for 20 years.

You know, this is all coming after the fact that, again, I'm not -- I'm not a computer technology person. So, you know, he came -- he did -- he brought it to my attention. He's not like he could have stolen it at that point. I would never know.

MR. LASSMAN: Right. Okay. So during the course of his review or whatever, he came across -- he came across your stuff?

MR. KAHAN: Yes.

MR. LASSMAN: Okay. And so having come across it, then your testimony would be that he found it and now he controls it or some -- is that -- is that a fair statement?

MR. KAHAN: Yeah. So he found it.

MR. LASSMAN: Yeah.

MR. KAHAN: Again, it's kind of unclear what happened from the time that he took it out of where it is because we've never been able to make it back that far.

MR. LASSMAN: Okay. Okay.

MR. KAHAN: As far as the -- he's a

custodian of the -- he'll admit -- I'm assuming you've seen conversations with him. He's helping me make sure that I don't lose it. He's still -- and now he says he lost the keys with it, yeah.

MR. LASSMAN: Yeah. So I guess I'm so -- I'm confused by one thing, but maybe I now understand it. So your understanding is that in the course of helping you resolve your computer issues, he discovered this, and he said, hey. Because -- and you would have said, hey. I lost the keys.

And then he would have said, hey. I can help you recover. Is that kind of what was happening here?

MR. KAHAN: No. Because to be -- to be honest, I didn't even remember buying it. It was, like, ten years prior. He didn't ask me --

MR. LASSMAN: Oh.

MR. KAHAN: -- had keys. He just asked me if I was involved with crypto. I said no. Why? He said, just come across some stuff while I'm cleaning up your cyber issues and locking down your assets because I had, like, passwords on the computer and like, it wasn't that hard to get into my stuff.

MR. LASSMAN: Okay. So when did you find out that he had custodial access? Or how did that

come up? He just called you and said, hey. Good news. I've got -- I've got your crypto?

MR. KAHAN: Exactly. What -- exactly how it happened about July was July 2022 or July or August?

MR. LASSMAN: Great.

MR. KAHAN: You can get the date we booked it into a cold wallet.

MR. LASSMAN: Okay. All right. So he calls you up and said, hey. Great news. You've got -- I found this Bitcoin, and I've moved it into various wallets on your behalf or something.

MR. KAHAN: Into one wallet. Exactly.

MR. LASSMAN: Into one wallet. Okay. Okay. So now -- so then what's the next thing? Like, what happens then?

MR. KAHAN: So I say, you know, good job. He had just come off of finding unclaimed funds for me from, like, when I was in college in Worcester from years past and helping my sister. Like, he was a really good consultant. I didn't really -- didn't ring a bell, so I said, that's great. You know?

You're doing a good job. Like, you know, keep going. I didn't know that -- he said he told me once the good news. I didn't know how to even look it up or how to where to go. Didn't really ask, you

know, the value because, look, he found a bank account for me that had, you know, something significant in the Webster First Federal Credit Union, an account that opened in, like, 1990 or 2000 maybe. So --

MR. LASSMAN: Hold on. Hold on. Hold on. Hold on a sec. So, I guess my question is, when did you find out that there was value in this account? He tells you he has it. You think it's nothing. When do you think it's something?

MR. KAHAN: So, eventually, he gets extremely upset and frustrated with me. He's given me clear instructions on what to do, and I don't know how to do it because I'm not -- it's just not going to do it --

MR. LASSMAN: Wait. Wait. Instructions on what -- instructions on what to do what?

MR. KAHAN: He's placed the Bitcoin. He doesn't tell me -- I still, to this day, don't know exactly what he did, and neither does, like, if nobody --

MR. LASSMAN: Right. Go ahead.

MR. KAHAN: Tracked it back. But he put -- placed the funds in a cold wallet called a paper wallet --

MR. LASSMAN: Yep.

MR. KAHAN: -- for a place to put it temporarily. He instructed me to take it from there and put it into, I don't know, like, a Coinbase or nothing like that. A cold wallet by a -- so he gave me instructions on what to do.

MR. LASSMAN: Yep.

MR. KAHAN: I didn't even know how to look it up or where to go or not none of that. Like, you know, you'd have to be like a computer scientist to follow his instructions. Borderline personality issues, autistic.

MR. LASSMAN: So okay. But let's put that aside for the moment. So he tells you what to do. You can't do it.

He gets frustrated. So then what? He just -- that's it. Goodbye. See you later.

MR. KAHAN: No. He comes back to me and says -- comes back to me and says, if you're not -- he goes, if you're not going to move this, I'm going to take a percentage out of this as my consultant fee, and you're on your own.

MR. LASSMAN: Fine.

MR. KAHAN: Listed to me.

MR. LASSMAN: Fine.

MR. KAHAN: He does -- he does that. He

removes he removes 654 Bitcoin, I believe it was, from the wallet that he -- that he put -- that he deposited into. So he took 650.

MR. LASSMAN: Okay. So that's his fee?

MR. KAHAN: Self-proclaimed or self --

MR. LASSMAN: No. That's okay. That's right.

MR. KAHAN: I mean, that this --

MR. LASSMAN: That's -- yeah. But he says that would be his fee. Is -- and so the remaining 1,200 Bitcoin are yours or something?

MR. KAHAN: Exactly.

MR. LASSMAN: Okay. Okay. So does he give them to you? What happens?

MR. KAHAN: At that point, I asked him. I'm like, listen, man. This seems like a big deal. So he walked me through slowly for something that's not a computer, that how to search to see what it is. I go into Blockchain Explorer, shows me how to do it.

He walks me through, search the wallet address, and I see 1,200 come up. I thought it was $1,200. You know? And I'm like, you know, well, that's great. You know?

You're doing a great job. You found, you know, stuff that I would never have found. And but

that doesn't release or give me -- he doesn't -- he has had -- at that point, he was still pretty upset with me. Now he's charging me the fee -- then here's where the fees start happening. He -- I, at some point, received a key from him.

It wasn't valid because he locked the wallet down. I would never have been able to access it. And that's where, like, the start -- not ransom. But you know, pay you know, consulting fees for him helping me move my Bitcoin, and that's where it started.

I've spent a fortune. Probably the reason why we're talking, the main reason why we're talking is because of that. I didn't know any better. I, you know, as soon as I you know, it went on for probably six months with him saying, oh, give me a thousand dollars, and I'll get you -- I'll move it for you.

MR. LASSMAN: Did you give him the money? Did you give him the money? Did you give him the thousand?

MR. KAHAN: I did.

MR. LASSMAN: Okay. So you pay him. Okay.

MR. KAHAN: I paid him. I'm assuming you've seen the receipts and the proof of payment. It's over well over 1,500,000, I believe.

MR. LASSMAN: No. So I haven't seen any of

that, actually. So I don't know anything about that.

MR. KAHAN: So that should be coming from Attorney Cuccinelli. He asked me for that. There's a Dropbox file which has all of this info and all that. So, I've been to several law firms, several lawyers, several law enforcement agencies. It should be all in there.

MR. LASSMAN: So how did you have a million five to pay him? Like, where'd you get that money?

MR. KAHAN: So that's spread over. So if you look at it, you'll see it's mostly $2,000 to $1,000 payments. I brought a lot of people into it. I borrowed money, and there's a lot of people on the list here. Did whatever I had to do when I was depleted because it always felt like it's that close.

MR. LASSMAN: And so the idea was he would recover these Bitcoin for you that you've forgotten about?

MR. KAHAN: He had already done that. At this point, he already succeeded and been paid for that. Now it's just -- and you had an encrypt -- a dynamic encryption on this. If that means anything to you, it doesn't to me. But there was never anybody that would be able to move it but him.

MR. LASSMAN: Okay. That's fine. That's

fine. And so now he's in the wind. He's not talking to you, communicating with you?

MR. KAHAN: Oh, no. I talk to him on a daily basis multiple times, like, where -- he continuously asks me for money. But I explained to him I'm in bankruptcy, and you have all my money, including my Bitcoin.

MR. LASSMAN: And does -- so what does he need the -- I guess, I'm confused. What does he need the money for? Like, if he has it, what's the point?

MR. KAHAN: He does not touch the money. He does not -- excuse me. He does not spend my Bitcoin. At one point, he creates some sort of illusion where he moves it to steal fees from it, if that makes sense. It doesn't to me.

But he did it on June 24, moved 610 and then moved it back, but he was able to pay himself mining fees of, like, 140,000. It's in the Luca report. The only way he doesn't take money from my Bitcoin. He either gets paid by me, which can't happen anymore because I don't have any money, or he does something, like, where he pays himself a fee, but he's only done that a couple times, but he's also sent Bitcoin to Binance.

MR. LASSMAN: So, if he knows -- if he

know -- okay. So he calls you two or three -- he's calling you twice a day for money. You tell him I don't have any. He says, okay. Thank you.

Hangs up. Then he calls you again the same day. You tell him the same thing. So this just repeats itself over and over and over, twice a day, every day.

MR. KAHAN: He understands of who I brought into this deal that if I don't have money, there's still 10 people behind me that do. So I explained to him that in the real world, you get paid upon performance. I'm stupid enough to have paid you without performing, but now we have real lawyers, federal agencies. And this is what our problem -- this is what we're waiting for.

MR. LASSMAN: Okay. No. No. I got that. I got -- wait. But answer my question. My question is you have the same phone conversation twice a day every day.

MR. KAHAN: I talk to him constantly. I can talk to him right now. Yeah. And it's not always asking for money. It's him claiming to be working on recovering or generating the keys, which is not real.

95 percent of crypto thefts is hardware theft, which is --

MR. LASSMAN: Okay.

MR. KAHAN: But you read it out of, you know, whatever. Okay. It's not. He's fabricating a story.

MR. LASSMAN: Okay. No. I understand. I understand. Okay. All right. This Ken Cuccinelli, how'd you find him?

MR. KAHAN: So he's great. The intelligence firm that I hired to, they're, like, hostage and kidnapping. They were kidnapping young consultants, one of them in The US out of Texas, Hawkwood Intelligence. We'll have a relationship with Ken.

I'm fortunate to be linked up with Ken because he's the one that I've been to five law firms, two in New York, and like, to Boston who really struggled around proving custodial ownership.

I've been to the United States Treasury, the number one in command there. They helped me get to the point where I could provide Ken Cuccinelli with everything that was needed that he could look at it and sign his name, sign his blessing. Beyond a reasonable doubt. I got him from Hawkwood.

MR. LASSMAN: So you believe that you've established custodial ownership sufficiently or can or Ken has documents to establish that. So all you

really need to do is have Hunter Penn just give you the --

MR. KAHAN: Yeah. Yeah.

MR. LASSMAN: -- credentials to access the Bitcoin. We're all going to be happy here. And he would say that he's not a thief. He would just say, hey. I did you a good deed.

I found this for you, and we all go on our way. Is that kind of what -- that's kind of what he'd say?

MR. KAHAN: Yeah. Most confusing thing in this situation is the fact that he, being Hunter Penn, has never disputed the ownership. We'll explain to you what he did. He replied Bitcoin never said they're his.

MR. LASSMAN: Okay.

MR. KAHAN: Okay. And it's like so the proof of custodial ownership is kind of irrelevant. When he's got it, he'll tell you. You know, we've been around. I mean --

MR. LASSMAN: Okay.

MR. KAHAN: Smart enough to understand that I can't get the attention of -- there's no fact here, really, besides the Binance that he denies.

MR. LASSMAN: Okay. Okay. No. I got it.

I just try to just, like I said, just trying to keep a sense of what's going on. Okay. And so --

MR. KAHAN: It is a lot.

MR. LASSMAN: Yeah. Yeah. No. That's fine. But they're bright people, certainly smarter than me that are working on this.

MR. KAHAN: I have mentioned I'm being transparent as this comes out. I've mentioned to him that I am in bankruptcy. My wife is sick. I mean, I have paramedics in my house probably three to four or five times a week, and that I this is 100 percent direct result of what he's doing.

And I mentioned to him that I filed bankruptcy and that I would be discussing this with the bankruptcy trustee and my attorney.

You know, and I don't know what's going to be a result of it, but I am assuming it's not just going to be like, okay, Hunter. You can have whatever is left of the Bitcoin and there's not going to be anything of it. I've mentioned it to him that I'm in bankruptcy. I'm speaking to a trustee. I hope that's fine.

MR. LASSMAN: Yeah. That's -- I don't care. Barry, have you ever talked to Hunter Penn?

MR. LEVINE: Me? No. Not at all.

MR. LASSMAN: Okay. Okay. And Mr. Kahan, would you -- did Ken talk to Hunter? Other people have talked to him, not just you. Right?

MR. KAHAN: Exactly.

MR. LASSMAN: So let me ask you a question. If you get -- you have his phone number. Right?

MR. KAHAN: I have his phone number. Yeah. I have everything.

MR. LASSMAN: Yeah. So if you give me his phone number, I call him, will you speak to me?

MR. KAHAN: I'd say -- I'd say he may pick up, but probably not. He's a -- he's more like a text message. He uses this app called Telegram.

MR. LASSMAN: Okay.

MR. KAHAN: You'll get him eventually because I haven't talked into multiple -- I mean, we have counterintelligence agent now working with me here at Hawkwood. The first day that Hawkwood approached it, we added an attorney. You can speak to him. His name is Bob, and I don't have it with him. He's licensed, and I think they'd land in New York. With the one that that knocked in his door with the other intelligence, is --

MR. LASSMAN: Is this the report --

MR. KAHAN: -- the guy you want to talk

to --

MR. LASSMAN: Is this the report from 3LPM or something like that? Is that what you're talking about? That written report they gave, is that something else?

MR. KAHAN: Yep. Yep. So day one, the reaction was crying, and I'm sorry. And I'll give you the crypto and this and that.

MR. LASSMAN: Yeah. Yeah.

MR. KAHAN: Day two was -- or day three. Day three, they stayed -- they stayed monitoring, and they notified the local police. Did it all proper.

Everything's been above board. You know, he called the police a couple times, but it didn't matter. Day three, he realized that Hawkwood does not have the authority to arrest him or do anything outside of their --

Like, if they go outside to Mexico or Israel to get a child that's been kidnapped, they're going to do what they have to do, but they can't do it on US soil.

So they were very effective. They got to him. He was -- he was, you know, day three, though, he must have either talked to an attorney or realized that there's nothing they can do but scare him. And

they at that point --

MR. LASSMAN: So let me ask you this. When you refer to Hawkwood, there's a forensic report from a company called 3MP. Is that the same thing or not?

MR. KAHAN: Same. One and the same. They're like the intelligence part of Hawkwood.

MR. LASSMAN: How do you spell Hawkwood?

MR. KAHAN: So they're all -- that's one and the same. 3M and Hawkwood are one in -- they're two entities, but the same company.

MR. LASSMAN: Okay. How's the Hawkwood spelled, please?

MR. KAHAN: H-A-W-K-W-O-O-D.

MR. LASSMAN: One word?

MR. KAHAN: Yeah. One word.

MR. LASSMAN: One word. Okay. All right.

MR. KAHAN: I would love to link you up with them if you want to.

MR. LASSMAN: Yeah. Well, yeah. I'm not sure which way I'm headed yet here, but I've been -- I've been talking to Ken. He's supposed to get a proposal to me. Hopefully, he will do that soon because --

MR. KAHAN: Yeah.

MR. LASSMAN: -- I can't do anything without

the permission of the bankruptcy court, and I can't seek the permission of bankruptcy court unless until I have a proposal, and I don't have a proposal. So I'm waiting on that.

MR. KAHAN: So I'll push him for that. He's get -- we're getting close to November. Right? So, like, I hope he doesn't disappear. I'm actually up to November, but Ken can --

MR. LASSMAN: Yeah. So, you know

MR. KAHAN: I don't mean disappear. He's a busy guy.

MR. LASSMAN: No. That's what you mean.

MR. KAHAN: Politician. Right?

MR. LASSMAN: Busy with other things.

MR. KAHAN: He's a -- he's a great asset. I don't want to lose him. He thought we were going to be done by now, but he's pivotal.

MR. LASSMAN: Yeah. No. I get -- I get you. Okay. So, yeah. So that's what's happening. So, yeah, if you can communicate with him and say, hey, you know, just remember. I'm sending him emails, like, every couple days. So it's not like I'm letting him go, but you know, he does get busy.

MR. KAHAN: Can I speak freely? Speak for him? I mentioned a few things here. It's, so, again,

Hunter Penn, you know, claims that he used to work for DOD, which he may or may not have. I don't believe so.

Does not seem to be at all nervous or affected by -- he's spoken to Treasury agents. He's spoken to FBI. I've been on conference calls with him and FBI agents. Right? So, like, it's the craziest thing.

So something -- there's never been a demand or a legal -- anything from the civil side, and he knows that there's no way FBI is going to pick this up because nothing -- there's really not been a crime, you know, per se. It's a civil matter almost.

But again, like, you know, a demand, a subpoena, something like that, that was what Ken was working on, engaging an attorney from Virginia, which I don't know his whole game plan, but I don't think this recovery is going to be really hard based upon his reaction to Hawkwood Intervention. He was crying. He was apologizing.

His mother, they went to his mother's house, who is also in the same -- she actually does work for DOD. She's a penetration test or whatever that means. Went to the mother, mother said was aware, knew that he was into this, said he was bipolar.

She moved because she feared that for her life, but was -- we were flying her back to speak sense and not her because, you know, I've never been involved with, like, criminal stuff like this. Like, not me personally, so I don't know.

Obviously, I know not to threaten criminal action. I don't have the authority, but she knew what could be coming if this thing goes the wrong way and the prosecutor picks it up. Wire fraud and that's the -- he's in the -- we know and those reports will show he's funding terrorism.

He's working with drug cartels. He's working with human trafficking. And working mean, like, he probably is was forced into this. Like, again, Hawkwood is the -- we need to talk to shed a to give you a clear picture. I don't really deliver the story properly.

MR. LASSMAN: No. That's fine. That's fine. I got that.

MR. KAHAN: My recovery team does.

MR. LASSMAN: Yep. No. I'm okay. I'm okay with that.

MR. KAHAN: It's pretty bad.

MR. LEVINE: A lot of moving parts.

MR. KAHAN: Yeah. The terrorism thing is

new, and that's a pretty big deal. Like, that's starting to attract attention. We have someone from the head of counterterrorism in LA. Guy, I'll give you his name too. He's been talking to him every day.

MR. LASSMAN: Okay. So --

MR. KAHAN: He's been asking me --

MR. LASSMAN: But his -- let me ask you. His -- but Hunter's position at this point in time may be, hey. I'd love to help you, but I don't have the keys. You know, goodbye.

MR. KAHAN: That's his -- that's what he says. They got stolen, but he's also asking for some criminal indemnity.

MR. LASSMAN: Yep. Okay. All right. So, I don't have any more questions at this time on this issue, so hold on a minute here. We had some people that were present, assuming they're still here.

I don't see -- I'm sure they've been riveted by this story, so they're probably wide awake. So I'm going to ask Vladimir, and I don't say that in a sarcastic way, actually.

Mr. -- Attorney Timroth, do you have any questions you'd like to ask at this time if you're still there?

MR. TIMROTH: Well, yes. I'm here. You

know, I think that you're probably going to continue this meeting. Right?

MR. LASSMAN: Correct.

MR. TIMROTH: Because I want to have the opportunity to consult with my consultants about this, very serious counterterrorism issues that we raised. So I'll have at this time, I'm not in a position to ask any questions.

MR. LASSMAN: All right. Justin Kesselman. Counselor, do you have any questions you'd like to ask at this time?

MR. KESSELMAN: I'd like to wait till that continued meeting given the time right now.

MR. LASSMAN: Okay. That's fine.

MR. KESSELMAN: It's close to my nap time. You know, in my age, it it's tough to stay up this late.

MR. LASSMAN: Okay. Well, I want to be respectful. We'll try to -- we'll try to make sure you get your nap in time.

So Attorney Cruickshank, do you have any questions you'd like to ask at this time?

MS. CRUICKSHANK: Not at this time. Thank you very much, Mr. Lassman.

MR. LASSMAN: Okay. I must have worn

everybody out. So, what I'm going to -- what I'm going to do is --

MR. LEVINE: The 31st at 9:00?

MR. LASSMAN: No. No. No. Not 9:00. I'm going to say the 31st at 4:00 because I have your other case, Mr. Kirby, at three. So let's actually, let's say it --

MR. KAHAN: Oh, okay.

MR. LASSMAN: At the same time, actually. Let's make it easy for you. Let's make it easier for you, Bear. Let's say, I would do October 30 let me -- just let me check that date, please. Bear with me for one second.

I was relying on a piece of software. Yep. Yep. Yep. So that'll be October 31 also at 3:00 PM. So that way, Barry, you can just get this all done in one day.

MR. LEVINE: Okay.

MR. LASSMAN: All right now is there is there anyone that's on the line?

MR. LEVINE: Can you wait for now?

MR. LASSMAN: No, hold on one second. Let me just ask because someone may have joined late. Is there anyone else that wants to ask any questions at this time that I may not have recognized? Okay.

Hearing none, we're adjourned to October 31 at 3:00 PM.

Thank you everyone for your patience. Mr. Kahan, thank you very much for your testimony.

MR. KAHAN: I appreciate it. They're well done and have a good fast if you fast.

MR. LASSMAN: Thank you very much. Bye.

MR. LEVINE: Take care.

(End of Audio Recording)

CERTIFICATE OF TRANSCRIPTIONIST

I WENDY K. SAWYER, hereby certify that I was authorized to and did transcribe the provided recording and that the foregoing transcript is a true transcript of said electronic recording to the best of my ability.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 4th day of August, 2026.

WENDY K. SAWYER, CDLT

**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

In re: ) Chapter 7
)
JASON M. KAHAN, ) Case No. 24-11592-JEB
)
Debtor. )
--------------------)

Transcription of File:

TR0001_IT11815_2024-12-27 (12h21m37s)

December 27, 2024

(Beginning of Audio Recording)

MR. LASSMAN: This is the continued meeting of creditors in the case of Jason M. Kahan. Case number is 21-11592.

Mr. Kahan, can you kindly raise your right hand? Sir, do you solemnly swear the testimony you're about to give is true and correct?

MR. KAHAN: I do.

MR. LASSMAN: Can you tell me your name, please?

MR. KAHAN: Jason Kahan.

MR. LASSMAN: And Attorney Levine, can you confirm that that is, indeed, Mr. Kahan with you in your office?

MR. LEVINE: He's sitting across from me, indeed.

MR. LASSMAN: All right. So my special counsel is on the line, Ken Cuccinelli. He has some questions for Mr. Kahan. Ken, if you want to proceed now, please.

MR. CUCCINELLI: Okay. Good morning.

MR. KAHAN: Good morning.

MR. CUCCINELLI: Just a few questions. I'd like to ask you about, to start with, communications with Hunter Penn. Have you had telephonic

communications with Hunter Penn since the beginning of your relationship with him?

MR. KAHAN: Yes.

MR. CUCCINELLI: And when was the last time you talked to him on the phone?

MR. KAHAN: It has to be at least six months. It's always communications, texting over Telegram (inaudible).

MR. CUCCINELLI: Okay. And how about any email communication with him? Has there been any email communication with him?

MR. KAHAN: There's been limited email. There has been some. It's been a while since we've emailed back and forth. Nothing of substance.

MR. CUCCINELLI: Okay.

MR. KAHAN: I can provide all the emails.

MR. CUCCINELLI: Yeah. If you can provide a set of the emails, please, as well as -- well, let me ask the following question. For the texting back and forth, have you all used the same app or different apps for that communication?

MR. KAHAN: The apps have been consistent. There's been -- it's been Telegram primarily. Wire Messenger would be the other one. Primarily those two.

MR. CUCCINELLI: And why is there more than one, if you can say?

MR. KAHAN: His suggestion was to -- he introduced me to Wire because it was it was more secure.

MR. CUCCINELLI: Okay. So the use of more than one was at his request or insistence; is that correct?

MR. KAHAN: Correct.

MR. CUCCINELLI: Okay. Have you kept screenshots of those communications?

MR. KAHAN: I have a Dropbox file that should be in the record that has petabytes and petabytes of recorded conversations as much as I could gather along the way when I realized what was kind of going on that I can provide.

MR. CUCCINELLI: Okay. Yes. If you can provide those, that would be excellent. And we'll go ahead and ask Barry for those, as well as the emails if we could, please.

Jason, are those in -- are they stored in date order? If we open the Dropbox today, would we be able to understand the order of communication by the file names or anything?

MR. KAHAN: Yeah. They should be, and

they're not only conversations between me and Hunter, but between me and two other, I guess, friends or investors that have helped me along the way here, and they're all -- you know, my conversations plus Christopher Saba (phonetic), who has helped me communicate with Hunter the whole way and Tony Barletta, Jr. (phonetic). So I have those all stored in Chris Saba's Dropbox that would be chronological probably by date of creation.

MR. CUCCINELLI: Okay.

MR. KAHAN: So they'll be sorted by when they're created.

MR. CUCCINELLI: Okay. Yeah. Obviously, it's important to us to be able to follow the communications, so having them sort by date is ideal. Thank you.

With respect to Alex Coleman, is it do you have an understanding as to whether that person actually exists?

MR. KAHAN: Yes. From our research and our intelligence firm at Aqua, that is a -- it is not a real identity. It does not exist.

MR. CUCCINELLI: Okay. And -- but Hunter Penn uses that name frequently for communication?

MR. KAHAN: Yes.

MR. CUCCINELLI: Is that correct? Okay.

MR. KAHAN: Correct.

MR. CUCCINELLI: Has he ever used Hunter Penn openly and voluntarily for communication, meaning the name Hunter Penn?

MR. KAHAN: Between he and I, no. Between Hawkwood (phonetic), when they when they when Hawkwood visited his residence, he represented he was Hunter Penn. I believe I have to get the transcript from them, but represented both he was Hunter Penn and Alex Coleman.

MR. CUCCINELLI: Okay. And that was at the end of May of this year? Does that sound right?

MR. KAHAN: I can look. I'd have to check with Hawkwood. In the last six months.

MR. CUCCINELLI: Okay. All right. And was there ever any documentation of your hiring Hunter as a consultant?

MR. KAHAN: Just initial conversations. I believe at some point, there was a contract for -- unrelated to the victim. I believe in the very beginning when there was a positive consulting working relationship, I believe that there was a contract, and I could probably locate that. But that had to do with my cybercrime that I had had just been through.

MR. CUCCINELLI: Right.

MR. KAHAN: And that kind of IT or cybersecurity. I believe so. Not like a Docusign. There's a -- yeah. Yeah. I can locate a contract initially. It's probably one. We didn't do a separate contract --

MR. CUCCINELLI: Okay.

MR. KAHAN: --for each engagement or each different scope of work.

MR. CUCCINELLI: Right. Understood. So just to be clear, that contract was to hire Hunter Penn to clean up the some of the damage and loss from an identity theft that you suffered; is that correct?

MR. KAHAN: Correct.

MR. CUCCINELLI: Okay. And was that identity theft in 2021?

MR. KAHAN: The identity theft began somewhere on and around 2021 or before. I don't know the exact -- like, when it's when it all started. But, yes, on and around that time.

MR. CUCCINELLI: Okay. And when -- what year did you first encounter Hunter Penn, and if it's the same as when you first hired him to repair the damage from that identity theft?

MR. KAHAN: I believe it was early 2022.

I'd have to go back and check my Bank of America correspondence, but early 2022, following the account closures with Bank of America or shortly thereafter. I think it was right around the New Year of 2022 or the end of 2021. I could give you the exact --

MR. CUCCINELLI: Okay.

MR. KAHAN: -- the exact date of the correspondence (inaudible).

MR. CUCCINELLI: Just trying to get an order of sequence. Do you have emails to and from Bank of America in which Hunter Penn is discussed?

MR. KAHAN: I don't believe we have emails back and forth. At some point after I hired my first attorney -- I can give you all these dates and I can give you the engagement there -- we reached out to Bank of America -- I don't believe I did; I'd have to check to see if the attorney did it -- for the purpose of ensuring that the person that gave me the recommendation wasn't also involved with what we -- what was going on with Hunter.

I can give you a timeline on that sequence. I wasn't -- I didn't have the details prepared, but I can have that for you.

MR. CUCCINELLI: Okay. And do you have any information that would provide Chris Green's

(phonetic) work or home address?

MR. KAHAN: Absolutely.

MR. CUCCINELLI: Could we -- yeah, if we could obtain that, Barry, that would be helpful.

MR. KAHAN: Sure. Would that be acceptable if it came from Hawkwood because they're kind of --

MR. CUCCINELLI: Sure.

MR. KAHAN: -- (inaudible)? Okay. Okay.

MR. CUCCINELLI: Yeah. Absolutely. Do you happen to know whether it's a home or a work address or -- and are we talking about a current address?

MR. KAHAN: Talking about current where he is, could be right now. They're both residential addresses in in New York and New Jersey.

MR. CUCCINELLI: Okay. All right. Yeah. That would be very helpful.

So, Barry, if we could get that as well, I'd appreciate it.

MR. KAHAN: In addition to his significant other where he also resides from time to time. She's an attorney.

MR. CUCCINELLI: Okay. Yeah. And any of those residents' addresses, including the one you just described, would all be helpful.

And, Barry, I'd go ahead and ask it. If you

all could provide those, I would appreciate it.

MR. LEVINE: Sure.

MR. CUCCINELLI: And on the subject of Chris Green, I provided -- and, Barry, I re-emailed it to you -- a one-page Bitcoin wallet summary from -- I want to say from BitRef. Barry, do you have that?

MR. LEVINE: Hang on a sec.

MR. CUCCINELLI: Okay.

MR. LEVINE: You know, it was here, and I had no idea where it went.

MR. CUCCINELLI: I emailed it to you again this morning, so it should be top --

MR. LEVINE: I know. And I saw it. And I -- and I can't find it at the moment, so (inaudible).

MR. CUCCINELLI: Here, I'll send it again.

MR. LEVINE: Okay.

MR. CUCCINELLI: There you go. That's all right.

MR. LEVINE: Been that kind of day.

Do you have any other questions for him while we wait for my email to show up? Like watching water boil.

MR. CUCCINELLI: Yes. So I'll go ahead and try to do this independent of the document.

MR. LEVINE: Hang on. Hang on.
MR. CUCCINELLI: Okay.
MR. LEVINE: You want to take a look at this? We're changing spots.
MR. CUCCINELLI: Okay. Okay. So, Jason, just let me know when you've had a chance to look at it.
MR. KAHAN: The block the Blockchair statement?
MR. CUCCINELLI: Yes. Yeah.
MR. KAHAN: Okay. Yes, I've seen it.
MR. CUCCINELLI: Yeah. And so you can see the date on it is the 18th of December. You know, it's nine days old, so the U.S. dollar value isn't the same. But does this look to you like what we have referred to in discussions in this case as the 1,000 Bitcoin wallet?
MR. KAHAN: Yes. It does.
MR. CUCCINELLI: Okay. And is your understanding that nothing has been removed from this wallet to date?
MR. KAHAN: Nothing has been removed from that wallet. There has been -- there was funds added to the wallet in October of -- yeah. No, nothing has been removed.

MR. CUCCINELLI: So in terms of adding funds, they're -- the most recent one, the first two entries show on September 6th. Now all times are UTC, so, you know, I'm terrible at time zones. But it's in UTC time, it was, you know, 5:00 in the morning. So maybe it was the 5th here. I don't know. But it's a very small addition, about $20 -- U.S. dollars of Bitcoin, and then the next one on the same date is about $30. Do you see those two entries?

MR. KAHAN: Yes. I do.

MR. CUCCINELLI: And on September 6th, do you know why these additions were made to this account?

MR. KAHAN: (Inaudible).

MR. CUCCINELLI: Can you explain that, please?

MR. KAHAN: Yeah. As it was explained to me, they were sent there to change the status of the wallet to lure Hunter into going into -- going into wherever these are stored to determine if they can, you know, recover. It's so -- this -- that was done by Chris Green, Chris Green's team, or whatever they want to call themselves working unilaterally after, you know, after they -- we tried to do a -- we tried to contract them for the recovery services back in

June.

MR. CUCCINELLI: Okay.

MR. KAHAN: So they -- that's it, so.

MR. CUCCINELLI: Okay.

MR. KAHAN: (Inaudible).

MR. CUCCINELLI: So I understand that. Okay. That's helpful. Thank you.

And has Chris Green made any representations to you about whether he believes he and his team can recover the Bitcoin out of this wallet?

MR. KAHAN: Yes.

MR. CUCCINELLI: And what has he said about that? And in what media has he communicated it?

MR. KAHAN: They have the keys to the 1,000 wallets. They have the keys to the 604 wallet, actual working keys. And that has happened in the last three to four weeks.

MR. CUCCINELLI: Okay. And has he asked your permission to access those wallets?

MR. KAHAN: No. I wouldn't call it my permission.

MR. CUCCINELLI: Okay. Does he understand that the assets in those wallets -- as best you know, does he understand that the assets in those wallets come from you or are yours?

MR. KAHAN: Absolutely, he does. I turned up -- I supplied them with all of the ownership information the same that I did with the (inaudible).

MR. CUCCINELLI: And do you know whether Chris Green has an impression as to whether or not -- let me strike that. Have you or your counsel communicated to Chris Green that if they want to be engaged to recover the Bitcoin, they need to work with the bankruptcy Trustee to do that at this point in time?

MR. KAHAN: They have, multiple times.

MR. CUCCINELLI: Okay. All right.

Don, that's all I have. That's all I need at the moment, though, Barry, if we could put a schedule together to get those documents, I would appreciate it.

MR. LEVINE: Sure. I'll talk to Jason once we're done here.

MR. CUCCINELLI: Okay.

MR. LASSMAN: Okay.

MR. CUCCINELLI: Jason, others may have questions, but thank you.

MR. KAHAN: Thank you.

MR. LASSMAN: Ken, thanks so much. I'll let you communicate directly with Barry for scheduling of

document production.

MS. DEVINE: Hi. This is Christine Devine, the Trustee's general counsel. And I just wanted to -- before Ken excuses himself on kind of the Bitcoin situation, I just wanted to ask a couple follow-up questions.

One is, I think Ken asked about the medium used by Chris Green to communicate recently with Mr. Kahan, and I didn't hear an answer to that.

MR. KAHAN: It would be by text message, email. It's been represented by email correspondence most recently. This is all in the last few days, representing they have the keys. Like, that'll all be in -- turned over in whatever format you'd like it to be. And text messages.

MS. DEVINE: Okay. And so that'll all be turned over to Mr. Cuccinelli?

MR. KAHAN: However you'd like, yes, to Attorney Levine, and Levine will get it to whomever it needs to go to.

MS. DEVINE: Okay. And then the other question I had was looking through -- we're going to go through in a little more detail the bank statements or the financial account statements that you provided to the Trustee, but there were multiple transactions

that indicate transfers to and from Hunter Penn in March, April, I think May, June, you know, over a long period of time, dozens of transactions. Can you just explain how that all came about and what the purpose of it was?

MR. KAHAN: The most recent or in its entirety? Because it's been almost a three-year process of dealing with this situation. It's changed -- it's always --

MS. DEVINE: If you want to just -- I know you went into detail at the first 341 meeting on the whole history, and I don't think we need to go back and do that again. We have that. You've already explained that.

But just in the month before you filed bankruptcy, in particular, March, April, May, June of this year, there were multiple, I'm going to say, dozens of transactions to and from Hunter Penn in the Cash App account. So in just that period of time, what was going on?

MR. KAHAN: So I've been -- at that time and currently, I've been working with Hawkwood investigators out of -- I believe they're out of Texas -- who are a licensed bonded ransom and kidnapping negotiation firm. It's basically what they

do. They were hired as intel or intelligence to locate Hunter Penn or Alex Coleman, I will say. They did -- the CEO of that firm, while they were working on, you know, their investigation and during, essentially told me to act as normal with Hunter or Alex, I'll call him because they referred him -- he never a refers to him as Hunter, but act as normal, like business as usual, which consists of him asking for small monetary fees for various, what I say, fabricated jobs here and there.

So I was told to keep business as usual while they put a plan together. They -- you know, Hawkwood has been to his residence multiple times. Believe that we are pretty close to -- they were they were pretty close to succeeding in getting him to -- you know, he did admit, but getting him to turn over the keys. This is all in a report that -- I don't know if you have it or not -- Hawkwood -- Hawkwood is -- if you'd like to speak with him directly, I don't think it would be a problem.

Basically, their CEO told me to remain -- you know, if he asked for money, give him money to my best of my ability. I don't think it was -- there was any -- you know, it's -- at points, he asked for, you know, a larger amount of some to buy hardware. It's

gone on for a very long time. These from currently, I mean, I don't have -- you know, I don't have the funds to buy hardware for him or, you know, anything that he has. So it's basically small monetary amounts to keep him happy, keep him focused on me, and not go elsewhere or disappear.

And it's not just Hunter Penn. There's probably five other names that you'll see there that are tied to him. Venmo, Cash App, PayPal. I could give you -- there's separate different identities that he used to collect money. That's how Hawkwood located him.

MS. DEVINE: Okay. I definitely don't want to spend too, too much time on this. But I guess, just if you were to summarize, Hawkwood directed you to make transfers to him when requested, and in the month of March, April, May, you transferred him thousands of dollars?

MR. KAHAN: Yeah. I'd have to check when we first engaged Hawkwood, but that sounds -- that sounds correct.

MS. DEVINE: Okay. I don't have any more questions on kind of the substance of what Mr. Cuccinelli is handling.

MR. LASSMAN: Okay. I'll turn it over to

attorney Justin Kesselman. Justin, you have some questions you'd like to ask at this time?

MR. KESSELMAN: Just about the crypto issues or any issues?

MR. LASSMAN: Any issues that you have.

MS. KESSELMAN: All right.

MS. DEVINE: Can I just -- I'm sorry, Justin. I just want to be -- can I -- before we move on, I just want to be clear. This is Christine Devine again. I do have a series of questions on other issues. I just kind of wanted to wrap up the crypto pursuit of Hunter Penn. But whether you want Mr. Kesselman to go first on other issues or me, just let us know your direction here.

MR. LASSMAN: Yeah. Right. Yep, yep, yep, yep, yep. Justin, go ahead, please.

MR. KESSELMAN: On any issues?

MR. LASSMAN: Yes.

MR. KESSELMAN: All right. Well, on the -- this is Justin Kesselman from the U.S. Trustee. On the issue of the Hunter Pen transfers, what were the other identities?

MR. KAHAN: There was a -- so Samantha Gravel, you'll see come up very frequently in my bank records. That's a real person. Samantha Gravel.

Christopher Short -- hold on one second. Christopher Short is the current name he's using. That's where we transact now when he asked for any money. Christopher Short. Samantha Gravel. Hunter Penn, obviously.

There's an Alex Coleman, Cash App. Older one. I'd have to -- there's probably four or five different identities/names. I can give you, like, the sheet that kind of identifies and maps out how we were able to locate. They're all generally around Springfield, Massachusetts and the Hartford, Connecticut area. But those are --

MR. KESSELMAN: These are real people or fake names?

MR. KAHAN: These are all real people, besides Alex Coleman, obviously.

MR. KESSELMAN: And so the Gravel and Short, they're people that are working with Hunter Penn?

MR. KAHAN: Yep. So Hawkwood would be able to would be able to give you more insight on that. I believe -- I forget his last name. We have an attorney that we were dealing with that actually is, like, feet on the ground. Yes, they're all -- they're working together. He uses their identities to collect money.

But it is -- and there's more than those names. I apologize. I'm looking them up right now. There quite a few. But I have, like, a kind of a hot sheet that has everything that was supplied to the federal authorities along the way, Hawkwood. But it is how exactly how Hawkwood was able to locate Hunter Penn.

MR. KESSELMAN: All right. And when the transfers occur, how do you make the transfers? Is it to an -- what particular type of account?

MR. KAHAN: So, currently, it would be Cash App. So it'd be Cash App from my business Cash App, which is Fire Protection 24 to Chris Short has been the name he's been using. I think for the past maybe five to six months. There has not been a payment to Hunter Penn in in some time.

MR. KESSELMAN: Is it a Hunter Penn Cash App account? A Chris Short Cash App account? Is that Cash App to Cash App?

MR. KAHAN: Yes. Chris Short Cash App account. I can give you the name if you like it.

MR. KESSELMAN: Well, you can, you know --

MR. KAHAN: I give it to --

MR. KESSELMAN: You don't have to do it on the call, but there'll be follow-up information that

that that can be a part of. But I'm just trying to get to get a sense of when funds are transferred to these various individuals, you know, what type of account is it going into? Is it all Cash App accounts?

MR. KAHAN: All Cash App. For the past six months, it's been all Cash App. Prior to that was Venmo and Cash App. There's a PayPal involved along the way. At some point, there was crypto. Again, a crypto buying and selling for me. I don't -- didn't have much experience in that.

Although, rarely, if it was a larger request, we would have to, like, run around and use a device called Coinstar and deposit, like, money into a Coinstar machine and then convert it to crypto and then send it to him that way. But that was -- a handful of times it was crypto. Most of the time was Venmo, Cash App, and PayPal.

MR. KESSELMAN: And, what, they give you their Venmo or Cash App account name, and you execute a transfer to that account name?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. And that's all in the information that you'll provide to the Trustee?

MR. KAHAN: Yes. Not a problem at all.

MR. KESSELMAN: All right. I'm going to ask about a series of bank accounts that were referenced within the accounts that -- account statements that you provided. Okay. I'm just going to go through a list. There's an account at Bancorp Bank ending number 5886. Whose account is that?

MR. KAHAN: Bancorp. Is that fintech -- is that BlueVine? There's --

MR. LEVINE: There are transfers to and from a Bancorp bank account ending 5886. Do you know what that is? B-A-N--C-O-R-P.

MR. KAHAN: It would have to -- I believe that's BlueVine. So BlueVine is the name of, like, the bank that I would bank on the -- kind of similar to, like, a Cash App or whatever. They use Piermont Bank --

MR. KESSELMAN: Well --

MR. KAHAN: They use --

MR. KESSELMAN: -- BlueVine was connected to the Coastal Community Bank account.

MR. KAHAN: What is the bank name again? One more time.

MR. LEVINE: Bancorp, B-A-N-C-O-R-P.

MR. KAHAN: I'd have to look up to see what, like, Fintech Bank would be attached to that. I could

look it up right now, but --

MR. KESSELMAN: Yeah. So for all these, right, you know, who owns the -- I want to know who owns the account. Okay? Is the account, you know, still open? What records are available for the account? Okay?

MR. KAHAN: Okay.

MR. KESSELMAN: All right. Piermont Bank, ending 5934.

MR. KAHAN: That'd be Cash App, I believe. That's still open.

MR. KESSELMAN: Who is the owner of the account?

MR. KAHAN: That's me.

MR. KESSELMAN: Jason Khan?

MR. KAHAN: Yes.

MR. KESSELMAN: Pathword (phonetic), ending 9415.

MR. KAHAN: I don't know what that is.

MR. LEVINE: All right. So there are transfers with that Pathword account. You don't know what that account is for?

MR. KAHAN: I'm going to assume it's the same thing as Cash App and BlueVine where they use a, like, a local third party or a bank. They service the

local bank, I guess. I'd have to do a little research, but that's not familiar

MR. KESSELMAN: All right. So I'll go through them now, and then after I'll follow with a list to your counsel of all the accounts and a request, you know, who owns the accounts, what records are available.

MR. KAHAN: Okay.

MR. KESSELMAN: Okay?

MR. KAHAN: Yep.

MR. KESSELMAN: Pathword, ending 3880.

MR. KAHAN: Yep.

MR. KESSELMAN: Alliant Credit Union, ending 1043. Do you know what that is?

MR. KAHAN: Yeah. Alliant is my -- it was a credit union that I opened up, I guess, less than -- probably, like, a year ago, since closed, but I -- that one I remember.

MR. KESSELMAN: All right. When did that account close?

MR. KAHAN: Very little activity. Closed probably four or five months ago. I could get statements for the whole duration of having that account open.

MR. KESSELMAN: All right. That's a Jason

Kahan account? Is it Khan or Kahan? Sorry.

MR. KAHAN: Kahan.

MR. KESSELMAN: I thought so. I remember when we --

MR. KAHAN: Thank you.

MR. KESSELMAN: -- spoke in the other case. I thought it was Kahan. There's another Bancorp account ending 6856.

MR. KAHAN: So I just found -- so that's Chime. That Chime did belong to me. It's no longer open. The reason why there's a lot of bank accounts, just to be clear, is I could send you my checks system report, as well as my credit report. So following my cybercrime, my identity, my checks system, which is an internal banking, like, review has been -- it has, you know, victim of cybercrime all over it.

So generally, I'm able to open a bank account sometimes, and then it gets closed after -- I don't know -- a few months. You'll see a history of that. You'll see a history of the fintech banks because they -- they're like second chance. Chime's a second chance bank that I would have to -- you know, I can't go to Bank of America, Chase, TD Bank, Wells Fargo. I have -- I open an account. They'll close then in three months every time.

The fintech ones take a little longer, but I can provide you with -- you know, I reported all of the cybercrime information, and it follows me to this day. Like, I often try and open a normal bank account. We banked with Bank of America for 35 years. I had -- I don't know -- 20-plus accounts going into this whole mess that I'm in, and every one of them got -- including one that I opened up when I was five years old, were all closed on the same day. Not by choice, by following me and assisting Bank of America figure out who the cybercriminal was.

MR. KESSELMAN: Okay. No. I hear you. I understand. What all I'm trying to -- you know, all of these accounts that we're going to go through now though were references having transfers in 2024, right, so, you know, these are all the accounts, you know, that -- I'm not, you know, kind of going back to the beginning of time. These are all accounts that I saw in the statements you provided.

So there was some activity in the six months before you filed the Chapter 7 case or during your Chapter 13 case. So, you know, if they were closed, they're only open for a short period, then there won't be a lot of statements to provide it. Okay?

MR. KAHAN: I was just providing you with

kind of context to why you're seeing a bunch of -- but I can provide you with --

MR. KESSELMAN: Yeah. No. I get I get it. I'm not -- you know, don't assume that there's some, like, you know, motive of me going through a long list. I just don't have the records or the information about these accounts. Okay?

MR. KAHAN: No problem.

MR. KESSELMAN: Because they weren't listed.

MR. KAHAN: I've got --

MR. KESSELMAN: Don't --

MR. KAHAN: -- (inaudible) through this size prior with -- you know, I had -- a lot of this stuff has -- a lot of these accounts have back and forth. Like, this was provided to Hawkwood, so it shouldn't be difficult for me to get it to you.

MR. KESSELMAN: All right. Coastal Community Bank, ending 5886.

MR. KAHAN: That's BlueVine account. Pretty sure that's BlueVine Coastal.

MR. KESSELMAN: And who's the owner of that account?

MR. KAHAN: That would be Kronos Collaborative, which would be my business. I would be the -- I would be the owner of Kronos Collaborative.

MR. KESSELMAN: Are you the 100 percent owner?

MR. KAHAN: I believe, in the beginning, my wife and I were 50/50 at some point. I had to remove her because of her medical issues. Yeah. I believe -- currently, I'm the 100 percent owner.

MR. KESSELMAN: All right. Thank you. Citizens Bank, ending 1728? Who's the owner of that account?

MR. KAHAN: (Inaudible). Yes.

MR. KESSELMAN: That was you?

MR. KAHAN: I was -- I had a Citizens Bank account for a short time.

MR. KESSELMAN: Okay. Coastal Community Bank, ending 9373?

MR. KAHAN: That could be BlueVine. It's -- I believe that's the only one that --

MR. KESSELMAN: All right. And who's the owner of that account?

MR. KAHAN: It have to be -- I would assume it'd be me. The same account.

MR. KESSELMAN: All right. Coastal Community Bank, ending 2236.

MR. KAHAN: So there's three separate Coastal you just mentioned.

MR. KESSELMAN: Yep.

MR. KAHAN: There was only one -- yeah, I have to look in to see. If it's coming -- if it was sent to you, I'd be the owner. I'm just not sure which fintech would be attached to it, but I will figure that out and get back to you.

MR. KESSELMAN: All right. Thank you. Piermont Bank, ending 6182?

MR. KAHAN: Piermont would have to be Cash App, I believe. Yeah.

MR. KESSELMAN: Who would be the owner?

MR. KAHAN: That'd be me.

MR. KESSELMAN: All right. Varo Bank, ending 5154, that's you, correct?

MR. KAHAN: That's me. Yep. That's still active. It's my longest. I have that.

MR. KESSELMAN: Okay. Varo Believe Secured account, what is that?

MR. KAHAN: That's also mine. It's, like, a prepaid credit card, credit builder, kind of fixer.

MR. KESSELMAN: All right. Are there any other Varo Believe -- or any other Varo accounts other than those two?

MR. KAHAN: My wife has Varo and Varo Believe, a credit builder, same thing. I don't know

what her account information is, but to be --

MR. KESSELMAN: Oh, that's okay. How long has she had those accounts?

MR. KAHAN: We both kind of started them at the same time, at least a year or more.

MR. KESSELMAN: Okay. All right. Do you have a Varo savings account, as well?

MR. KAHAN: Yes.

MR. KESSELMAN: And it's in your name?

MR. KAHAN: Yeah, my name. I can give you the account. It's the account that's -- I don't think there's any activity.

MR. KESSELMAN: Okay.

MR. KAHAN: There's not really any activity in it.

MR. KESSELMAN: All right. Do you have an Apple Wallet?

MR. KAHAN: I do.

MR. KESSELMAN: All right. Are you able to produce account or transaction history in the Apple Wallet?

MR. KAHAN: Absolutely.

MR. KESSELMAN: All right. How many Apple Wallets do you have?

MR. KAHAN: Just one.

MR. KESSELMAN: It's in your name?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. Does Kronos Collaborative have an Apple wallet?

MR. KAHAN: No.

MR. KESSELMAN: Okay. What is MoonPay?

MR. KAHAN: MoonPay. I think that's a crypto buying -- I think it's used to buy cryptocurrency.

MR. KESSELMAN: Okay. And in the statements that you provided, there are a number of transactions involving where you make payments through MoonPay.

MR. KAHAN: Okay.

MR. KESSELMAN: Do you have any recollection of those?

MR. KAHAN: It would have to be a request from Alex Coleman. But, yes, if it was MoonPay, that's a -- like, if you use your debit card or Apple Pay to buy cryptocurrency. I could probably get statements on that.

MR. KESSELMAN: All right. Thank you. How many MoonPay accounts do you have or do you have access to?

MR. KAHAN: I just -- I have one. I believe my wife has one, like, KYC.

MR. KESSELMAN: Right. So and there was at least a few instances in which you transferred funds to your wife using MoonPay. What was the purpose of that?

MR. KAHAN: I don't think it would have been transferred to my wife. It was in using MoonPay that transferred a cryptocurrency with a request.

MR. KESSELMAN: Well, for instance, if there was a -- if on your Varo bank account, right, or your Cash App account, there's a transaction that says MoonPay Olga Bassa, what would that mean?

MR. KAHAN: It would mean that my MoonPay was closed for the very the same issues that my bank accounts closed, and I had to use my wife's MoonPay account to buy cryptocurrency to pay the request that I was given.

MR. KESSELMAN: All right. And what about -- I think there was one called -- to something called the Exodus, MoonPay to Exodus. What is that?

MR. KAHAN: Exodus is a -- a wallet, a crypto wallet. Like, a -- it sends out crypto. You know, you buy it -- it links you from MoonPay to Exodus. That's how we would have to buy crypto to send it out.

MR. KESSELMAN: And who has the Exodus

account?

MR. KAHAN: That's mine.

MR. KESSELMAN: Okay. And what is MoneyLion?

MR. KAHAN: It's a prepaid account, like a prepaid debit card, like a fintech. I have that also. I don't actively use it, but I believe it's still active.

MR. KESSELMAN: That's in your name? Sir, that's in your name?

MR. KAHAN: Yes, it is.

MR. KESSELMAN: All right. Okay. And is that involved in crypto or totally separate?

MR. KAHAN: No. That's just, like, a fintech prepaid account that I would have attempted to open to deal with the problematic banking issues.

MR. KESSELMAN: All right.

MR. KAHAN: But I can have (inaudible) everything related to that.

MR. KESSELMAN: Okay. What is Airwallet?

MR. KAHAN: That's not familiar. Airwallet?

MR. KESSELMAN: Airwallet or Wallex? Do you know what that is?

MR. KAHAN: No.

MR. KESSELMAN: All right. What is

CryptoHub?

MR. KAHAN: I don't know what that is.

MR. KESSELMAN: All right. There's a payment from one of your accounts to CryptoHub. You don't know what that was for?

MR. KAHAN: You'd have to show it. I'd have to see it and --

MR. KESSELMAN: All right. Another time. What is Crypto.com?

MR. KAHAN: It's a -- it's an exchange. Like, a Binance or Coinbase. At some point, I had an account there. It's like a another way to buy cryptocurrency. It's an exchange. I had an account there.

I still have access to it. It hasn't been functional, like normally functional in some time, but I can provide whatever you need from that.

MR. KESSELMAN: So there are records for all these different crypto accounts that you have?

MR. KAHAN: Yeah. I have records on all these. Not much activity, but I can provide you with all the information you need.

MR. KESSELMAN: So in these -- in MoonPay and Crypto.com and any other crypto accounts, there will be records of crypto that's been purchased, sold,

or transferred?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. Are there any other -- are there any other accounts that I haven't mentioned that you're aware of?

MR. KAHAN: So Coinbase, still in communication with them. There was five accounts in my name open there. I didn't -- haven't really accessed --

MR. KESSELMAN: Do you have access to those accounts?

MR. KAHAN: I don't. Never have. Same with Binance. If they're not supplied by me, they're -- you know, they probably show up. But we're in, you know, in the middle of dealing with Binance and Coinbase.

MR. KESSELMAN: Of course. I understand.

MR. KAHAN: Yeah. Let me think here.

MR. KESSELMAN: Any others?

MR. KAHAN: I don't believe so.

MR. KESSELMAN: All right. I saw a reference to a Wave account. What is that?

MR. KAHAN: Wave is a merchant service account, Wave Financial. So that would be, like, how I bill my clients.

MR. KESSELMAN: All right. That's billing for Kronos Collaborative?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. And Zelle? Who uses Zelle?

MR. KAHAN: Well, I haven't had Zelle in quite some time. I don't think either of us have Zelle anymore. None of our accounts. We used to.

MR. KESSELMAN: All right. When did that stop?

MR. KAHAN: About the time when the big banks stopped leaving us alone, at least six months or greater, I think.

MR. KESSELMAN: All right. And who -- do you have a PayPal account?

MR. KAHAN: I do.

MR. KESSELMAN: How many?

MR. KAHAN: I have a -- I believe I just have one.

MR. KESSELMAN: Personal account?

MR. KAHAN: Personal account, yeah.

MR. KESSELMAN: Personal or Kronos?

MR. KAHAN: Personal, but it has, like -- at some point, it had Kronos. I would be collecting payments from -- for Kronos there. Not a lot, but it

was tied into Kronos Collaborative. It's still active.

MR. KESSELMAN: All right. So it's used for both personal and Kronos Collaborative?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. And you can get records for that?

MR. KAHAN: Absolutely.

MR. KESSELMAN: And Cash App is a personal account of yours?

MR. KAHAN: Personal account, yes.

MR. KESSELMAN: Do you have any other Cash App accounts?

MR. KAHAN: Not that I'm aware of.

MR. KESSELMAN: All right. Did you go to Greece in July of 2024?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. How long was that vacation?

MR. KAHAN: Wouldn't necessarily call it a vacation. It was a -- my wife's father passed away. It was a memorial service.

MR. KESSELMAN: Oh, sorry.

MR. KAHAN: Yeah.

MR. KESSELMAN: All right.

MR. KAHAN: We haven't been able to go there in some time because of the financial situation, but her father passed when -- there was a memorial service for her father passed away. I think it was a year or two (inaudible).

MR. KESSELMAN: All right. Sorry to hear that. How was that paid for, that trip?

MR. KAHAN: Partially, her mother helped us with tickets. And then, I want to say I had a friend, I believe, paid for it with a credit card to get the plane tickets. I have to look through our -- my records. But once we're there, I mean, my wife is from there. Her entire family is there. We don't pay for a hotel or anything. It's -- once we land there, it's -- we actually don't spend any money whatsoever. So it's just the plane tickets to get us over there was the cost.

MR. KESSELMAN: All right. Just a little bit more. I had questions about a few names that I saw in the statements that were sent over. There are a number of transactions called car sales. What is that for?

MR. KAHAN: What is it -- does it have, like, a money sign in front of it?

MR. KESSELMAN: Just says car sales. And --

MR. KAHAN: That sounds like a temporary -- that sounds like an Alex Coleman/Hunter Penn Cash App that was used for a short period of time. I'd have to see the transactions, but if it's between, like, zero and $300, it's definitely Hunter Penn. It's probably payment to Cash App.

MR. KESSELMAN: Okay. And what about Sting Blacks (phonetic)?

MR. KAHAN: Pretty much the only reason why I'm using Cash App is to pay Hunter Penn. So if that's what that is -- I could tell you. I'm looking it up right now. It's all going to be relating to the same -- yep, this is Cash App, car sales. Sting Blacks is Hunter Bend. This is a temporary --

MR. KESSELMAN: Rack Lord (phonetic)?

MR. KAHAN: All the same.

MR. KESSELMAN: Lovely XL (phonetic)?

MR. KAHAN: All around the same time, I'm assuming? All Hunter Penn.

MR. KESSELMAN: It's all in that period of statements that were sent over.

MR. KAHAN: Yeah. I see that one. There's $80 sent on February 17th, Hunter Penn.

MR. KESSELMAN: T-O-O-D-R-X-P-P-Y. There are a lot with that account.

MR. KAHAN: $856 SENT. There'll be a corresponding request for money. Yeah, 150, 100, 100, same thing.

MR. KESSELMAN: These are all Hunter Penn?

MR. KAHAN: Yes.

MR. KESSELMAN: All right. And who's Chris Saba?

MR. KAHAN: Chris Saba has been -- he's a friend and colleague and has been helping me with dealing with Hunter. He's probably the closest -- he's communicated the most with Hunter Penn and helped along the way. Also has a good amount of funds in the effort. So I guess he'd be a consultant, more of a friend, to help communicate with Hunter when -- different than me because I really haven't had any success getting my keys turned over.

Chris has a different insight coming from a, you know, not the damage party, but, you know, he's more willing and able -- he's local to Massachusetts -- to provide his story.

MR. KESSELMAN: What is his background?

MR. KAHAN: He's a real estate finance real professional. He's a real estate developer. His father, who I've worked with for 25-plus years, is an architect. You know, doesn't have a crypto background

if that's what you're asking. He is has tech background.

MR. KESSELMAN: No. I'm not -- yeah, I'm not -- there's no ulterior implications. I mean --

MR. KAHAN: (Inaudible).

MR. KESSELMAN: What is the purpose of the of -- you know, there are a number of payments to him. You know, why are you sending payments to him?

MR. KAHAN: It would only be for the same reason of getting Hunter Pen money. Chris was involved. There was a time when he asked for, I think, $10,000. Chris put the money up or needed help from whatever I could. But there's a series of transfers from Chris Saba to Hunter Penn, as well.

MR. KESSELMAN: So you pay Chris Saba, and he pays Hunter Penn?

MR. KAHAN: I would pay the gap in whatever Hunter was asking for or whatever I was able to contribute.

MR. KESSELMAN: And do you have any agreements with Chris Saba, or is this all just verbal?

MR. KAHAN: Written agreements? Probably not. I mean, we've documented what he's sunken in to separate. I don't believe there's a written agreement

between he and I. There are several other Chris Sabas that have been involved with this.

MR. KESSELMAN: What does that mean? How many Chris Sabas have been involved in this?

MR. KAHAN: There's a -- there'll be a name, Tony Barletta --

MR. LEVINE: Oh, it's not -- they're not called Chris Saba?

MR. KAHAN: Oh, they're not Chris Saba, but it's similar, but they've all been helping --

MR. KESSELMAN: I thought the same thing. Okay. All right.

MR. KAHAN: So there's five --

MR. KESSELMAN: Okay.

MR. KAHAN: -- four or five close friends of mine that have helped us -- have helped along the way for the effort with Hunter Penn because I ran out of funds a very long time ago. You know, why I'm here is for that very reason. Pretty much the answer to all of your questions is going to lead back to the same.

And I can give you whatever is needed, fintech accounts, but there's four names that you're going to see would be Tony Barletta, Jr. He's helped with the effort. Taylor Jenkins (phonetic). You'll probably see funds back and forth from him. And those

are the three main --

MR. KESSELMAN: All right. What -- Roland Rubio.va (phonetic), is that another -- do you know what that is?

MR. KAHAN: Yeah. She's my, like -- she's offshore Filipino assistant of mine, you know? Inexpensive, has really kept me focused while I -- you know, I can't -- a lot less than having someone locally. I generally would always have -- like, when I'm fully focused on my business, I'd have, like, someone that -- you know, a project manager or someone helping me. I just haven't been able to do that, so she's a virtual from the Philippines on Upwork.

MR. KESSELMAN: A virtual assistant?

MR. KAHAN: Yes.

MR. KESSELMAN: It's a real person, though, or it's a company?

MR. KAHAN: Oh, it's a real person. I found her through Upwork.

MR. KESSELMAN: It's not a virtual person. It's -- she's just remote.

MR. KAHAN: Yeah. She's in the Philippines.

MR. KESSELMAN: All right. So the Kronos Collaborative, is that still operative business?

MR. KAHAN: No. Kronos is not operative.

It's going to dissolve, if it hasn't already been involuntary dissolved. I'll file the taxes in January -- you know, come January 1st for a variety of reasons. Care for me to get into it, I can. But I've established a new entity kind of that would take over Kronos, same exact business function, a small business consulting.

MR. KESSELMAN: Is it servicing the same customers?

MR. KAHAN: Exactly the same customers. Everything's the same. It just would have a different (inaudible).

MR. KESSELMAN: Did Kronos have employees or did it have any employees?

MR. KAHAN: They had one employee right around the time of the pandemic -- little after the pandemic, Josh Kaplan (phonetic). But other than that, everything's virtual -- everybody was a virtual consultant or virtual designer.

MR. KESSELMAN: Do you use 1099s?

MR. KAHAN: The 1099s would be issued from Upwork.

MR. KESSELMAN: Say that again?

MR. KAHAN: So I generally use a system called Upwork that, like, would deal with all of that,

the 1099s of -- the 1099-ing of offshore (inaudible), but, yes.

MR. KESSELMAN: Do you use -- so is it -- you know, how many independent contractors did it use to function?

MR. KAHAN: Right now, I just have one and then one that's on Upwork and one designer that's pretty consistent, so two currently. I've had many over the past, you know, two to three years, kind of rotate in and out as needed.

MR. KESSELMAN: All right. And the new business, when was that formed?

MR. KAHAN: It's going to be full function on January 1st, but we formed it, I believe, sometime in, like, November. Hasn't really had much activity. I'm trying to prepare and get things right (inaudible) for January 1st.

MR. KESSELMAN: Does it have a bank account yet?

MR. KAHAN: So we applied for a bank account. It would have been BlueVine. I don't think it has activity in it, though.

MR. KESSELMAN: All right. Is that -- is the company operating using Kronos Collaborative accounts and funds?

MR. KAHAN: For now, we're Kronos Collaborative, and we're going to we're going to change it to -- it's called CAP Design Group, C-A-P. Everything is exactly the same except for a different logo, different EIN. I can explain why if you care.

MR. KESSELMAN: All right. Sure. Explain.

MR. KAHAN: I was -- about two months ago, I received a lawsuit by a -- on a project that I was the engineer of record on. Or I was not the engineer of record on. I had sent a proposal and kind of what I do often is show the client, like, what I plan on doing, so I provided them a plan. I did not end up getting the project. This was back in 2021.

And I was sued for $500,000, Kronos Collaborative was, for a project that I was not the engineer of the record, didn't stamp it, never got submitted, never got paid for it. And, unfortunately, I talked to the attorney. He was based out of Wellesley. Explained this to him that someone else was -- you know, someone else got the job. I basically didn't get paid. It went with somebody else and never had stepped foot on it. It was a condo association lawsuit.

I explained to him that I'm in bankruptcy and that I'm not going to be able to engage -- you

know, supply retainer to a law firm to defend myself and I shouldn't have to because I didn't stamp it, didn't partake in the job. And he basically told me that, you know, you need to find an attorney. Good luck. I had several calls with him.

And at that point, I really couldn't fight that battle. Don't exactly know what's going on with that lawsuit, but that's when I had to kind of Kronos -- you know, shut Kronos down because I really couldn't keep it -- you know, couldn't keep -- I couldn't fund the litigation needed to fight to that.

MR. KESSELMAN: Got it. All right.

MR. KAHAN: I can (inaudible) that lawsuit to show context.

MR. KESSELMAN: Sure.

MR. KAHAN: It's pretty (inaudible).

MR. KESSELMAN: All right. Did Kronos file tax returns?

MR. KAHAN: Kronos has -- so my CPA has the tax returns from 20 -- it has not, no.

MR. KESSELMAN: It has never filed a tax return?

MR. KAHAN: I don't believe it's filed since its inception. Maybe extensions. So it'd be 2022, '23, and '24. But I don't believe --

MR. KESSELMAN: All right. Okay. And prior to Kronos, did you have a similar fire protection business?

MR. KAHAN: Yeah.

MR. KESSELMAN: What was that?

MR. KAHAN: It was called Prometheus Life Safety.

MR. KESSELMAN: Okay. And what were the years of operation of Prometheus?

MR. KAHAN: It's at least 20 years. That was my most -- 20 years, at least. It was back when I was still in Somerville. Always taxes --

MR. KESSELMAN: All right. And --

MR. KAHAN: --filed on that.

MR. KESSELMAN: Sorry. Go ahead.

MR. KAHAN: Taxes filed on Prometheus until its -- kind of saw its end of day. It was --

MR. KESSELMAN: All right. So taxes -- tax returns were filed for Prometheus until it was terminated?

MR. KAHAN: Yes.

MR. KESSELMAN: And what -- was Prometheus a similar company to Kronos Collaborative?

MR. KAHAN: Exactly the same.

MR. KESSELMAN: All right. And why the

switched from Prometheus to Kronos?

MR. KAHAN: There was a high volume of fraudulent use of my -- so I'm in kind of a rare specialty in engineering. City of Boston and I had a meeting with the building commissioner. There was -- the use of my stamp fraudulently was happening frequently. I was working with (inaudible). I was working with the City of Boston at the time. I also worked for the City of Boston Fire Department (inaudible) and testify as a third party.

Thought it would be best for me to stop Prometheus, start a new entity. It's going to push back on me because I had that for 20-plus years, and it was established, you know, firm, but it seemed the best thing to do to kind of stop the risk associated with that. So that would be the reason.

MR. KESSELMAN: And did Kronos service the same customers as Prometheus?

MR. KAHAN: Yes.

MR. KESSELMAN: Did you have an interest in a business called Covenant Fire Protection?

MR. KAHAN: I did.

MR. KESSELMAN: And what was the nature of that company?

MR. KAHAN: Covenant Fire Protection was a

fire sprinkler installation company that I started, founded back in 2010, I believe, with a partner, Ray Scott (phonetic). We grew it organically. It still exists to this day. Around 2018 or '19, kind of all my problems started at the same time. It's right around then. I ended up selling my shares there and kind of going on my -- going my own way.

MR. KESSELMAN: Did you sell them to the other owners?

MR. KAHAN: Yeah.

MR. KESSELMAN: How much did you sell them for?

MR. KAHAN: I'd have to go back to my records. It was a lot less than I should have, but I can get you information regarding that.

MR. KESSELMAN: Do you recall the approximate amount?

MR. KAHAN: I don't -- do not.

MR. KESSELMAN: Was it more than a million or less than a million?

MR. KAHAN: Oh, it wasn't even close to a million. It was not even near a million dollars. Significantly less --

MR. KESSELMAN: All right. Less than a million.

MR. KAHAN: Yeah.

MR. KESSELMAN: Is it more than a 100,000?

MR. KAHAN: I believe it's more than 100, less than 500, somewhere in the middle. I think 200, maybe.

MR. KESSELMAN: All right. Yeah. Okay. And for Kronos, you provided a spreadsheet through Attorney Levine with a P&L for six months -- six or seven months preceding the Chapter 7 case. Do you know what document I'm referring to?

MR. KAHAN: I do.

MR. KESSELMAN: All right. Is that a document you created for -- you know, to respond to an inquiry in the case or something that was kept in the ordinary course of your business affairs?

MR. KAHAN: That would be something I created for the purpose of turning it over to my CPA. So I will have updated -- everything updated -- or a CPA, I should say, because my CPA wouldn't do my -- it's a whole another story, but for purpose of filing taxes.

MR. KESSELMAN: All right. So when was that document created?

MR. KAHAN: It was probably exported from QuickBooks. So whatever date -- probably has a date

on it, I would think.

MR. KESSELMAN: All right. I don't -- I'm not sure I saw it, but I'll check again. So do you use QuickBooks to keep track of your business transactions?

MR. KAHAN: I do. I just recently cleaned it up, organized it, not recently, but for the purpose of the CPA filing taxes. So it's pretty accurate right now, more so than probably what you're looking at. I'm working with a CPA trying to rectify the outstanding taxes.

MR. KESSELMAN: What are the years of records covered by your QuickBooks software?

MR. KAHAN: 2021 till current.

MR. KESSELMAN: All right. And is that for Kronos or all of your business activities?

MR. KAHAN: It'd just be Kronos. I don't really use QuickBooks on -- it would just be Kronos.

MR. KESSELMAN: So it would be anything that was used for Kronos or personal matters paid through Kronos accounts?

MR. KAHAN: Pretty much Kronos. I mean, there was some overlap with, obviously, you know, the effort that -- the Bitcoin effort. You'll see some cross crossover that, unfortunately, had no option.

MR. KESSELMAN: All right. And how do you keep -- do you have a general practice of how you keep records for Kronos and QuickBooks? Meaning, do you upload copies of invoices, issue -- you know, purchase orders, issue invoices through QuickBooks? How do you utilize the QuickBooks?

MR. KAHAN: Just really only for bookkeeping. Not -- none of not that. It was more -- just for basically it would be tied to, like, my BlueVine account or whatever, like, bank account was opened at the time. There are, obviously, several as we've discussed, (inaudible) --

MR. KESSELMAN: So transactions are linked to those accounts and then those particular transactions are categorized within QuickBooks or given a certain project category?

MR. KAHAN: Exactly. It would be more, like, just buckets, like expenses, you know, consulting, whatever, subcontractor or -- exactly.

MR. KESSELMAN: Do you have any practices for keeping records for real estate transactions?

MR. KAHAN: Depends on the project. Historically, we -- you know, when things were organized, each different LLC or project would get a QuickBooks account, but it's been a long time since

(inaudible) like that. Not currently.

MR. KESSELMAN: I mean, when was the last time -- you know, what was the last period of time in which you had -- well, let me let me rephrase that. Do you have any QuickBooks accounts for real estate deal entities?

MR. KAHAN: I'm pretty confident (inaudible) 19 Elm Street has a QuickBooks attached to it. There was very little activity there. Also, a project called 16 Boston Avenue. There was a project manager, a partner. My involvement there was more of design side, but there's QuickBooks that are associated with those two properties.

MR. KESSELMAN: Any others that you have?

MR. KAHAN: Not that I can recall.

MR. KESSELMAN: All right. Do you have any other -- do you know if you have records for -- we don't have to go through all of them. You listed a lot of entities in your schedule. So I'm happy to go through them. I don't know how much time everyone has, but we could save that for another day. If you recall, (inaudible) records --

MR. KAHAN: Yeah.

MR. KESSELMAN: -- records of any -- sorry. Go ahead.

MR. KAHAN: 19 Elm Street, Summerlin, Mass were not kept by me. I had a project manager working for me and the and my partner there, Josh Kaplan, who kept the QuickBooks, like, costing. 19 Elm Street, Somerville, Mass. were not kept by me. I had a project manager working for me, and my partner there, Josh Kaplan, who kept the QuickBooks, like job costing. 19 Elm Street, Somerville, Mass.

16 Boston Avenue, Somerville, Mass. 62 Elmwood Road, Somerville, Mass. Very little activity there, but there would be QuickBooks attached to those three. I think that would be it. The other ones have all been upside down and not in a place where there anything was happening, activity-wise.

MR. KESSELMAN: All right. Are you able to say what -- of all the entities that you have an interest in, how many of them still own assets, putting aside whether they're upside down?

MR. KAHAN: I have to -- I wouldn't -- I don't want to make a guess with that. I have to get back to you.

MR. KESSELMAN: All right. When was the last tax return that you have filed personally?

MR. KAHAN: I believe it's 2020. We are ready to go in 2021 and -- or I shouldn't speak for my

CPA, but very close to being ready to file back taxes.

MR. KESSELMAN: All right. So you're close to being ready to go to file an amended 2020 and original 2021, 2022, and 2023?

MR. KAHAN: Actually, starts with an amended 2015, and then it goes to '20 -- I just sent you an email. Amended 2020, then new 2021 through the current.

MR. KESSELMAN: All right. And what's the timeline for filing those?

MR. KAHAN: Before the end of the -- before the beginning of the year, but the way it's moving, he could probably supply the preliminary.

MR. KESSELMAN: Um-hum.

MR. KAHAN: I think he's going to be done by, like, (inaudible) of January.

MR. KESSELMAN: Okay. Well -- okay. Well, you know, we'd like to see the returns once they're ready to be shown.

MR. KAHAN: Absolutely.

MR. KESSELMAN: And do the returns include business schedule fees or not? Yes?

Were separate tax returns filed for any of your other entities other than Prometheus?

MR. LASSMAN: Hey, Justin. Trustee here.

I've got to have you wrap up because I have counsel --

MR. KESSELMAN: Yep.

MR. LASSMAN: -- that wants to ask questions, and you can conduct --

MR. KESSELMAN: Yeah.

MR. LASSMAN: -- other discovery in the context of an adversary proceeding. So I think at this point in time, I'd ask you to be done.

MR. KESSELMAN: Absolutely.

MR. LASSMAN: And then I'll --

MR. KESSELMAN: Yep.

MR. LASSMAN: I'd like to switch over to Attorney Devine, if that's okay.

MR. KESSELMAN: That's fine.

MR. LASSMAN: Okay. All right. Attorney Devine, are you still there?

MS. DEVINE: I am still here.

MR. LASSMAN: Good. Okay. So I'm going to turn it over to you now, if that is okay.

MS. DEVINE: Absolutely.

Mr. Kahan, Christine Devine here. I represent the Trustee generally in this case. I want to ask you about our recent pleading filed by Enterprise Bank with respect to a pending matter before the court.

Enterprise indicated in their filing that in October of this year, you paid $235,000 to Enterprise to cure the mortgage default. Is that accurate?

MR. KAHAN: That's accurate.

MS. DEVINE: Okay. What was the source of those funds?

MR. KAHAN: It was a loan that gets paid off recovery at the crypto. That's it.

MS. DEVINE: And who made the loan?

MR. KAHAN: Two entities. The attorney that did the documents or the actual investor?

MS. DEVINE: The -- both. The investor first.

MR. KAHAN: One was Sean Galvin (phonetic), client that I worked for that helped me out. The other name was Richard Sloan (phonetic). He's a real estate finance company. That just this -- did a small loan to help out.

MS. DEVINE: And these -- are these loans documented?

MR. KAHAN: Yeah. I believe so.

MS. DEVINE: Well, you mentioned an attorney. Did -- was there an attorney that created a document?

MR. KAHAN: There was an attorney.

MS. DEVINE: I'm sorry?

MR. KAHAN: Yes. There was -- I could -- there's an attorney involved. I could get you -- link you up with them directly and if you need those documents from them, yes.

MS. DEVINE: Yep. If you could send those records -- have your attorney send those records to the Trustee, to me, that would be great.

MR. KAHAN: Okay.

MS. DEVINE: Who was the attorney that documented the loan?

MR. KAHAN: Attorney Eric Lomas. He's head of Lomas Law in Stoneham.

MS. DEVINE: Okay. Okay. I wanted -- Mr. Kesselman very thoroughly covered the four accounts that you provided some statements for. So I'm not going to repeat what he asked, but I wanted to just take a step back. And if you could just explain for each of them -- and I'll just walk you through each account -- just kind of how you use them. For example, business purposes, household purposes, just to kind of get a sense of that.

Starting with the Varo bank account, I think you provided six -- approximately six months' worth of statements. Is that a -- that's a personal account in

your name; is that right?
MR. KAHAN: Yeah. Varo was a second chance bank that is pretty much the only one that stayed open. But, yeah, a personal and my wife, you know, personal account.
MS. DEVINE: Okay. Do any of Kronos's clients make deposits directly into your Varo account?
MR. KAHAN: Possibly. I mean, we weren't -- our accounting isn't as superb, and I would say it probably occurred at some point. Try not to. It depends on what the business banking situation is.
MS. DEVINE: Okay. Who's Benjamin Mermelstein (phonetic)?
MR. KAHAN: Benjamin -- I don't recognize the name.
MS. DEVINE: A $1,800 deposit in May 2024.
MR. KAHAN: Does it have a -- like, in the memo, does it have a, like, a job attached to it?
MS. DEVINE: Nope.
MR. KAHAN: I'd have to research it to tell you if that's in -- a deposit in the Varo account?
MS. DEVINE: Yep. The Varo.
MR. KAHAN: What was the date again?
MS. DEVINE: May of 2024. And I said 1,800. It's a $1,000 deposit on May 29th and an $800 deposit

on May 31st.
MR. KAHAN: I will look that up while we're -- it's going to take me a minute or so, but I'll check. I'm just going to check it.
MS. DEVINE: Okay.
MR. KAHAN: (Inaudible) --
MS. DEVINE: Can --
MR. KAHAN: -- could be a client.
MS. DEVINE: So you'll get us that information?
MR. KAHAN: Yes.
MS. DEVINE: How do you -- so just kind of stepping back a little bit. How -- the clients of Kronos, are they ongoing clients who are paying for ongoing services, or are they kind of a one-time, they pay you for a service, and they're done?
MR. KAHAN: I'd say 80 percent of my clients greater have been 20-plus year clients that I've kept -- you know, kept close because, you know, it's just consistently you have to deal with real estate developers. They're ongoing. It's not like a recurring service, but they work basically business-to-business for real estate developers and architects, sometimes end users, as the general national laws changes and there becomes more

requirements for life safety, I start taking -- I start getting (inaudible) volume of calls in for end user or single family has increased.

So I've been taking on new clients mostly because I don't have a choice. I take whatever I can get at this point till I kind of restabilize my financial situation. But the majority of clients are recurring. That name that you mentioned is not a recurring client.

MS. DEVINE: Okay. Who's Nicole Dunn?

MR. KAHAN: She's the owner of Neecy Mechanical. One of my best clients.

MS. DEVINE: Okay. All right. I just want to kind of ask you the same question about how you use the Cash App that also is in your personal name. Do you use it just for personal reasons or you do use it as a business account, as well?

MR. KAHAN: So I attempted to use it as a business merchant because I have consistent problems with collecting checks from clients. So I've used the fire name -- I named it Fire Protection 24. There's one or two clients -- Steve Bennett (phonetic) is one name that that sometimes pays me with Cash App. Nicole Dunn pays with Cash App. So I would collect business transactions. The answer is yes to that when

I -- when it was available. Other than that, it would be used just -- you know, I was unfamiliar with Cash App until I met Hunter Penn. Now it's actually been -- it's actually helped a little bit for collecting. But yeah.

MS. DEVINE: What is One Love Caribbean?

MR. KAHAN: That's Steve Bennett. So he's the owner of a fire sprinkler installation company. Not the name of the company, but yeah.

MS. DEVINE: So he, for One Love Caribbean, makes -- pays his receivables directly into the Cash App?

MR. KAHAN: He's receivable, so it'd be more like accounts payable. Yeah. So my receivables. He's a client.

MS. DEVINE: Right.

MR. KAHAN: You know, it -- yes. One Love Caribbean is Steve Bennett. (Inaudible) the name of the company.

MS. DEVINE: Okay. And then kind of same question for BlueVine, is that -- do you use that for just business or do you do personal -- do you use it for personal reasons, as well?

MR. KAHAN: I try my best to run only business, but there are -- there is crossover.

MS. DEVINE: So sometimes you use the BlueVine for personal expenses?
MR. KAHAN: (Inaudible) my banking options are limited. It's kind of like whatever -- it's like survival mode, so I'll use that when I have to.
MS. DEVINE: Yep.
MR. KAHAN: The CPA is hopefully going to get everything where it needs to go and file proper taxes and stabilize.
MS. DEVINE: All right. And then just finally, how do you use the -- the last set of a couple of statements that were provided are the Venmo that has an at Kronos Collab name. How do you use that one?
MR. KAHAN: Yeah. Venmo, I have a personal and a business, Kronos. Probably my number one preferred way to collect any sort of payments. It's been steady. It's never closed on me. It's annoying sometimes, but it's my -- if I had my choice, it'd be the only way. So I collect client payments through the Kronos, sometimes personal. And I use it, you know, for kids' stuff or whatever. I have a debit card that's attached to it.
MS. DEVINE: Okay. So I just -- at the beginning of that, did you say you have two Venmos or

only one?

MR. KAHAN: It's one Venmo account that has a business. It has at Kronos Collab -- like, I log in to Venmo. It has a personal and a business. It's one login, so I guess it would be two different names, one account.

MS. DEVINE: Okay. So I -- and I guess I -- the question that I guess I'll ask you and Mr. Levine to go back and look at what you provided to the Trustee. And did you did you provide all of the Venmo accounts that you have? Or -- because the only ones I see say at Kronos Collab.

MR. KAHAN: I absolutely provided all of them. There'll be another at Kronos collab has its own statements and then at J&K Boxford (phonetic) is the, I think, the name is -- has its own statements. Those both should be in there, and they should be separate.

MS. DEVINE: Okay. So, Mr. Levine, if you would follow-up on that because I don't believe we received at Jason. We only have at Kronos.

MR. KAHAN: Okay. Okay.

MS. DEVINE: Okay. A project that you mentioned from the last meeting was 227 Havre Street, and you provided the Trustee with some kind of an

unsigned participation agreement or profit share agreement?

MR. KAHAN: Yes.

MS. DEVINE: And indicated that there may be some equity in the project that you would be entitled to split under those documents and that profit share. That sound familiar?

Are you there?

MR. KAHAN: Yes. I said there was supposed to be. Yes.

MS. DEVINE: Okay. So counsel to the, I guess I'll say lender or investor, depending how you look at it, has sent a summary of the expenses for the project, indicating that all units have been sold, and there were insufficient funds to pay the original debt, as well as the 5 percent share, all of which -- the 5 percent profit that would have had to be paid before there was a distribution to you. Did you take a look at that summary?

MR. KAHAN: I did. Yep.

MS. DEVINE: Okay. Did it look accurate to you?

MR. KAHAN: Completely inaccurate and complete fabrication and just what I -- tip of what I (inaudible) from a predatory lender, and I can go on

and on and on about that situation. But if I had funds to hire a litigator, we would be -- we would be in discovery right now.

MS. DEVINE: Okay. So can -- was it -- my understanding is it was a six-unit building. Is that right?

MR. KAHAN: Yes.

MS. DEVINE: Okay. And, I guess, the borrowing was about 4.3 million?

MR. KAHAN: I don't agree with that.

MS. DEVINE: Okay. I think that's what -- okay. That is what the documents that your counsel sent to us said, that the property was, you know, deeded to your lender on particular terms that established the amount that would be -- need to be repaid.

MR. KAHAN: That I agree with. There's a backstory with this whole thing that I don't know if we want to get to. I disagree with the accounting they sent over. It's -- it also came as a result of -- oh, so one of the lender was at my house when I notified that particular -- First Boston -- that they were asking about the contract between David -- or First Boston and I.

And very shortly after, all the units were

magically sold, and I got that email. So I disagree with everything that was sent to me. It's --

MS. DEVINE: Okay. So I'm going to ask you to follow-up with your attorney and if you could get us, you know, a kind of specifics on what you disagree with. And let me just -- I just want to give you -- right here with your attorney a couple things that I see.

One is the profit participation agreement that you provided to us talks about a loan for $4.4 million that had to be repaid along with a 5 percent return. So I guess if you disagree with that piece of it, if you would kind of explain why you entered into the agreement that says that. That's the first thing.

And then the second thing is, if you disagree with the accounting that, you know, set the -- where the lender sets forth what they receive, I ask you to look at the registry of deeds. There are six deeds on there, right, that show that closing transaction to, you know, consumers, it looks like, and just provide a summary. We'll run it down, but indicate why you think it's fabricated.

It looks like six units were sold to six disparate couples. If you think the valuation is off, you know, there's Zillow. Let us know what you think

the unit should have sold for. And if you provide us with that, we'll follow-up.

MR. KAHAN: I can put something together for the entire -- for that entire project. As a result, (inaudible) my house, too, right? So, you know, like, I can do a nice summary there. That relationship and that -- when accounting, I was referring to that -- not that service -- the revenue was not deducted off, that 4.4. So there's two-plus years of $360,000 of collected revenue there.

The accounting off. I'll give you a summary, and I'll put it on a one-page document. I won't get too in detail with it, but I'll provide that.

MR. DEVINE: Perfect. That -- you know, aside from everything that Mr. Kesselman asked for, you know, I'd ask that that also go to Mr. Lassman, as well. And that's all I have, Don, if you got anything else. Or if anyone else does.

MR. LASSMAN: Okay. Is anyone present? Justin, are you still on the line?

MR. KESSELMAN: I am.

MR. LASSMAN: Okay. So sorry I had to cut you off there. I hope you --

MR. KESSELMAN: No. That's all right.

MR. LASSMAN: -- Were not offended by that. I didn't mean to do that.

MR. KESSELMAN: It's all right. I'm not offended. No, no, no, not --

MR. LASSMAN: Okay. All right. So --

MR. KESSELMAN: Yeah. If I need more, I know the proper --

MR. LASSMAN: The proper route?

MR. KESSELMAN: -- (inaudible), so.

MR. LASSMAN: Christine, yeah. And --

MR. KESSELMAN: Yeah.

MR. LASSMAN: -- unless my counsel says otherwise, what I would do is conclude the meeting at this time. Christine, are you okay with that? Are there documents --

MS. DEVINE: The only -- I'm thinking through.

MR. LASSMAN: Yeah. Yep.

MS. DEVINE: We've asked for quite a few documents.

MR. LASSMAN: Okay. Okay.

MS. DEVINE: I think you probably -- I would wait for them to come in before you conclude the meeting.

MR. LASSMAN: Okay. All right. So we want

to continue to a date in case the documents generate further questions? Okay.

MS. DEVINE: Exactly.

MR. LASSMAN: Okay. Hold on one second.

MR. KESSELMAN: That would make sense to me, too.

MR. LASSMAN: All right. No, no. That's fine. That's fine. Let me see if I can do that. All right. So, Barry, what is your sense of timing?

MR. LEVINE: My sense is that when everybody sends me what they're looking for us to provide, we're probably looking at continuing this, hopefully, into late February or early March because that's a shitload of documents everybody's looking for. And, you know, I got a lot of other things going on, but we'll try to get them to you as fast as we can.

MR. LASSMAN: Okay. Hold on one second. Okay. So let's pick a date. How about a date during the week of February 17? How do people --

MR. LEVINE: Is that Saint Patrick's Day?

MR. LASSMAN: The week of February 17.

MR. LEVINE: Hang on. Sure. Your choice.

MR. LASSMAN: So, Christine or Jason, are there any dates? I would go to Wednesday the 19th and --

MR. LEVINE: In the morning?

MR. LASSMAN: What is best for -- is the morning good for you in particular, Barry?

MR. LEVINE: Yeah. I prefer the morning because usually, you know, the doctor's appointments and shit are later on in the day, so --

MR. LASSMAN: Okay.

MR. LEVINE: -- I can work around it.

MR. LASSMAN: So could we say February 19th at 9:00 a.m.?

MR. KAHAN: Perfect.

MR. LASSMAN: Wait. Let me check with Attorney Devine and Attorney Kesselman.

MS. DEVINE: That's fine with me.

MR. KESSELMAN: Fine with me.

MR. LASSMAN: Okay. So I appreciate this. We'll continue the meeting to Wednesday, February 19th at 9:00 a.m. Everyone may -- oh, is there anyone else present that has any questions for the Debtor that I didn't get to?

Okay. Hearing none, everyone, you can disconnect from the phone. Have a good weekend. If I don't talk to you, have a good New Year.

MR. KESSELMAN: Have a happy and a healthy New Year, everybody.

MR. KAHAN: I'd like to apologize for being late again. Sorry about that. We're in a little bit of a downward medical spiral right now.

MR. LASSMAN: Okay. Thank you, Mr. --

MR. KAHAN: (Inaudible).

MR. LASSMAN: Thank you, Mr. Kahan. Bye.

MR. LEVINE: Happy New Year.

(End of Audio Recording)

CERTIFICATE OF TRANSCRIPTIONIST

I WENDY K. SAWYER, hereby certify that I was authorized to and did transcribe the provided recording and that the foregoing transcript is a true transcript of said electronic recording to the best of my ability.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 4th day of August, 2026.

WENDY K. SAWYER, CDLT

**EXHIBIT E**

LAW OFFICE OF DONALD R. LASSMAN
POB 920385
NEEDHAM, MA 02492
Don@LassmanLaw.com
781-455-8400
www.Lassmanlaw.com

November 25, 2024

Hunter Penn
1153 Elm Street
Apt. 3L
West Springfield, MA 01089
-Via First Class Mail
-Via Certified Mail, Return Receipt Requested
-Via Email to AlexColvin@Protonmail.com

Re: Jason M. Kahan, Chapter 7 Bankruptcy Case No. 24-11592-JEB

DEMAND FOR TURNOVER OF PROPERTY OF THE BANKRUPTCY ESTATE

Dear Mr. Penn:

Please be advised that I have been appointed to serve as the Chapter 7 Bankruptcy Trustee for Jason M. Kahan. Mr. Kahan filed a voluntary Chapter 7 bankruptcy proceeding in Federal Bankruptcy Court in Massachusetts on August 7, 2024, at case number 24-11592. A copy of the "Notice of Case Commencement" and my "Notice of Trustee Appointment" is enclosed with this Letter.

According to the Bankruptcy Schedule A/B filed by Mr. Kahan (copy eclosed), **you are the custodian** of Bitcoin with a valuation of not less than $110,000,000.00. The United States Bankruptcy Code requires a custodian with knowledge of the commencement of a bankruptcy case to immediately deliver all property in their custody to the Trustee and file an accounting from the time that the property came into their control. A copy of the relevant provision of the United States Bankruptcy Code governing custodians is enclosed with this letter.

The purpose of this letter is to demand that you immediately turn over to me, in my capacity as Bankruptcy Trustee for Mr. Kahan, all Bitcoin (including keys and/or passwords and usernames) that you are holding or are otherwise controlling now or at any time in the future. Absent communication from you on or before December 6, 2024, I will assume that you do not intend to comply with the request and will seek appropriate relief in Federal Bankruptcy Court.

I have established an account at Gemini for the purpose of receiving Mr. Kahan's Bitcoin that I understand that you are holding. The wallet address for that account is as follows:

[redacted]xf27

Please contact me when you prepare to send the Bitcoin in question so we may first do a 'test-send' of a small amount to ensure the wallet address is properly entered on your end.

Additionally, please contact me immediately if you have any questions concerning the contents of this letter or expect to be unable to timely comply with this demand for any reason. Thank you.

Very truly yours,

Donald R. Lassman

**Information to identify the case:**

| | | | |
|---|---|---|---|
| Debtor 1: | Jason M Kahan<br>First Name Middle Name Last Name | Social Security number or ITIN: | xxx−xx−3987 |
| | | EIN: | _ _−_ _ _ _ _ _ _ |
| Debtor 2:<br>(Spouse, if filing) | First Name Middle Name Last Name | Social Security number or ITIN: | _ _ _ _ |
| | | EIN: | _ _−_ _ _ _ _ _ _ |
| United States Bankruptcy Court: | District of Massachusetts | Date case filed for chapter: | 7 8/7/24 |
| Case number: | 24−11592 | | |

Official Form 309A (For Individuals or Joint Debtors)

# Notice of Chapter 7 Bankruptcy Case 10/20

**For the debtors listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtors or the debtors' property. For example, while the stay is in effect, creditors cannot sue, garnish wages, assert a deficiency, repossess property, or otherwise try to collect from the debtors. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although debtors can ask the court to extend or impose a stay.

The debtors are seeking a discharge. Creditors who assert that the debtors are not entitled to a discharge of any debts or who want to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadlines specified in this notice. (See line 9 for more information.)

**To protect your rights, you may wish to consult an attorney.** All documents filed in the case may be inspected through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**To help creditors correctly identify debtors, debtors submit full Social Security or Individual Taxpayer Identification Numbers, which may appear on a version of this notice. However, the full numbers must not appear on any document filed with the court.**

**Do not file this notice with any proof of claim or other document in the case. Do not include more than the last four digits of a Social Security or Individual Taxpayer Identification Number in any document, including attachments, that you file with the court.**

| | | About Debtor 1: | About Debtor 2: |
|---|---|---|---|
| 1. | **Debtor's full name** | Jason M Kahan | |
| 2. | **All other names used in the last 8 years** | | |
| 3. | **Address** | 23 Sagamore Lane<br>Boxford, MA 01921 | |
| 4. | **Debtor's attorney**<br>Name and address | Barry R. Levine<br>100 Cummings Center<br>Suite 327G<br>Beverly, MA 01915 | Contact phone 978−922−8440<br>Email: barry@levineslaw.com |
| 5. | **Bankruptcy trustee**<br>Name and address | John O. Desmond<br>5 Edgell Road, Suite 30A<br>Framingham, MA 01701 | Contact phone 508−879−9638<br>Email: trustee@jdesmond.com |

**For more information, see page 2>**

Debtor **Jason M Kahan** Case number **24−11592 −jeb**

| | | |
|---|---|---|
| **6. Bankruptcy clerk's office**<br><br>Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at pacer.uscourts.gov. | U. S. Bankruptcy Court<br>J.W. McCormack Post Office & Court House<br>5 Post Office Square, Suite 1150<br>Boston, MA 02109−3945 | Hours open: Monday−Friday 8:30am−5:00pm<br><br>Contact phone 617−748−5300<br><br>Date: 8/7/24 |
| **7. Meeting of creditors**<br><br>Debtors must attend the meeting to be questioned under oath. In a joint case, both spouses must attend. Creditors may attend, but are not required to do so. | **September 3, 2024 at 11:30 AM**<br><br>The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | Location:<br><br>**The meeting will be held TELEPHONICALLY** |

**The dial−in number and participant code for the telephonic section 341 meeting of creditors will be posted to the docket within 14 days prior to the meeting. You may also contact the trustee for dial−in information.**

| | | |
|---|---|---|
| **8. Presumption of abuse**<br><br>If the presumption of abuse arises, you may have the right to file a motion to dismiss the case under 11 U.S.C. § 707(b). Debtors may rebut the presumption by showing special circumstances. | The presumption of abuse does not arise. | |
| **9. Deadlines**<br><br>Papers and any required fee must be received by the bankruptcy clerk's office **no later than the deadlines listed.** | **File by the deadline to object to discharge or to challenge whether certain debts are dischargeable:**<br><br>**You must file a complaint:**<br>• if you assert that the debtor is not entitled to receive a discharge of any debts under any of the subdivisions of 11 U.S.C. § 727(a)(2) through (7), or<br>• if you want to have a debt excepted from discharge under 11 U.S.C. § 523(a)(2), (4) or (6).<br><br>**You must file a motion:**<br>• if you assert that the discharge should be denied under § 727(a)(8) or (9). | **Filing deadline: 11/4/24** |
| | **Deadline to object to exemptions:**<br>The law permits debtors to keep certain property as exempt. If you believe that the law does not authorize an exemption claimed, you may file an objection. | **Filing deadline:** 30 days after the *conclusion* of the meeting of creditors |
| **10. Deadline to file §503(b)(9) requests:** | Requests under Bankruptcy Code §503(b)(9)(goods sold within twenty(20) days of bankruptcy) must be filed in the Bankruptcy Clerk's office. | **Filing deadline:** 60 days from the first date set for the meeting of creditors |
| **11. Proof of claim** | For holder(s) of a claim secured by a security interest in the debtor's principal residence, pursuant to Rule 3002(c)7(A): | **Filing deadline:** 70 days from the Filing Date of the Petition |
| | For creditors other than those holding a *Claim Secured by a Security Interest in the Debtor's Principal Residence:* A date has not been set yet. No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now. If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline. | |

**For more information, see page 3>**

| | |
|---|---|
| **12. Discharge of Debts** | The debtor is seeking a discharge of most debts, which may include your debt. A discharge means that you may never try to collect the debt from the debtor. If you believe that the debtor is not entitled to receive a discharge under Bankruptcy Code §727(a) or that a debt owed to you is not dischargeable under Bankruptcy Code §523(a)(2),(4), or (6), you must file a complaint or a motion if you assert the discharge should be denied under §727(a)(8) or (a)(9) in the bankruptcy clerk's office by the "Deadline to Object to Debtor's Discharge or to Challenge the Dischargeability of Certain Debts" listed on line 9 of this form. The bankruptcy clerk's office must receive the complaint or motion and any required filing fee by that deadline. |
| **13. Creditors with a foreign address** | If you are a creditor receiving a notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. |
| **14. Financial Management Training Program Deadline for the Debtor** | **Deadline for debtor to attend a financial management training program approved by the United States Trustee: Sixty (60) days from the first date set for the meeting of creditors.** The discharge will not enter if the debtor fails to attend a financial management−training program approved by the United States Trustee or if the debtor attends such training and fails to file a certificate of completion with the U.S. Bankruptcy Court. The training is in addition to the pre−bankruptcy counseling requirement. A list of approved courses may be obtained from the United States Trustee or from the court's website at www.mab.uscourts.gov. |
| **15. Exempt property** | The law allows debtors to keep certain property as exempt. Fully exempt property will not be sold and distributed to creditors. Debtors must file a list of property claimed as exempt. You may inspect that list at the bankruptcy clerk's office or online at pacer.uscourts.gov. If you believe that the law does not authorize an exemption that the debtors claim, you may file an objection. The bankruptcy clerk's office must receive the objection by the deadline to object to exemptions in line 9. |
| **16. Abandonment of Estate Property** | Notice is hereby given that any creditor or other interested party who wishes to receive notice of the estate representative's intention to abandon property of the estate pursuant to 11 U.S.C. §554(a) must file with the Court and serve upon the estate representative and the United States trustee a written request for such notice within fourteen (14) days from the date first scheduled for the meeting of creditors. |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

---

| | | |
|---|---|---|
| In Re: | Jason M Kahan ,<br>Debtor | Chapter: 7<br>Case No: 24−11592<br>Judge Janet E. Bostwick |

---

**CERTIFICATE OF APPOINTMENT OF INTERIM TRUSTEE**
**AND FIXING OF BOND**

Pursuant to 11 U.S.C. § 701(a)(1)

Donald Lassman
Law Offices of Donald Lassman
P. O. Box 920385
Needham, MA 02492

is hereby appointed as Interim Trustee in the above−referenced proceeding and is designated to preside at the meeting of creditors. The Trustee's bond is fixed under the general blanket bond heretofore approved. The Trustee shall notify the United States Trustee immediately in the event that the liquid assets exceed $1,000,000.

Pursuant to FRBP 2008 the Trustee will be deemed to have accepted this appointment unless it is rejected within five (5) days of receipt of this notice. Unless another trustee is elected the Interim Trustee appointed herein shall serve as Trustee without further appointment as provided by 11 U.S.C. § 702(d).

Date:8/27/24

William K. Harrington
U.S. Trustee
(617) 788−0400

Original filed with Bankruptcy Court
Copy to trustee

---

**REJECTION**

I, Donald Lassman , hereby REJECT appointment as Trustee.
Dated: This day of ___________________________ .

Donald Lassman

Original filed with Bankruptcy Court
Copy to United States Trustee

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | Jason M Kahan (First Name / Middle Name / Last Name) |
| Debtor 2 (Spouse, if filing) | (First Name / Middle Name / Last Name) |
| United States Bankruptcy Court for the: | DISTRICT OF MASSACHUSETTS |
| Case number | 1:24-bk-11592 |

☐ Check if this is an amended filing

# Official Form 106A/B

# Schedule A/B: Property

12/15

**In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

## Part 1: Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☒ Yes. Where is the property?

1.1

23 SAGAMORE LN
Street address, if available, or other description

BOXFORD MA 01921
City State ZIP Code

County

**What is the property?** Check all that apply

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other

**Who has an interest in the property?** Check one

☒ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

**Other information you wish to add about this item, such as local property identification number:**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| **Current value of the entire property?** | **Current value of the portion you own?** |
|---|---|
| $1,600,000.00 | $1,600,000.00 |

**Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.**

☐ **Check if this is community property** (see instructions)

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here.........................................................................=>** $1,600,000.00

## Part 2: Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☒ No
☐ Yes



Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Case 24-11592 Doc 32 Filed 09/11/24 Entered 09/11/24 08:14:50 Desc Main
Document Page 9 of 28

Debtor 1 Jason M Kahan Case number *(if known)* 1:24-bk-11592

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☒ No
☐ Yes

5 **Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here.............................................................................=>** $0.00

**Part 3:** **Describe Your Personal and Household Items**

**Do you own or have any legal or equitable interest in any of the following items?** — **Current value of the portion you own?** Do not deduct secured claims or exemptions.

6. **Household goods and furnishings**
*Examples:* Major appliances, furniture, linens, china, kitchenware
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| 23 Sagamore Lane, Boxford, MA 01921 | $3,000.00 |

7. **Electronics**
*Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| (3) cellphones; (5) TVs; (2) tablets; (1) plotter; (1) printer; (2) PCs; (2) laptops | $2,000.00 |

8. **Collectibles of value**
*Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
☒ No
☐ Yes. Describe.....

9. **Equipment for sports and hobbies**
*Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
☒ No
☐ Yes. Describe.....

10. **Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
☒ No
☐ Yes. Describe.....

11. **Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| 23 Sagamore Lane, Boxford, MA 01921 | $500.00 |

12. **Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| (1) wedding ring | $1,000.00 |

13. **Non-farm animals**
*Examples:* Dogs, cats, birds, horses
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| (1) dog | $0.00 |


Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

14. **Any other personal and household items you did not already list, including any health aids you did not list**

☒ No
☐ Yes. Give specific information.....

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ............................................................................ $6,500.00

**Part 4:** **Describe Your Financial Assets**

| **Do you own or have any legal or equitable interest in any of the following?** | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |
|---|---|

16. **Cash**

*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition

☒ No
☐ Yes...............................................................................................................

17. **Deposits of money**

*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.

☐ No
☒ Yes....................... Institution name:

| | | Institution name | Current value |
|---|---|---|---|
| 17.1. | Checking | Citizen's Bank | $0.00 |
| 17.2. | Bitcoin | Hunter Penn, Custodian of the Debtor's bitcoin | $110,400,000.00 |

18. **Bonds, mutual funds, or publicly traded stocks**

*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts

☒ No
☐ Yes................. Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**

☐ No
☒ Yes. Give specific information about them..................

| Name of entity: | % of ownership: | |
|---|---|---|
| The Debtor at all times relevant thereto was either the manager, sole member, officer, director, sole shareholders of all the entities listed on the Debtor's answer to question 27 of the SOFA. It is not believed that any of his equity interested have any value independent of the real estate projects they may be associated with. The Debtor, however, shares his interest in Kronos, Inc. with his spouse. The Debtor specifically exempts his interest in WJH Elm Street Somerville, LLC. | 100 % | $1,000.00 |

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**

*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.

☒ No
☐ Yes. Give specific information about them

Issuer name:

21. **Retirement or pension accounts**

*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans

☒ No
☐ Yes. List each account separately.

Type of account: Institution name:



Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

22. **Security deposits and prepayments**
Your share of all unused deposits you have made so that you may continue service or use from a company
*Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
☒ No
☐ Yes. ..................... Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
☒ No
☐ Yes............. Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
☒ No
☐ Yes............. Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
☒ No
☐ Yes. Give specific information about them...

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
☒ No
☐ Yes. Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
*Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
☒ No
☐ Yes. Give specific information about them...

| **Money or property owed to you?** | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
☒ No
☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
*Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
☒ No
☐ Yes. Give specific information......

30. **Other amounts someone owes you**
*Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay, workers' compensation, Social Security benefits; unpaid loans you made to someone else
☒ No
☐ Yes. Give specific information..

31. **Interests in insurance policies**
*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
☒ No
☐ Yes. Name the insurance company of each policy and list its value.
Company name: Beneficiary: Surrender or refund value:

32. **Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
☒ No
☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue
☐ No
☒ Yes. Describe each claim.........

| Claim | Value |
|---|---|
| First Boston Associates<br>Braintree, MA | Unknown |


Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor 1 Jason M Kahan Case number *(if known)* 1:24-bk-11592

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
☒ No
☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**
☒ No
☐ Yes. Give specific information..

36. **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here**....................................... $110,401,000.00

**Part 5: Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.**

37. **Do you own or have any legal or equitable interest in any business-related property?**
☒ No. Go to Part 6.
☐ Yes. Go to line 38.

**Part 6: Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.**
If you own or have an interest in farmland, list it in Part 1.

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
☒ No. Go to Part 7.
☐ Yes. Go to line 47.

**Part 7: Describe All Property You Own or Have an Interest in That You Did Not List Above**

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
☒ No
☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** .................................. $0.00

**Part 8: List the Totals of Each Part of this Form**

| | | | | |
|---|---|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ......................................... | | | $1,600,000.00 |
| 56. | **Part 2: Total vehicles, line 5** | $0.00 | | |
| 57. | **Part 3: Total personal and household items, line 15** | $6,500.00 | | |
| 58. | **Part 4: Total financial assets, line 36** | $110,401,000.0<br>0 | | |
| 59. | **Part 5: Total business-related property, line 45** | $0.00 | | |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | $0.00 | | |
| 61. | **Part 7: Total other property not listed, line 54** + | $0.00 | | |
| 62. | **Total personal property.** Add lines 56 through 61... | $110,407,500.0<br>0 | Copy personal property total | $110,407,500.00 |
| 63. | **Total of all property on Schedule A/B**. Add line 55 + line 62 | | | $112,007,500.00 |



Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

# *11 USCS § 542*

Current through Public Law 118-106, approved October 4, 2024.

***United States Code Service > TITLE 11. BANKRUPTCY (§§ 101 — 1532) > CHAPTER 5. Creditors, the Debtor, and the Estate (Subchs. I — III) > Subchapter III. The Estate (§§ 541 — 562)***

## § 542. Turnover of property to the estate

**(a)** Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title [*11 USCS § 363*], or that the debtor may exempt under section 522 of this title [*11 USCS § 522*], shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

**(b)** Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title [*11 USCS § 553*] against a claim against the debtor.

**(c)** Except as provided in section 362(a)(7) of this title [*11 USCS § 362(a)(7)*], an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsection (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title [*11 USCS §§ 101* et seq.] concerning the debtor had not been commenced.

**(d)** A life insurance company may transfer property of the estate or property of the debtor to such company in good faith, with the same effect with respect to such company as if the case under this title [*11 USCS §§ 101* et seq.] concerning the debtor had not been commenced, if such transfer is to pay a premium or to carry out a nonforfeiture insurance option, and is required to be made automatically, under a life insurance contract with such company that was entered into before the date of the filing of the petition and that is property of the estate.

**(e)** Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

## History

**HISTORY:**

Nov. 6, 1978, *P. L. 95-598*, Title I, § 101, *92 Stat. 2595*; July 10, 1984, *P. L. 98-353*, Title III, Subtitle H, § 457, *98 Stat. 376*; Oct. 22, 1994, *P. L. 103-394*, Title V, § 501(d)(16), *108 Stat. 4146*.

United States Code Service
Copyright © 2024 All rights reserved.

**EXHIBIT F**

**tony tonybarlettajr.com**

**From:** Nils Trosterud <ntrosterud@nordcapadvisors.com>
**Sent:** Thursday, December 12, 2024 6:01 PM
**To:** tony tonybarlettajr.com
**Cc:** Nils Trosterud
**Subject:** Re: BTC extraction process

Great, Tony. Many Thanks.

Nils

12. des. 2024 kl. 23:51 skrev tony tonybarlettajr.com <tony@tonybarlettajr.com>:

Just wanted to let you know that all funds are now with Chris. Thanks again!



**Tony Barletta Jr.**
Loan Officer

NMLS# 18717 781-223-0845 508.356.5262

tonyb@milestonemortgagesolutions.com

508.858.0632

www.tonybarlettajr.com

128 Union Street, Suite 101, New Bedford, MA 02740

CO NMLS #1815656

MILESTONE
MORTGAGE SOLUTIONS

Apply Online! >

We appreciate your feedback! Leave us a Google Review!

The contents of this email and any attachments are confidential.If you have received this communication in error, please immediately notify us and delete this
'Unsubscribe' by replying to this email and letting us know you no longer wish to receive emails.

---

**From:** Nils Trosterud <ntrosterud@nordcapadvisors.com>
**Sent:** Wednesday, December 11, 2024 1:32 PM
**To:** tony tonybarlettajr.com <tony@tonybarlettajr.com>
**Cc:** Nils Trosterud <ntrosterud@nordcapadvisors.com>
**Subject:** BTC extraction process

When we receive the $50,000, we will immediately show the Software Company that the funds are in our account. At the same time, we will send the funds to them.

Once they confirm reception of the funds, they will go to work within 24 hours. They could start immediately, but they need to be certain that there is no other activity at the other end.

We have the private key to the wallet containing 1000.00131470 BTC, as well as the same private key that we discovered when the 3rd Party accessed the same wallet to investigate the 0.0000033 BTC we sent as an unconfirmed test transaction to the wallet.

At the same time, we will go for the 610 BTC wallet.

The then 1810 BTC were located in 4 wallets, containing 1.000, 100, 100 and 610 BTC respectively. On June 26, 2024, the 610 BTC wallet was emptied except for 0.0001 BTC that still remain. The 610 BTC were transferred to 3 new wallets, containing 1, 3 and 606 BTC respectively. This means the 1.810 BTC are now located in 7 wallets.

We will move the 1000.00131470 BTC and the 606 BTC to two new wallets, controlled by us.
Once we have the BTC in the new wallets, we will deduct 10% and pay the Software Company. We will then deduct the equivalent of $675,000 in BTC to cover incurred costs. Of this amount, we will send $50,000 to Eric Lomas.

Finally, the remaining BTC will be transferred to two new, net wallets. That is, wallets net of agreed fees. We will get a notification as to how much Jason owes the bankruptcy court and send the amount to the court. The remainder will be sent to Eric, Jason or you.

Time is now the essence. We expect the funds to be transferred by close of business Thursday December 12 or latest Friday morning, December 13, 2024.

Thank you.

Nils

**EXHIBIT G**


2:03
124
849
cgreen@windcrofte...
I'm hoping that the guys have validated. I've gotten over 5000 non working over the past 2 years.
He accessed the 1,000+ wallet twice. Each time, they picked up the same private key.
The 604 also
Also the loan docs
need to be held internally until after or you need to get on the creditor list. If that gets in the wrong se it could be extremely problematic
Edited
I understand.
Getting the 1,000 Bitcoin solves everything.
Subject
iMessage


2:04
124
849
cgreen@windcrofte...
Yes did they also get the 604 or are they still planning on going after it ?
And if so who's extracting and funds need to be helps to avoid this again
2 Replies
Yes, they know where the 604 is. It was in one wallet then he split it into three wallets. They picked up private keys each time.
But it hasn't moved, it
In the same wallet
Unless there's a way to have a parent and child while it's within the mode that could be a possibility but look at this
Address:
[redacted] rxkm
blockchain.com
Subject
iMessage


2:04
849
cgreen@windcrofte...
Originally, there were four wallet, now there seven. 610 was transferred into two wallets and then a third wallet.
The three wallets contain 3 BTC, 1 BTC, and 606 BTC.
You have my PNC account and wire information - correct?
Yes I'm not doing a SARS so You will see multiple deposits under the limit
Ok Great.
Dec 10, 2024 at 9:39 AM
I'm expecting a wire confo at or around 10 o'clock I'll send it when I have it. Cash deposit In to someone else's Account didn't really fly
Ok
Subject
iMessage


2:04
849
cgreen@windcrofte...
They are sweeping. We will keep an audit trail. Can send to two wallets.
I don't know if I keep an audit trai but OK sounds good.
Record of who got paid what.
Oh ok
There I only one wildcard here

Also

Am getting loan docs to anything to sing
Edited
I think Eric is probably losing his mind over this I don't wanna drive him to a mental breakdown
Yes
Dec 10, 2024 at 12:32 PM
Subject
iMessage


2:05
134
849
cgreen@windcrofte...
Very good. Standing by for the wires. I will let Oslo know I am receiving it.
I'm assuming the guys know how to carefully transfer, I would definitely ask them if there's a possibility that Hunter could shut this down in mid transmission I don't think that's possible in the block chain but they would know
Because if there is a possibility I'm gonna send feet on the ground to go make sure he doesn't do anything
We are accessing the 1,000+ and the 604 wallet at the same time. We are moving the Bitcoin to two wallets - 1,000 and 604. Nils is controlling the two private keys.
OK I just don't have the experience if it's on a self hosted note if this dickhead able to shut it down mid transmission
Subject
iMessage


2:06
849
cgreen@windcrofte...
I will keep you posted.
Dec 12, 2024 at 5:30 PM
I have the $50,000. I contacted Computer Support in Oslo. I will hear back in the morning.
Ok and I'll send over wallet addresses for the 2 guys that put up $50k if that works for you.
I may give more info than needed but I'll keeping us clean
Ok. Send them over.
Dec 13, 2024 at 12:29 PM
They are working on it. However, are going radio silence. Afraid Alex might get wind of this. I expect more info over the weekend.
Who has gone radio silence
Edited
Subject
iMessage


2:06
849
cgreen@windcrofte...
expect more info over the weekend.
Who has gone radio silence
Edited
I am actively speaking with Alex: give me the word and I'll eliminate the issue or I can have him go do a job for me
If they have keys it should not matter what he does
Oslo has. They are not telling anyone anything. Alex is not the problem. They are not telling anything until they have the bitcoin.
Ok
Thanks you very much
Give me the word and I'll demobilize him
Subject
iMessage


2:07
14
849
cgreen@windcrofte...
Dec 18, 2024 at 1:17 PM
Chris I don't need anything specific as far as update but I do have to go into a hearing at 2 PM.
Do we have a general timeframe
Anything
Dec 18, 2024 at 3:34 PM
Tonight.
Dec 18, 2024 at 8:10 PM
We are monitoring Alex's activity. As soon as we can a lull in the activity, we are going.
I'm about to begin working with him
Today I'm buying a alt coin trading bot
I'll manage to piss him off to sign off around midnight
Subject
iMessage


2:09
849
EL
Recovery Effort
and get it into Barry as soon as possible
These guys have big balls
Give them an upside makes zero sense if they're confident they get the deal done give them more money when they clear it should be so fucking easy
Offer them more
Another 2% or a little more
We cannot have no funds to the trustee that would be a bigger issue
cgreen@windcroftecapital.com Add
Oh great, I have over $600,000 in and we are losing this opportunity to get the key. Ken is an idiot. He will never get the key. They will sell it or take the Bitcoin in the next 24 hours. We will be fucked. Ken has no jurisdiction in Oslo. They are been very reasonable.
Subject
iMessage


2:09
849
EL
Recovery Effort
There is definitely a key. Nils has it. Jason, they are done. We have made commitments and not delivered. They do not believe you own it and believe you must have given the key to Alex. They will just take it themselves.
I'm at the point where even if the money drops in Eric's account I'm not dealing with the terrorist I have for 3 years.
I have zero confidence in anything that's being said here and it doesn't make any sense I've done everything that's been asked of me there's been 100 grand in the account for like a week we keep wasting time and here we are at the 11th hour
I don't know what to say here man I can try and coerce kirk
Subject
iMessage


2:10
16
849
EL
Recovery Effort
I know but better to add to the BK and hope Ken gets it done
You have the power over these Guys I don't understand fully but as we wasted time the capital was taken back
Still confident we have it but again missed deadline 50,000 or 100,000 they would need to return it if they don't succeed to avoid a shitshow
cgreen@windcroftecapital.com Add
She keeps asking me what the problem is that we are not getting money to Oslo to make this happen. This deal in Oslo is dead today. We lose the $50,000 and I lose $600,000. They will not work with us and I have no idea what they will do key.
We will Start submitting loan docs to Barry to add Chris to the creditor list.
Subject
iMessage


2:10
849
EL
Recovery Effort
cgreen@windcroftecapital.com Add
Nils is out of Oslo at his cabin development project way up in the mountains. He is not reachable. He was ok to backstop two days ago. However, last time we talked he thought that we would have the $50,000 today and he did not have to backstop. He is away for the weekend. I will call the guys now and see what I can do. Call me.
Ok well we'll have money it won't be able to go out after today
The 50k is there
cgreen@windcroftecapital.com Add
Ok. Get me $50,000 in next 3 hours and I can hold them. However, I cannot hold them if I cannot show them I have it. If we want them to do this today or over the weekend, I have to have the funds to show them.
Subject
iMessage


2:13
17
EL
Recovery Effort
Them after
Take additional funds for the other 604
And send balance to Trustee
Wallet
Isn't that a better plan than waiting for me to close a loan or a sale to get you repaid
cgreen@windcroftecapital.com Add
Part of the effort is to get the 660. They know what wallet it is in; however, he moved it before we started on July 8th. We need to draw him out to access that wallet and then we will get the key through key strokes. We have been sitting in his computer undetected for almost four months. I know they have the key.
Dec 3, 2024 at 10:59 AM
Subject
iMessage


2:14
Recovery Effort
today
I'll have more in Eric's escrow when they ask for more as well.
Can we just get this done or is there a concern if they actually have a key
Have they tested the key? Have they verified it?
cgreen@windcroftecapital.com Add
They use the key to take the bitcoin. They cannot test it or Alex will see that someone is accessing the wallet. Then he will start moving everything. They will send bitcoin to the other wallets to draw him out and get the keys when he accesses the wallet.
So they pay you first
Them after
Take additional funds for the
Subject
iMessage


2:14
17
EL
Recovery Effort
and Eric. It is up to you to give it to Jason.
Ok so how much is needed now my guy will wire
cgreen@windcroftecapital.com Add
They never said they were not going to do it. They just have not been paid the $50,000 to get the ball rolling. I was stupid to advance $600,000 to help you out. I am the fool. Not sure how I became the bad guy.
Chris we already signed docs to get you paid back
cgreen@windcroftecapital.com Add
$50,000. I can probably get them to agree to that but they will not negotiate until they receive a wire.
Do 100,000 but we better fucking make sure that these
Subject
iMessage


2:14
16
EL
Recovery Effort
We went from 50 and 50k now it's 100k and an additional 100,000 and a 600,000 loan
cgreen@windcroftecapital.com Add
It was always $100K. Oslo expected the wire today. I had an excellent chance of selling them on just the $50K to do the work. They would not negotiate until they received a wire. You had all the contracts early this morning. Eric has all my invoices with Oslo for the $600,000. I told you I would front the money for Oslo. They did a lot of work because we asked them to. Through the keystroke reader, they secured the private key. So now, we cannot get the key to open the wallet and I am out $600,000.
I need a clear path for a lot of reasons, the most being that this has run above board for 2.5 years, what we are doing makes the most sense but there are multiple risks involved
Subject
iMessage

# EXHIBIT H

# CONTINGENT SERVICES AGREEMENT

THIS CONTINGENT SERVICES AGREEMENT (herein "Agreement") is made and entered into effective the 3rd day of February, 2025 (herein "Effective Date"), by and between Jason M. Kahan in his individual capacity (herein "Kahan"), and NordCap Advisors AS (herein "Contractor").

All parts of this Agreement, including these introductory paragraphs, are substantive and agreed to by both parties.

WHEREAS Kahan is the Debtor in Case No. 24-11592-JEB in the United States Bankruptcy Court for the District of Massachusetts (herein "Court", or "Bankruptcy Court"), and such case is pending pursuant to Chapter 7 of the Bankruptcy Code; and

WHEREAS Kahan by this Agreement intends to retain the Contractor as an independent contractor (without authority of an agent or representative), and the Contractor intends to be so retained to perform the services set forth and explained below on the terms and conditions stated herein; and

WHEREAS both parties understand and acknowledge that because Kahan is the Debtor in the above-referenced Chapter 7 bankruptcy case (herein "Case"), Kahan's only independent ability to enter into a contract related to his own assets, as are described hereunder, is under contingent circumstances where he may only agree to terms related to any remainder that may ultimately exist after his Chapter 7 Bankruptcy Trustee (herein "Trustee") pays all creditors and costs of the bankruptcy case. "Remainder" being all the bitcoin not used to satisfy the claims of Kahan's creditors; and

WHEREAS Kahan warrants and represents that the amount required to pay off all creditors and costs of the bankruptcy proceeding does not exceed [redacted]; and

[redacted]

WHEREAS the parties have been informed that Hunter Penn has recently acknowledged in writing to Cuccinelli that all the Bitcoin in wallets (herein "Bitcoin Wallets") with the following addresses and balances as of January 12, 2025:

[redacted]0hz

Balance: 1000.0013147 BTC,

[redacted]ssr

Balance: 100.0001 BTC, and

[redacted]x4x

Balance: 100.0001 BTC.

are entirely the property of Kahan, Contractor has been provided with this information from Kenneth Cuccinelli, Esquire, special counsel to the Trustee, and is satisfied that the issue of ownership concerning the above-referenced Bitcoin Wallets has been resolved; and

FURTHERMORE, both parties understand that all recovered assets required to pay off all creditors and costs of the bankruptcy proceeding, an amount which will [redacted] must be delivered entirely, and directly to Kahan's, into the Gemini account established by the Trustee for that purpose; and

FURTHERMORE, both parties understand that the remaining balance of the Bitcoin Wallets shall be remitted to Kahan at his designated Bitcoin Wallet destination less the fee due the Contractor for the recovery of same; and

THEREFORE, the parties have chosen the contingent payment structure described herein so that their Agreement can be fulfilled as expeditiously as possible with at all times relevant hereto time being of the essence; and

FURTHERMORE, in addition to both parties' agreement to all the foregoing, and in consideration of the mutual covenants set forth herein and the other good and valuable consideration, the sufficiency of which both as to amount and timing is hereby acknowledged by each party, it is hereby agreed by and between the parties as follows:

1. **Accounts/Wallets.** Each party shall designate one wallet for the receipt of any payout/delivery of Bitcoin under this Agreement for the distribution of the content of the Bitcoin Wallets:

    a. **Bankruptcy Trustee Wallet Address:** The wallet address of the Trustee to which any recovered Bitcoin, [redacted] will be immediately transferred by Contractor as part of a successful recovery is:

[redacted]xf27

b. **Kahan Wallet Address:** The wallet address to which Kahan will direct the Contractor to send his portion of the Bitcoin; and:

c. **Contractor Wallet Address**: The wallet address to which the Contractor will send the commission described hereunder.
[redacted]q53l

2. **Services to be Rendered by Contractor:** Contractor warrants and represents that it has or has access to the technical expertise needed to recover the Bitcoin from the Bitcoin wallets. Contractor will take those steps necessary to confirm receipt of a test amount of bitcoin forwarded to each designated Wallet Addresses prior to effectuating the undertakings described herein.

3. **Time is of the Essence:** Contractor shall perform its obligation herein and effectuate its recovery of the Bitcoin, if at all, within FORTY-EIGHT (48) HOURS of the mutual execution hereof.

4. **Contractor's Limit of Liability:** It is expressly noted that Contractor shall have no liabilities associated with the fulfilment, or lack thereof, of this Agreement or any parts of it. However, Kahan, at all times material hereto, shall be entitled to any bitcoin recovered by the Contractor less the latter's 20% fee from the above-referenced Bitcoin Wallets. Contractor shall have no responsibility for damages to any equipment or software and shall not be liable for any costs or damages if Contractor´s actions prevent the future recovery of Kahan´s Bitcoin whether contained in the above-referenced Bitcoin Wallets or not, nor shall the Contractor have any liability to Kahan if its efforts result in no recovery.

5. **Confirmation of Transactions:** Kahan agrees to make his best effort to obtain confirmation of all transfers accomplished by Contractor including that to the Trustee and himself and agrees to share such confirmations with Contractor as soon as such confirmations are available.

6. **Remuneration:** [redacted]

a. [redacted]

b. [redacted]

7. **Exclusive Option:** [redacted]

8. **Payment of Previous Costs:** Kahan agrees to have accumulated a debt of [redacted] to Contractor for bitcoin-related services prior to the effective date of this Agreement. If Contractor is successful in retrieving Kahan´s bitcoin in full, and is renumerated in accordance with this Agreement, this debt shall thereafter be null and void. If Contractor is not successful in retrieving the bitcoin as referenced in this Agreement, or not renumerated in accordance with this Agreement, Kahan shall pay Contractor the accumulated and outstanding debt within ten (10) business days after the Bankruptcy case has been settled. Kahan´s obligation to settle the outstanding debt to Contractor as specified in this paragraph shall survive the Termination of this Agreement.

9. **Nondisclosure:** The parties agree to keep confidential the existence and terms of this Agreement.

10. **Governing Law and Dispute Resolution:** This Agreement shall be governed by and construed under the laws of the Commonwealth of Massachusetts with no presumption(s) based on the drafting of the Agreement. However, any dispute between the parties shall be decided by binding arbitration in Boston, Massachusetts (or such other location if agreed to by the parties), not via court proceeding, with the loser of such arbitrated dispute bearing all costs of such dispute, as determined by the arbitrator. If the parties cannot agree to an arbitrator to decide their dispute, then each party shall select one certified arbitrator and the parties' selected arbitrators shall in turn select an arbitrator to hear and decide the dispute.

    Both parties waive legal service requirements in the event of arbitration and agree that service will be based upon actual notice, including via email using the email address for notice each party provides in the signature block hereto.

11. **Termination:** This Agreement, except the parts that are agreed to survive its Termination, shall terminate in **FORTY-EIGHT (48) HOURS** from the execution hereof regardless of Contractor's performance.

12. **Entire Agreement and Authority to Execute:** The parties understand and agree that this Agreement constitutes their entire and sole agreement, and that there are no additional terms not contained herein. The parties further agree that any amendment hereto must be in writing, and such amendment is only effective if and when it is signed by both parties, with signatures delivered to the other party.

    Contractor's signature to this Agreement shall demonstrate his/her authority to execute this Agreement to the satisfaction of Kahan. Kahan´s signature shall demonstrate his commitment to satisfy the terms and conditions stated herein.

13. **Manner of Execution:** Each party may execute this Agreement electronically with prior notice to the other party and/or in counterparts (i.e., each party executes a different copy of this same Agreement).

14. **Miscellaneous:** There are no representations, conditions, warranties, terms, promises or inducements except as expressly set forth herein. Headings are for convenience only and are not an integral part of this agreement.

Signed under seal this 3rd day of February, 2025.

Jason Kahan
____________________________

Jason M. Kahan
23 Sagamore Lane
Boxford, MA 01921
USA
jk@jasonkahan.com
DATE OF SIGNATURE

Signed: 2/3/2025

____________________________

Nils Trosterud
CEO and Chairman
NordCap Advisors AS
Hegdehaugsveien 31
0352 Oslo, Norway
ntrosterud@nordcapadvisors.com
DATE OF SIGNATURE

Signed 2/3/2025
Local time 10pm

**EXHIBIT I**

# ADDENDUM TO CONTINGENT SERVICES AGREEMENT

REFERENCE is made to a certain Contingent Services Agreement dated February 3, 2025, by and between Jason M. Kahan (herein "Kahan") and NordCap Advisors AS (herein "NordCap"), a copy of which is annexed hereto as Exhibit A, the content of which is specifically incorporated herein by reference.

NOW THEREFORE, Kahan and NordCap agree that the time for performance by the latter, as set forth in Paragraph 3 of said Contingent Services Agreement, and termination, as set forth in Paragraph 11, are by reason hereof extended up to and through 12:00 noon eastern standard time, Monday, February 10, 2025.

Kahan and NordCap agree that otherwise said Contingent Services Contract remains in full force and effect, time continuing to be of the essence.

Signed under seal this 7th day of February, 2025.

__________________________________

Jason M. Kahan
23 Sagamore Lane
Boxford, MA 01921
USA
jk@jasonkahan.com
DATE OF SIGNATURE

For NordCap Advisors AS

__________________________________

Nils Trosterud
CEO and Chairman Hegdehaugsveien 31,
0352 Oslo, Norway
ntrosterud@nordcapadvisors.com
DATE OF SIGNATURE: 020725

**EXHIBIT J**

**ADDENDUM TO THE CONTINGENT SERVICES AGREEMENT**
**DATED: February 3, 2025**
**BETWEEN:**

**Jason Kahan ("Client")**

**Nord Cap Advisors ("Firm")**

**Thornhill ("Third Party")**

1. **Hand-Over of Materials**
   1.1 **Obligation to Deliver.** Nord Cap Advisors agrees to deliver to Thornhill's designated representative all materials developed under the Contingent **Services** Agreement dated February 3, 2025, and any predecessor agreements with Jason Kahan. This delivery must occur in Oslo no later than **14:00 CET on March 12, 2025**, ensuring the Thornhill representative does not leave without said materials.

2. **Mutual Non-Disclosure Agreement (NDA)**
   2.1 **Definition of Confidential Information.**
   For purposes of this Addendum, "Confidential Information" means any non-public, proprietary, or confidential information disclosed by one party ("Disclosing Party") to any other party ("Receiving Party"), either directly or indirectly, in writing, orally, or by inspection of tangible objects. This includes but is not limited to data, analyses, plans, strategies, software code, databases, processes, trade secrets, business methods, or financial information related to the matters covered by the Contingent Services Agreement and this Addendum.

2.2 **Exclusions.**
Confidential Information does **not** include information that:

- **(a)** is or becomes generally available to the public other than as a result of a breach of this NDA;
- **(b)** was lawfully in the Receiving Party's possession prior to disclosure, as evidenced by written records;
- **(c)** is lawfully disclosed to the Receiving Party by a third party who is not under any obligation of confidentiality; or
- **(d)** is independently developed by the Receiving Party without use of or reference to the Disclosing Party's Confidential Information.

2.3 **Obligations of Confidentiality.**
Each Receiving Party shall:

- **(a)** keep Confidential Information strictly confidential and not disclose it to any third party without the Disclosing Party's prior written consent;
- **(b)** use the Confidential Information solely for the purpose of performing obligations under the Contingent Services Agreement and this Addendum;
- **(c)** limit access to Confidential Information to only those of its officers, employees, agents, or advisors who need such access to fulfill the Receiving Party's obligations and who are bound by confidentiality obligations at least as stringent as those in this NDA;
- **(d)** promptly notify the Disclosing Party upon discovery of any unauthorized use or disclosure of Confidential Information and cooperate in any reasonable way to help the Disclosing Party regain possession of such Confidential Information and prevent further unauthorized use.

2.4 **Bankruptcy Trustee Access.**
The parties agree that any information necessary to close or administer Jason Kahan's bankruptcy may be shared with the **Bankruptcy Trustee** without prejudice and without constituting a breach of this NDA.

2.5 **Duration and Remedies.**

- **(a)** This NDA and the obligations herein shall remain in effect for the longer of (i) five (5) years from the date of this Addendum, or (ii) until such time as all Confidential Information becomes non-confidential through no breach by any Receiving Party.
- **(b)** Each party acknowledges that a breach of this NDA may cause irreparable harm to the Disclosing Party that cannot be adequately compensated by money damages. Accordingly, in addition to all other remedies available at law or equity, the Disclosing Party shall be entitled to seek injunctive relief to prevent any such breach or threatened breach.

3. **Civil Liability Waiver**
   Each party hereby waives all civil liability claims against the other parties arising out of or relating to any good-faith compliance with this Agreement, except in cases of fraud, willful misconduct, or gross negligence.

4. **Conditional Fee**
   In the event these materials are successfully utilized and result in the recovery of any Bitcoin (BTC) from the initial sweep, Nord Cap Advisors shall receive [redacted] of any BTC recovered.

5. **Deadline and Consequences**
   If the materials are not handed over by **14:00 CET on March 12, 2025**, this Addendum is automatically deemed **void**. In that event, it shall be assumed that the agreement cannot be met, and the Client will seek any and all available remedies, including damages and the involvement of appropriate authorities.

6. **Governing Law and Jurisdiction**
   This Addendum shall be governed by and construed in accordance with the laws of the **Commonwealth of Massachusetts**, without regard to its conflict-of-law principles. Any dispute arising out of or relating to this Addendum, its formation, or its enforceability shall be resolved exclusively in the state or federal courts located in **Massachusetts**, and each party consents to the exclusive jurisdiction of such courts.

7. **Signatories**
   This Addendum is executed by the following:

**Jason Kahan (Client)**
**Date:** 11th March 2025

**Nord Cap Advisors** By: Nils Trosterud
**Date:** 12th March 2025

**Thornhill LLC (Third Party)** By: ________________________________
**Date:** 12th March 2025

**EXHIBIT K**

Kenneth T. Cuccinelli II, Attorney at Law

February 27, 2025

Nils Trosterud, in your personal capacity
c/o
Nordcap Advisors AS
Hegdehaugsveien 31
0352 Oslo
NORWAY
Via email to ntrosterud@nordcapadvisors.com

Re: Jason M. Kahan, Chapter 7 Bankruptcy Case No. 24-11592-JEB in the District of Massachusetts

**DEMAND FOR TURNOVER OF PROPERTY OF THE BANKRUPTCY ESTATE**

Dear Mr. Trosterud:

Please be advised that I have been appointed to serve as special counsel to the Chapter 7 Bankruptcy Trustee for Jason M. Kahan. Mr. Kahan filed a voluntary Chapter 7 bankruptcy proceeding in Federal Bankruptcy Court in Massachusetts on August 7, 2024, at case number 24-11592. A copy of the "Notice of Case Commencement" and the "Notice of Trustee Appointment" is enclosed with this Letter, as well as the order appointing me as special counsel.

According to the Bankruptcy Schedule A/B filed by Mr. Kahan (copy enclosed), Bitcoin with a valuation of not less than $110,000,000 is part of the Bankruptcy Estate (current value over $150,000,000). The United States Bankruptcy Code requires a custodian with knowledge of the commencement of a bankruptcy case to immediately deliver all property in their custody to the Trustee and file an accounting from the time that the property came into their control. A copy of the relevant provision of the United States Bankruptcy Code governing custodians is enclosed with this letter.

The purpose of this letter is to demand that you immediately turn over to me, in my capacity as Special Counsel to the Bankruptcy Trustee for Mr. Kahan, all keys, passwords and files ("the assets") that constitute the technical elements to take control and/or possession of aforementioned Bitcoin. These are assets of the bankruptcy estate and must be turned over immediately. The demand for these assets applies to your actual control as well as legal, or constructive control, such as materials in the possession of your employees, contractors, or agents of any kind.

Alternatively, the Bankruptcy Trustee has established an account at Gemini for the purpose of receiving Mr. Kahan's Bitcoin to which you may transfer the Bitcoin, and the wallet address for that account is as follows:

[redacted]xf27

If you are going to send the Bitcoin in compliance with this demand, please contact me first so that I may ensure that the Trustee may first receive a 'test send' of a small amount of Bitcoin to ensure the wallet address is properly entered on your end.

Absent communication from you on or before March 6, 2025, I will assume that you do not intend to comply with the request and will seek appropriate relief in Federal Bankruptcy Court.

Please contact me immediately if you have any questions concerning the contents of this letter or expect to be unable to comply with this request for any reason. Thank you.

Very truly yours,

Kenneth T. Cuccinelli, II

**Information to identify the case:**

| | | | |
|---|---|---|---|
| Debtor 1: | Jason M Kahan<br>First Name Middle Name Last Name | Social Security number or ITIN: | xxx−xx−3987 |
| | | EIN: | _ _–_ _ _ _ _ _ _ |
| Debtor 2:<br>(Spouse, if filing) | First Name Middle Name Last Name | Social Security number or ITIN: | _ _ _ _ |
| | | EIN: | _ _–_ _ _ _ _ _ _ |
| United States Bankruptcy Court: | District of Massachusetts | Date case filed for chapter: | 7 8/7/24 |
| Case number: | 24−11592 | | |

Official Form 309A (For Individuals or Joint Debtors)

# Notice of Chapter 7 Bankruptcy Case 10/20

**For the debtors listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtors or the debtors' property. For example, while the stay is in effect, creditors cannot sue, garnish wages, assert a deficiency, repossess property, or otherwise try to collect from the debtors. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although debtors can ask the court to extend or impose a stay.

The debtors are seeking a discharge. Creditors who assert that the debtors are not entitled to a discharge of any debts or who want to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadlines specified in this notice. (See line 9 for more information.)

**To protect your rights, you may wish to consult an attorney.** All documents filed in the case may be inspected through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**To help creditors correctly identify debtors, debtors submit full Social Security or Individual Taxpayer Identification Numbers, which may appear on a version of this notice. However, the full numbers must not appear on any document filed with the court.**

**Do not file this notice with any proof of claim or other document in the case. Do not include more than the last four digits of a Social Security or Individual Taxpayer Identification Number in any document, including attachments, that you file with the court.**

| | About Debtor 1: | About Debtor 2: |
|---|---|---|
| **1. Debtor's full name** | Jason M Kahan | |
| **2. All other names used in the last 8 years** | | |
| **3. Address** | 23 Sagamore Lane<br>Boxford, MA 01921 | |
| **4. Debtor's attorney**<br>Name and address | Barry R. Levine<br>100 Cummings Center<br>Suite 327G<br>Beverly, MA 01915 | Contact phone 978−922−8440<br>Email: barry@levineslaw.com |
| **5. Bankruptcy trustee**<br>Name and address | John O. Desmond<br>5 Edgell Road, Suite 30A<br>Framingham, MA 01701 | Contact phone 508−879−9638<br>Email: trustee@jdesmond.com |

**For more information, see page 2>**

| | | |
|---|---|---|
| **6. Bankruptcy clerk's office**<br><br>Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at pacer.uscourts.gov. | U. S. Bankruptcy Court<br>J.W. McCormack Post Office & Court House<br>5 Post Office Square, Suite 1150<br>Boston, MA 02109−3945 | Hours open: Monday−Friday 8:30am−5:00pm<br><br>Contact phone 617−748−5300<br><br>Date: 8/7/24 |
| **7. Meeting of creditors**<br><br>Debtors must attend the meeting to be questioned under oath. In a joint case, both spouses must attend. Creditors may attend, but are not required to do so. | **September 3, 2024 at 11:30 AM**<br><br>The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | Location:<br><br>**The meeting will be held TELEPHONICALLY** |

**The dial−in number and participant code for the telephonic section 341 meeting of creditors will be posted to the docket within 14 days prior to the meeting. You may also contact the trustee for dial−in information.**

| | | |
|---|---|---|
| **8. Presumption of abuse**<br>If the presumption of abuse arises, you may have the right to file a motion to dismiss the case under 11 U.S.C. § 707(b). Debtors may rebut the presumption by showing special circumstances. | The presumption of abuse does not arise. | |
| **9. Deadlines**<br><br>Papers and any required fee must be received by the bankruptcy clerk's office **no later than the deadlines listed.** | **File by the deadline to object to discharge or to challenge whether certain debts are dischargeable:**<br><br>**You must file a complaint:**<br>• if you assert that the debtor is not entitled to receive a discharge of any debts under any of the subdivisions of 11 U.S.C. § 727(a)(2) through (7), or<br>• if you want to have a debt excepted from discharge under 11 U.S.C. § 523(a)(2), (4) or (6).<br><br>**You must file a motion:**<br>• if you assert that the discharge should be denied under § 727(a)(8) or (9). | **Filing deadline: 11/4/24** |
| | **Deadline to object to exemptions:**<br>The law permits debtors to keep certain property as exempt. If you believe that the law does not authorize an exemption claimed, you may file an objection. | **Filing deadline:** 30 days after the *conclusion* of the meeting of creditors |
| **10. Deadline to file §503(b)(9) requests:** | Requests under Bankruptcy Code §503(b)(9)(goods sold within twenty(20) days of bankruptcy) must be filed in the Bankruptcy Clerk's office. | **Filing deadline:** 60 days from the first date set for the meeting of creditors |
| **11. Proof of claim** | For holder(s) of a claim secured by a security interest in the debtor's principal residence, pursuant to Rule 3002(c)7(A): | **Filing deadline:** 70 days from the Filing Date of the Petition |
| | For creditors other than those holding a *Claim Secured by a Security Interest in the Debtor's Principal Residence:* A date has not been set yet. No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now. If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline. | |

**For more information, see page 3>**

Debtor **Jason M Kahan** Case number **24−11592 −jeb**

| | |
|---|---|
| **12. Discharge of Debts** | The debtor is seeking a discharge of most debts, which may include your debt. A discharge means that you may never try to collect the debt from the debtor. If you believe that the debtor is not entitled to receive a discharge under Bankruptcy Code §727(a) or that a debt owed to you is not dischargeable under Bankruptcy Code §523(a)(2),(4), or (6), you must file a complaint or a motion if you assert the discharge should be denied under §727(a)(8) or (a)(9) in the bankruptcy clerk's office by the "Deadline to Object to Debtor's Discharge or to Challenge the Dischargeability of Certain Debts" listed on line 9 of this form. The bankruptcy clerk's office must receive the complaint or motion and any required filing fee by that deadline. |
| **13. Creditors with a foreign address** | If you are a creditor receiving a notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. |
| **14. Financial Management Training Program Deadline for the Debtor** | **Deadline for debtor to attend a financial management training program approved by the United States Trustee: Sixty (60) days from the first date set for the meeting of creditors.** The discharge will not enter if the debtor fails to attend a financial management−training program approved by the United States Trustee or if the debtor attends such training and fails to file a certificate of completion with the U.S. Bankruptcy Court. The training is in addition to the pre−bankruptcy counseling requirement. A list of approved courses may be obtained from the United States Trustee or from the court's website at www.mab.uscourts.gov. |
| **15. Exempt property** | The law allows debtors to keep certain property as exempt. Fully exempt property will not be sold and distributed to creditors. Debtors must file a list of property claimed as exempt. You may inspect that list at the bankruptcy clerk's office or online at pacer.uscourts.gov. If you believe that the law does not authorize an exemption that the debtors claim, you may file an objection. The bankruptcy clerk's office must receive the objection by the deadline to object to exemptions in line 9. |
| **16. Abandonment of Estate Property** | Notice is hereby given that any creditor or other interested party who wishes to receive notice of the estate representative's intention to abandon property of the estate pursuant to 11 U.S.C. §554(a) must file with the Court and serve upon the estate representative and the United States trustee a written request for such notice within fourteen (14) days from the date first scheduled for the meeting of creditors. |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In Re: | Jason M Kahan ,<br>Debtor | Chapter: 7<br>Case No: 24−11592<br>Judge Janet E. Bostwick |

**CERTIFICATE OF APPOINTMENT OF INTERIM TRUSTEE AND FIXING OF BOND**

Pursuant to 11 U.S.C. § 701(a)(1)

Donald Lassman
Law Offices of Donald Lassman
P. O. Box 920385
Needham, MA 02492

is hereby appointed as Interim Trustee in the above−referenced proceeding and is designated to preside at the meeting of creditors. The Trustee's bond is fixed under the general blanket bond heretofore approved. The Trustee shall notify the United States Trustee immediately in the event that the liquid assets exceed $1,000,000.

Pursuant to FRBP 2008 the Trustee will be deemed to have accepted this appointment unless it is rejected within five (5) days of receipt of this notice. Unless another trustee is elected the Interim Trustee appointed herein shall serve as Trustee without further appointment as provided by 11 U.S.C. § 702(d).

Date:8/27/24

William K. Harrington
U.S. Trustee
(617) 788−0400

Original filed with Bankruptcy Court
Copy to trustee

**REJECTION**

I, Donald Lassman , hereby REJECT appointment as Trustee.
Dated: This day of ____________________________ .

Donald Lassman

Original filed with Bankruptcy Court
Copy to United States Trustee

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor | Chapter 7<br>Case No. 24-11592-JEB |

**Order**

**MATTER:**
#61 Application filed by Trustee Donald Lassman to Employ Kenneth T. Cuccinelli, II as Special Counsel
#96 Supplement

Having considered the Application, the Supplement, and the arguments of counsel at the hearing, good cause being shown, the Application is granted as follows. The Trustee is authorized to employ Kenneth T. Cuccinellli, II as special counsel pursuant to Section 327(e) of the Code for the services set forth in the Application. Notwithstanding anything to the contrary in the Application, any fees and expenses shall be determined and allowed pursuant to Section 330 of the Code. Payment of any compensation shall be subject to prior Court allowance and approval pursuant to Section 330 and Section 331 of the Code. In addition, as provided in the Supplement, payment of any fees and expenses shall only be made or due from any funds recovered from the cryptocurrency assets that Special Counsel is pursuing for the estate.

Dated: December 23, 2024

By the Court,

Janet E. Bostwick

Janet E. Bostwick
United States Bankruptcy Judge

Case 24-11592 Doc 36 Filed 09/11/24 Entered 09/11/24 08:14:50 Desc Main
Document Page 239 of 288

09/11/24 8:13 AM

**Fill in this information to identify your case and this filing:**

Debtor 1: Jason M Kahan
First Name / Middle Name / Last Name

Debtor 2 (Spouse, if filing):
First Name / Middle Name / Last Name

United States Bankruptcy Court for the: DISTRICT OF MASSACHUSETTS

Case number: 1:24-bk-11592

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

**In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

**Part 1: Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In**

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☒ Yes. Where is the property?

1.1

23 SAGAMORE LN
Street address, if available, or other description

BOXFORD MA 01921
City / State / ZIP Code

County:

**What is the property?** Check all that apply

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other

**Who has an interest in the property?** Check one

☒ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

**Other information you wish to add about this item, such as local property identification number:**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
| --- | --- |
| $1,600,000.00 | $1,600,000.00 |

**Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.**

☐ **Check if this is community property** (see instructions)

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here.........................................................................=>** $1,600,000.00

**Part 2: Describe Your Vehicles**

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☒ No
☐ Yes



Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor 1 Jason M Kahan Case number *(if known)* 1:24-bk-11592

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☒ No
☐ Yes

5 **Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here.............................................................................=>** $0.00

**Part 3:** **Describe Your Personal and Household Items**

**Do you own or have any legal or equitable interest in any of the following items?** — **Current value of the portion you own?** Do not deduct secured claims or exemptions.

6. **Household goods and furnishings**
*Examples:* Major appliances, furniture, linens, china, kitchenware
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| 23 Sagamore Lane, Boxford, MA 01921 | $3,000.00 |

7. **Electronics**
*Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| (3) cellphones; (5) TVs; (2) tablets; (1) plotter; (1) printer; (2) PCs; (2) laptops | $2,000.00 |

8. **Collectibles of value**
*Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
☒ No
☐ Yes. Describe.....

9. **Equipment for sports and hobbies**
*Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
☒ No
☐ Yes. Describe.....

10. **Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
☒ No
☐ Yes. Describe.....

11. **Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| 23 Sagamore Lane, Boxford, MA 01921 | $500.00 |

12. **Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| (1) wedding ring | $1,000.00 |

13. **Non-farm animals**
*Examples:* Dogs, cats, birds, horses
☐ No
☒ Yes. Describe.....

| Description | Value |
|---|---|
| (1) dog | $0.00 |


Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor 1 Jason M Kahan    Case number *(if known)* 1:24-bk-11592

14. **Any other personal and household items you did not already list, including any health aids you did not list**
☒ No
☐ Yes. Give specific information.....

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** .............................................................................. $6,500.00

**Part 4: Describe Your Financial Assets**

**Do you own or have any legal or equitable interest in any of the following?**    **Current value of the portion you own?** Do not deduct secured claims or exemptions.

16. **Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
☒ No
☐ Yes.................................................................................................................

17. **Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
☐ No
☒ Yes........................    Institution name:

| | | Institution name | Current value |
|---|---|---|---|
| 17.1. | Checking | Citizen's Bank | $0.00 |
| 17.2. | Bitcoin | Hunter Penn, Custodian of the Debtor's bitcoin | $110,400,000.00 |

18. **Bonds, mutual funds, or publicly traded stocks**
*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
☒ No
☐ Yes..................    Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
☐ No
☒ Yes. Give specific information about them..................

| Name of entity: | % of ownership: | |
|---|---|---|
| The Debtor at all times relevant thereto was either the manager, sole member, officer, director, sole shareholders of all the entities listed on the Debtor's answer to question 27 of the SOFA. It is not believed that any of his equity interested have any value independent of the real estate projects they may be associated with. The Debtor, however, shares his interest in Kronos, Inc. with his spouse. The Debtor specifically exempts his interest in WJH Elm Street Somerville, LLC. | 100 % | $1,000.00 |

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
☒ No
☐ Yes. Give specific information about them
Issuer name:

21. **Retirement or pension accounts**
*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
☒ No
☐ Yes. List each account separately.
Type of account:    Institution name:


Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

22. **Security deposits and prepayments**
Your share of all unused deposits you have made so that you may continue service or use from a company
*Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
☒ No
☐ Yes. ..................... Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
☒ No
☐ Yes............. Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
☒ No
☐ Yes............. Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
☒ No
☐ Yes. Give specific information about them...

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
☒ No
☐ Yes. Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
*Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
☒ No
☐ Yes. Give specific information about them...

| **Money or property owed to you?** | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
☒ No
☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
*Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
☒ No
☐ Yes. Give specific information......

30. **Other amounts someone owes you**
*Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay, workers' compensation, Social Security benefits; unpaid loans you made to someone else
☒ No
☐ Yes. Give specific information..

31. **Interests in insurance policies**
*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
☒ No
☐ Yes. Name the insurance company of each policy and list its value.
Company name: Beneficiary: Surrender or refund value:

32. **Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
☒ No
☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue
☐ No
☒ Yes. Describe each claim.........

| | |
|---|---|
| First Boston Associates<br>Braintree, MA | Unknown |


Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor 1 Jason M Kahan Case number *(if known)* 1:24-bk-11592

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
☒ No
☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**
☒ No
☐ Yes. Give specific information..

36. **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here**........ $110,401,000.00

**Part 5: Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.**

37. **Do you own or have any legal or equitable interest in any business-related property?**
☒ No. Go to Part 6.
☐ Yes. Go to line 38.

**Part 6: Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.**
If you own or have an interest in farmland, list it in Part 1.

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
☒ No. Go to Part 7.
☐ Yes. Go to line 47.

**Part 7: Describe All Property You Own or Have an Interest in That You Did Not List Above**

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
☒ No
☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** ........ $0.00

**Part 8: List the Totals of Each Part of this Form**

| | | | |
|---|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ........ | | $1,600,000.00 |
| 56. | **Part 2: Total vehicles, line 5** | $0.00 | |
| 57. | **Part 3: Total personal and household items, line 15** | $6,500.00 | |
| 58. | **Part 4: Total financial assets, line 36** | $110,401,000.00 | |
| 59. | **Part 5: Total business-related property, line 45** | $0.00 | |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | $0.00 | |
| 61. | **Part 7: Total other property not listed, line 54** | + $0.00 | |
| 62. | **Total personal property.** Add lines 56 through 61... | $110,407,500.00 | Copy personal property total $110,407,500.00 |

63. **Total of all property on Schedule A/B**. Add line 55 + line 62 $112,007,500.00


Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

# *11 USCS § 542*

Current through Public Law 118-106, approved October 4, 2024.

***United States Code Service > TITLE 11. BANKRUPTCY (§§ 101 — 1532) > CHAPTER 5. Creditors, the Debtor, and the Estate (Subchs. I — III) > Subchapter III. The Estate (§§ 541 — 562)***

## § 542. Turnover of property to the estate

**(a)** Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title [*11 USCS § 363*], or that the debtor may exempt under section 522 of this title [*11 USCS § 522*], shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

**(b)** Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title [*11 USCS § 553*] against a claim against the debtor.

**(c)** Except as provided in section 362(a)(7) of this title [*11 USCS § 362(a)(7)*], an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsection (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title [*11 USCS §§ 101* et seq.] concerning the debtor had not been commenced.

**(d)** A life insurance company may transfer property of the estate or property of the debtor to such company in good faith, with the same effect with respect to such company as if the case under this title [*11 USCS §§ 101* et seq.] concerning the debtor had not been commenced, if such transfer is to pay a premium or to carry out a nonforfeiture insurance option, and is required to be made automatically, under a life insurance contract with such company that was entered into before the date of the filing of the petition and that is property of the estate.

**(e)** Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

## History

**HISTORY:**

Nov. 6, 1978, *P. L. 95-598*, Title I, § 101, *92 Stat. 2595*; July 10, 1984, *P. L. 98-353*, Title III, Subtitle H, § 457, *98 Stat. 376*; Oct. 22, 1994, *P. L. 103-394*, Title V, § 501(d)(16), *108 Stat. 4146*.

United States Code Service
Copyright © 2024 All rights reserved.

**EXHIBIT L**

Kenneth T. Cuccinelli II, Attorney at Law

February 27, 2025

Nils Trosterud
CEO & Chairman
Nordcap Advisors AS
Hegdehaugsveien 31
0352 Oslo
NORWAY
Via email to ntrosterud@nordcapadvisors.com

Re: Jason M. Kahan, Chapter 7 Bankruptcy Case No. 24-11592-JEB in the District of Massachusetts

**DEMAND FOR TURNOVER OF PROPERTY OF THE BANKRUPTCY ESTATE**

Dear Mr. Trosterud:

Please be advised that I have been appointed to serve as special counsel to the Chapter 7 Bankruptcy Trustee for Jason M. Kahan. Mr. Kahan filed a voluntary Chapter 7 bankruptcy proceeding in Federal Bankruptcy Court in Massachusetts on August 7, 2024, at case number 24-11592. A copy of the "Notice of Case Commencement" and the "Notice of Trustee Appointment" is enclosed with this Letter, as well as the order appointing me as special counsel.

According to the Bankruptcy Schedule A/B filed by Mr. Kahan (copy enclosed), Bitcoin with a valuation of not less than $110,000,000 is part of the Bankruptcy Estate (current value over $150,000,000). The United States Bankruptcy Code requires a custodian with knowledge of the commencement of a bankruptcy case to immediately deliver all property in their custody to the Trustee and file an accounting from the time that the property came into their control. A copy of the relevant provision of the United States Bankruptcy Code governing custodians is enclosed with this letter.

The purpose of this letter is to demand that Nordcap Advisors AS ("Nordcap") immediately turn over to me, in my capacity as Special Counsel to the Bankruptcy Trustee for Mr. Kahan, all keys, passwords and files ("the assets") that constitute the technical elements to take control and/or possession of aforementioned Bitcoin. These are assets of the bankruptcy estate and must be turned over immediately. The demand for these assets applies Nordcap's actual control as well as legal, or constructive control, such as materials in the possession of your employees, contractors, or agents of any kind.

Alternatively, the Bankruptcy Trustee has established an account at Gemini for the purpose of receiving Mr. Kahan's Bitcoin to which Nordcap may transfer the Bitcoin, and the wallet address for that account is as follows:

[redacted]xf27

If Nordcap is going to send the Bitcoin in compliance with this demand, please contact me first so that I may ensure that the Trustee may first receive a 'test send' of a small amount of Bitcoin to ensure the wallet address is properly entered on your end.

Absent communication from you on or before March 6, 2025, I will assume that Nordcap does not intend to comply with the request and will seek appropriate relief in Federal Bankruptcy Court.

Please contact me immediately if you have any questions concerning the contents of this letter or expect to be unable to comply with this request for any reason. Thank you.

Very truly yours,

Kenneth T. Cuccinelli, II

**EXHIBIT M**

LAW OFFICE OF DONALD R. LASSMAN
POB 920385
NEEDHAM, MA 02492
Don@LassmanLaw.com
781-455-8400
www.Lassmanlaw.com

November 25, 2024

Christopher Green
-Via Email to CGreen@Windcroftecapital.com, and CGreen@windcroftcapital.com

Re: Jason M. Kahan, Chapter 7 Bankruptcy Case No. 24-11592-JEB

DEMAND FOR TURNOVER OF PROPERTY OF THE BANKRUPTCY ESTATE

Dear Mr. Green:

Please be advised that I have been appointed to serve as the Chapter 7 Bankruptcy Trustee for Jason M. Kahan. Mr. Kahan filed a voluntary Chapter 7 bankruptcy proceeding in Federal Bankruptcy Court in Massachusetts on August 7, 2024, at case number 24-11592. A copy of the "Notice of Case Commencement" and my "Notice of Trustee Appointment" is enclosed with this Letter.

The United States Bankruptcy Code requires a custodian with knowledge of the commencement of a bankruptcy case to immediately deliver all property in their custody to the Trustee and file an accounting from the time that the property came into their control. A copy of the relevant provision of the United States Bankruptcy Code governing custodians is enclosed with this letter.

The purpose of this letter is to demand that you immediately turn over to me, in my capacity as Bankruptcy Trustee for Mr. Kahan, all Bitcoin (including keys and/or passwords and usernames) that you are holding or are otherwise controlling now or at any time in the future. Absent communication from you on or before December 6, 2024, I will assume that you do not intend to comply with the request and will seek appropriate relief in Federal Bankruptcy Court.

I have established an account at Gemini for the purpose of receiving Mr. Kahan's Bitcoin that I understand that you are holding. The wallet address for that account is as follows:

[redacted]xf27

Please contact me when you prepare to send the Bitcoin in question so we may first do a 'test-send' of a small amount to ensure the wallet address is properly entered on your end.

Additionally, please contact me immediately if you have any questions concerning the contents of this letter or expect to be unable to timely comply with this demand for any reason. Thank you.

Very truly yours,

Chapter 7 Trustee

Donald R. Lassman

| Information to identify the case: | | | |
|---|---|---|---|
| Debtor 1: | Jason M Kahan<br>First Name Middle Name Last Name | Social Security number or ITIN: | xxx−xx−3987 |
| | | EIN: | _ _−_ _ _ _ _ _ _ |
| Debtor 2:<br>(Spouse, if filing) | First Name Middle Name Last Name | Social Security number or ITIN: | _ _ _ _ |
| | | EIN: | _ _−_ _ _ _ _ _ _ |
| United States Bankruptcy Court: | District of Massachusetts | Date case filed for chapter: | 7 8/7/24 |
| Case number: | 24−11592 | | |

# Official Form 309A (For Individuals or Joint Debtors)
# Notice of Chapter 7 Bankruptcy Case 10/20

**For the debtors listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtors or the debtors' property. For example, while the stay is in effect, creditors cannot sue, garnish wages, assert a deficiency, repossess property, or otherwise try to collect from the debtors. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although debtors can ask the court to extend or impose a stay.

The debtors are seeking a discharge. Creditors who assert that the debtors are not entitled to a discharge of any debts or who want to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadlines specified in this notice. (See line 9 for more information.)

**To protect your rights, you may wish to consult an attorney.** All documents filed in the case may be inspected through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**To help creditors correctly identify debtors, debtors submit full Social Security or Individual Taxpayer Identification Numbers, which may appear on a version of this notice. However, the full numbers must not appear on any document filed with the court.**

**Do not file this notice with any proof of claim or other document in the case. Do not include more than the last four digits of a Social Security or Individual Taxpayer Identification Number in any document, including attachments, that you file with the court.**

| | | About Debtor 1: | About Debtor 2: |
|---|---|---|---|
| 1. | **Debtor's full name** | Jason M Kahan | |
| 2. | **All other names used in the last 8 years** | | |
| 3. | **Address** | 23 Sagamore Lane<br>Boxford, MA 01921 | |
| 4. | **Debtor's attorney**<br>Name and address | Barry R. Levine<br>100 Cummings Center<br>Suite 327G<br>Beverly, MA 01915 | Contact phone 978−922−8440<br>Email: barry@levineslaw.com |
| 5. | **Bankruptcy trustee**<br>Name and address | John O. Desmond<br>5 Edgell Road, Suite 30A<br>Framingham, MA 01701 | Contact phone 508−879−9638<br>Email: trustee@jdesmond.com |

**For more information, see page 2>**

Debtor **Jason M Kahan** Case number **24−11592 −jeb**

**6. Bankruptcy clerk's office**

Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at pacer.uscourts.gov.

U. S. Bankruptcy Court
J.W. McCormack Post Office & Court House
5 Post Office Square, Suite 1150
Boston, MA 02109−3945

Hours open: Monday−Friday 8:30am−5:00pm

Contact phone 617−748−5300

Date: 8/7/24

**7. Meeting of creditors**

Debtors must attend the meeting to be questioned under oath. In a joint case, both spouses must attend. Creditors may attend, but are not required to do so.

**September 3, 2024 at 11:30 AM**

The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket.

Location:

**The meeting will be held TELEPHONICALLY**

**The dial−in number and participant code for the telephonic section 341 meeting of creditors will be posted to the docket within 14 days prior to the meeting. You may also contact the trustee for dial−in information.**

**8. Presumption of abuse**

If the presumption of abuse arises, you may have the right to file a motion to dismiss the case under 11 U.S.C. § 707(b). Debtors may rebut the presumption by showing special circumstances.

The presumption of abuse does not arise.

**9. Deadlines**

Papers and any required fee must be received by the bankruptcy clerk's office **no later than the deadlines listed.**

**File by the deadline to object to discharge or to challenge whether certain debts are dischargeable:**

**Filing deadline: 11/4/24**

**You must file a complaint:**

- if you assert that the debtor is not entitled to receive a discharge of any debts under any of the subdivisions of 11 U.S.C. § 727(a)(2) through (7), or
- if you want to have a debt excepted from discharge under 11 U.S.C. § 523(a)(2), (4) or (6).

**You must file a motion:**

- if you assert that the discharge should be denied under § 727(a)(8) or (9).

**Deadline to object to exemptions:**

The law permits debtors to keep certain property as exempt. If you believe that the law does not authorize an exemption claimed, you may file an objection.

**Filing deadline:** 30 days after the *conclusion* of the meeting of creditors

**10. Deadline to file §503(b)(9) requests:**

Requests under Bankruptcy Code §503(b)(9)(goods sold within twenty(20) days of bankruptcy) must be filed in the Bankruptcy Clerk's office.

**Filing deadline:** 60 days from the first date set for the meeting of creditors

**11. Proof of claim**

For holder(s) of a claim secured by a security interest in the debtor's principal residence, pursuant to Rule 3002(c)7(A):

**Filing deadline:** 70 days from the Filing Date of the Petition

For creditors other than those holding a *Claim Secured by a Security Interest in the Debtor's Principal Residence:* A date has not been set yet. No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now. If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline.

**For more information, see page 3>**

| | |
|---|---|
| **12. Discharge of Debts** | The debtor is seeking a discharge of most debts, which may include your debt. A discharge means that you may never try to collect the debt from the debtor. If you believe that the debtor is not entitled to receive a discharge under Bankruptcy Code §727(a) or that a debt owed to you is not dischargeable under Bankruptcy Code §523(a)(2),(4), or (6), you must file a complaint or a motion if you assert the discharge should be denied under §727(a)(8) or (a)(9) in the bankruptcy clerk's office by the "Deadline to Object to Debtor's Discharge or to Challenge the Dischargeability of Certain Debts" listed on line 9 of this form. The bankruptcy clerk's office must receive the complaint or motion and any required filing fee by that deadline. |
| **13. Creditors with a foreign address** | If you are a creditor receiving a notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. |
| **14. Financial Management Training Program Deadline for the Debtor** | **Deadline for debtor to attend a financial management training program approved by the United States Trustee: Sixty (60) days from the first date set for the meeting of creditors.** The discharge will not enter if the debtor fails to attend a financial management−training program approved by the United States Trustee or if the debtor attends such training and fails to file a certificate of completion with the U.S. Bankruptcy Court. The training is in addition to the pre−bankruptcy counseling requirement. A list of approved courses may be obtained from the United States Trustee or from the court's website at www.mab.uscourts.gov. |
| **15. Exempt property** | The law allows debtors to keep certain property as exempt. Fully exempt property will not be sold and distributed to creditors. Debtors must file a list of property claimed as exempt. You may inspect that list at the bankruptcy clerk's office or online at pacer.uscourts.gov. If you believe that the law does not authorize an exemption that the debtors claim, you may file an objection. The bankruptcy clerk's office must receive the objection by the deadline to object to exemptions in line 9. |
| **16. Abandonment of Estate Property** | Notice is hereby given that any creditor or other interested party who wishes to receive notice of the estate representative's intention to abandon property of the estate pursuant to 11 U.S.C. §554(a) must file with the Court and serve upon the estate representative and the United States trustee a written request for such notice within fourteen (14) days from the date first scheduled for the meeting of creditors. |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In Re: | Jason M Kahan ,<br>Debtor | Chapter: 7<br>Case No: 24−11592<br>Judge Janet E. Bostwick |

**CERTIFICATE OF APPOINTMENT OF INTERIM TRUSTEE
AND FIXING OF BOND**

Pursuant to 11 U.S.C. § 701(a)(1)

Donald Lassman
Law Offices of Donald Lassman
P. O. Box 920385
Needham, MA 02492

is hereby appointed as Interim Trustee in the above−referenced proceeding and is designated to preside at the meeting of creditors. The Trustee's bond is fixed under the general blanket bond heretofore approved. The Trustee shall notify the United States Trustee immediately in the event that the liquid assets exceed $1,000,000.

Pursuant to FRBP 2008 the Trustee will be deemed to have accepted this appointment unless it is rejected within five (5) days of receipt of this notice. Unless another trustee is elected the Interim Trustee appointed herein shall serve as Trustee without further appointment as provided by 11 U.S.C. § 702(d).

Date:8/27/24

William K. Harrington
U.S. Trustee
(617) 788−0400

Original filed with Bankruptcy Court
Copy to trustee

**REJECTION**

I, Donald Lassman , hereby REJECT appointment as Trustee.
Dated: This day of ___________________________ .

Donald Lassman

Original filed with Bankruptcy Court
Copy to United States Trustee

# *11 USCS § 542*

Current through Public Law 118-106, approved October 4, 2024.

***United States Code Service > TITLE 11. BANKRUPTCY (§§ 101 — 1532) > CHAPTER 5. Creditors, the Debtor, and the Estate (Subchs. I — III) > Subchapter III. The Estate (§§ 541 — 562)***

## § 542. Turnover of property to the estate

**(a)** Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title [*11 USCS § 363*], or that the debtor may exempt under section 522 of this title [*11 USCS § 522*], shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

**(b)** Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title [*11 USCS § 553*] against a claim against the debtor.

**(c)** Except as provided in section 362(a)(7) of this title [*11 USCS § 362(a)(7)*], an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsection (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title [*11 USCS §§ 101* et seq.] concerning the debtor had not been commenced.

**(d)** A life insurance company may transfer property of the estate or property of the debtor to such company in good faith, with the same effect with respect to such company as if the case under this title [*11 USCS §§ 101* et seq.] concerning the debtor had not been commenced, if such transfer is to pay a premium or to carry out a nonforfeiture insurance option, and is required to be made automatically, under a life insurance contract with such company that was entered into before the date of the filing of the petition and that is property of the estate.

**(e)** Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

## History

**HISTORY:**

Nov. 6, 1978, *P. L. 95-598*, Title I, § 101, *92 Stat. 2595*; July 10, 1984, *P. L. 98-353*, Title III, Subtitle H, § 457, *98 Stat. 376*; Oct. 22, 1994, *P. L. 103-394*, Title V, § 501(d)(16), *108 Stat. 4146*.

United States Code Service
Copyright © 2024 All rights reserved.

**End of Document**

**EXHIBIT N**



2:37 TELEGRAM

Alex Colvin
last seen recently

115

So the wallet you originally found and the BTC connected were originally purchased by Jason correct? There no question of ownership in your mind? 11:39 AM

Yeah there's no question of ownership at all everything points to it being purchased legally 11:41 AM

Ok so you are legitimately strapped for cash right now. 12:18 PM

And I would imagine you'd like nothing better than to get this off your plate 12:18 PM

What do you mean Jason tied you into it?

Like when you found his BTC at that point you got roped into that other stuff with the other wallets? 12:20 PM

Yes because again Solomon spent all of what you guys thought are getting most of the equipment we're just shortened

**EXHIBIT O**

EXHIBIT 4
Penn
10-2-25 JR

# Re: Clarification on Access to Client Information

From alexcolvin <alexcolvin@protonmail.com>

To Ken Cuccinelli<KTCLaw@proton.me>

Date Wednesday, January 8th, 2025 at 10:17 AM

Dear Mr. Cuccinelli,

I hope this message finds you well. I apologize for the delayed response; the holiday season proved to be busier than anticipated.

Below, I have listed the three wallets where the coins are currently held. I am more than willing to provide evidence to demonstrate that I do not possess the keys to these wallets. Please let me know the specific documentation or details you require, and I will ensure it is promptly provided.

[redacted]l0hz

Balance: 1000 BTC

[redacted]qssr

Balance: 100 BTC

[redacted]gx4x

Balance: 100 BTC

Thank you for your time and guidance on this matter. I look forward to your instructions on the next steps.

-------- Original Message --------

On 12/30/24 2:10 PM, Ken Cuccinelli wrote:

> The offer I was referencing was your offer of laying out your documentation that you indicated would demonstrate that you do not have the keys. Presumably, such documentation would also show the manner of exploitation that you describe.
>
> Can you please provide me the wallet addresses for all of the wallets in which any of Jason Kahan's bitcoin is now held? That would be quite helpful in at least narrowing the discussion.
>
> Sincerely,
> Ken Cuccinelli
>
> On Monday, December 30th, 2024 at 1:32 PM, alexcolvin <alexcolvin@protonmail.com> wrote:
>
> > Dear Ken Cuccinelli,
> >
> > I am writing to address your recent email and provide clarification on the matter. Regarding the other individuals involved, there were various groups participating in this situation. However, I am likely not the

best person to identify all those individuals or their roles. From what I observed, they made similar claims but failed to present any substantive evidence. When I inquired about the evidence they purported to have, I often encountered vague responses or evasions. While this is tangential to the matter at hand, I thought it was worth mentioning.

As for the coins and their current security, I can confirm that at the time of the recovery attempt, certain exploits were utilized to facilitate movement without requiring the private key. Those exploits have since been patched, with no available alternatives to perform similar actions. The movement of the coins was not the intended outcome but rather an unforeseen consequence of attempting to retrieve the key. Since the keys are no longer in my possession, I can state with a reasonable degree of certainty that the coins are secure and will not move.

I also want to apologize for any delays in my responses. I am managing multiple responsibilities and assure you that any delay is unintentional. I will reply as promptly as possible when I have the opportunity to do so.

Lastly, I would appreciate some clarification regarding the "offer" you referenced in your last email. To my recollection, I did not make any offer in my previous correspondence. If you could elaborate, that would help me address the matter more effectively.

Thank you for your understanding, and I look forward to your reply.

-------- Original Message --------
On 12/30/24 1:22 PM, Ken Cuccinelli wrote:

> Mr. Penn,
>
> I will take you up on your offer(s). If I may first follow up regarding your last paragraph, with the hopes that you might respond in less time than the 3+ weeks from my last substantive communication, particularly given that no information was needed on your part to draft the response below.
>
> My followup inquiry relates to this pargraph:
>
> A recovery attempt is still ongoing, and any success or immediate knowledge gained will be communicated without delay. For the time being, the cryptocurrency remains parked in a safe and secure location where it will not be moved. This ensures that no further complications arise until the private keys are recovered.
>
> 1. Who are you referring to are all of the individuals you know of or believe are involved in "a recovery attempt"?
> 2. How did the cryptocurrency get to the wallet(s) in which it is "parked" for safe keeping, and who are all of the individuals who were involved in that undertaking?
> 3. How do you know it won't be moved?
> 4. To put the cryptocurrency in a new wallet(s) where you assert it is "safe and secure", would have required the private keys. So, who had those keys to move the cryptocurrency, or are you suggesting that the keys were not needed for that/those moves?
>
> Thank you for your engagement and I look forward to your responses.

Sincerely,
Ken Cuccinelli

On Monday, December 30th, 2024 at 10:25 AM, alexcolvin <alexcolvin@protonmail.com> wrote:

> Dear Ken Cuccinelli,
>
> I would like to clarify certain points regarding my involvement in this matter. At no point did I have direct remote access to Mr. Kahan's computer. While this option was considered on multiple occasions, it was ultimately deemed unnecessary, as the information provided was identical to what was already available on his system. Thus, remote access was never implemented for the purposes of recovery.
>
> Furthermore, I do not currently possess the private keys associated with the cryptocurrency in question. If I did, I would have turned them over immediately, as I have no use for them and my expertise does not extend to converting Bitcoin or other cryptocurrencies. While I have been collaborating with Mr. Kahan on this project since 2022, I do not currently have control or possession of his private keys.
>
> I have explained this multiple times to various parties who have raised concerns. To transfer any cryptocurrency, the private key is required. Despite extensive efforts to recover these keys, including employing numerous techniques and software, they have not been retrieved. While one method produced a potential result, it was uncontrolled and could not be replicated.
>
> I maintain comprehensive records to substantiate that I do not have possession of the keys nor have I transmitted them to any individual. Should I gain access to these keys in the future, I will promptly turn them over without hesitation.
>
> However, the repeated accusations that I currently possess the keys, without any supporting evidence, have become a source of frustration. I am confident that I can demonstrate, beyond a reasonable doubt, to any court or law enforcement agency, that I do not have access to the private keys. My records and the methods employed in attempting to recover them can corroborate this.
>
> A recovery attempt is still ongoing, and any success or immediate knowledge gained will be communicated without delay. For the time being, the cryptocurrency remains parked in a safe and secure location where it will not be moved. This ensures that no further complications arise until the private keys are recovered.
>
> Please let me know if further information or documentation is needed to assist in resolving this matter.
>
> -------- Original Message --------
> On 12/5/24 11:19 PM, Ken Cuccinelli wrote:
>
>> Mr. Penn,
>>
>> First of all, thank you for getting in touch with me. Just to be clear as to my current role, I serve as special counsel to the Bankruptcy Trustee in Jason Kahan's bankruptcy case. The name of the Trustee is Donald Lassman. Your email

below at least fulfills the Trustee's demand for a response by tomorrow, so again, thank you for your response, and you should know that you are always free to communicate with me, or you can email with the Trustee directly at: Don@LassmanLaw.com.

Second, I would note that the reason I am needed as special counsel is to address the cryptocurrency aspects of the case. And it is here that I'm having some trouble that perhaps you can help me with. Please correct any of my understandings below that are inaccurate.

a) I understand that you were remotely engaged by Mr. Kahan as a computer consultant to help Mr. Kahan resolve issues related to him suffering identity theft;
b) I understand that you were engaged as I described above in early 2022;
c) I am unaware of any written agreement between you and Mr. Kahan
d) I further understand that Mr. Kahan gave you remote access to his computer in order that you might perform remedial work (including monetary recoveries) on his behalf;
e) I further understand that you did in fact perform remedial work AND that you successfully recovered some funds for Mr. Kahan's benefit;
f) It is my further understanding that at some point you discovered Bitcoin (or keys, etc., feel free to clarify) on Mr. Kahan's computer;
g) If it is my further understanding that after discovering Mr. Kahan's Bitcoin, at some point thereafter you removed the Bitcoin to other wallets that you controlled at that time;
h) It is my further understanding that it was then your position that you were holding Mr. Kahan's Bitcoin for safekeeping and for his benefit;

Please understand my perspective, in light of the foregoing understandings on my part, it is difficult to accept that you do not now control Mr. Kahan's Bitcoin.

This is a very serious situation, involving the courts, a lot money and creditors that need to be paid. But it is a serious situation that we can all work through safely and appropriately if we work together. I should note that any resolution that the Trustee may be agreeable to, will still require the approval of the bankruptcy judge in Mr. Kahan's case.

I would propose that you (and any lawyer(s) that you may employ for your protection), me, the Trustee and the Trustee's Counsel schedule a time at the beginning of next week to meet in person to discuss this situation.

I look forward to your responses above, and I hope we have the chance to meet this coming week.

Ken Cuccinelli

On Thursday, December 5th, 2024 at 5:48 PM, alexcolvin <alexcolvin@protonmail.com> wrote:

Dear Ken Cuccinelli,

I am writing to address concerns regarding my access to Jason Kahan's Bitcoin. I want to clarify that I do not currently have access to any of your client's information, including usernames, passwords, or private keys.

There is an ongoing recovery attempt, and at this moment, I do not have the requested information available. However, as soon as this information becomes accessible to me, I will promptly share it with you or any other designated party as required.

I have communicated this limitation multiple times to various parties involved, and I appreciate your understanding and patience as the situation progresses. If you have further questions or require additional clarification, please feel free to contact me.

Thank you for your attention to this matter.

Best regards,
Mr. Penn

--------- Original Message ---------
On 11/25/24 8:09 PM, Ken Cuccinelli wrote:

Mr. Penn,

Please see the attached demand from the Trustee in Jason Kahan's bankruptcy case for his formal demand that you turn over all Bitcoin in your possession or under your control to the Trustee immediately.

Either he or I would be happy to discuss the mechanics of you turning over the aforementioned Bitcoin immediately.

Ken Cuccinelli
Special Counsel to Bankruptcy Trustee Donald Lassman

**EXHIBIT P**

NIXON PEABODY

Nixon Peabody LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Richard C. Pedone**
Partner

T / 617.345.1305
F / 866.947.1890
rpedone@nixonpeabody.com

July 8, 2026

**VIA EMAIL AND FIRST-CLASS MAIL**

Hunter Penn
42 South St
Plymouth, CT 06782
E-mail: paralaxpenn@gmail.com
soobstorypen@gmail.com
alicardjugf@gmail.com
hunterkellypenn@gmail.com
alexcolvin@protonmail.com

Hunter Penn
1153 Elm Street
Apartment 3L
West Springfield, MA 01089

**Re: *In re Jason M Kahan*, Case No. 24-11592-JEB**

*****LITIGATION HOLD NOTICE*****

To whom it may concern:

Nixon Peabody LLP is counsel to PBTC Recovery Partners, LLC ("PBTC") in a case concerning a debtor, Jason M. Kahan ("Kahan"), captioned *In re Jason M Kahan*, Case No. 24-11592-JEB (the "Case") currently pending before the United States Bankruptcy Court for the District of Massachusetts (the "Court"). PBTC is an interested party in the Case as it relates to the sale of certain assets from Kahan's estate, including the Estate Bitcoin (the "Sale").

As used herein, "Kahan Matters" means any and all communications, business relationships, financing, financial support, investments, agreements, partnerships, joint ventures, transactions, or any other dealings or engagements with Kahan, Ryan Moore, or Samara CR Holdings, LLC ("Samara"), whether past, present, or contemplated.

***This letter directs the recipient to preserve all documents and information relating to Kahan Matters.*** The failure to preserve documents and information relating to Kahan Matters may expose you to sanctions.

1. **Preservation of All Documents Related to Kahan Matters.**[1] Please preserve all documents and information, including the originals and all non-identical copies (i.e., different from originals due to notations made on or attached to such copies or otherwise) of the following:

[1] Rules governing civil procedure require preservation of all documents and data relating to the Kahan Matters from all sources. "Documents and data" as used here means not only hard copy documents. Instead, courts interpret "documents and data" very broadly to include audio recordings, videotape, e-mail, instant messages, text messages, messages on messaging applications such as Telegram, Signal, WhatsApp, or any other messaging application, video recordings or other data from video conference platforms such as Zoom, Teams, or Ring, search history from artificial intelligence applications such as ChatGPT or Claude, word processing documents, spreadsheets, databases, calendars, phone logs, Internet usage files, and all other electronic information created, received, and/or maintained by the Company on its computer systems. "Sources" include all hard copy files, electronic files, computer hard drives, removable media (e.g., CDs and DVDs), laptop computers, PDAs, Android devices, iPhones, smart phones, back up media and any other locations where hard copy or electronic data is or could be stored, including cloud or internet-based storage locations.

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

a. All documents, data and information relating to any communications, business relationships, partnerships, joint ventures, transactions, agreements, financing, financial support, or investments with or for the benefit of Kahan, Ryan Moore, or Samara.

b. All documents, data and information relating to the formation, funding, and corporate governance of any entity or venture in which Kahan or Samara has or had an interest or involvement.

2. **Preservation of Electronically Stored Information (ESI)**. Electronically stored information (ESI) may be an important and irreplaceable source of discovery and/or evidence in this matter. You must continue to take every reasonable step to preserve this information until further notice.

**To comply with your legal obligations, you must continue to preserve all existing documents and data related to Kahan Matters and suspend deletion, overwriting, or any other possible destruction of relevant documents and data on all electronic devices, including but not limited to laptops, computers and cellular devices. Automatic data destruction protocols must be suspended as they relate to materials encompassed by the scope of this notification. Failure to do so could result in sanctions by the court.**

Regarding ESI, you must continue to preserve **all** such information, no matter when it was created, continuing to the present. Your obligation to preserve data is ongoing: You should continue to preserve all newly created documents and data until further notice.

Typically, such ESI may be located in or on one or more of the following:

a. Computer(s), meaning any programmable machine, including network servers, desktops, laptops, notebook computers, home and office computers, mainframes, personal digital assistants (such as iPhone, and other handheld computing devices), tablets, and mobile phones
b. Hard drive(s), meaning the primary hardware that a computer uses to store information (also known as “hard disks”)
c. Network(s), meaning a group of one or more computer systems connected to enable people to share information and equipment (e.g., local area network(s) (“LAN”), wide area network(s) (“WAN”), home area network(s) (“HAN”), metropolitan area network(s) (“MAN”), etc.)
d. Other storage device(s) or media, meaning any component that is used to store data
e. Magnetic storage media, including hard drives, stick drives, Zip drives, thumb drives, and floppy disks
f. Optical storage media, including CD-ROMs and DVD-ROMs
g. Voice-mail and/or voice messaging systems
h. Archive(s) and/or backup tapes, meaning long-term storage area(s) for data and hard copy documents
i. Cloud or internet-based storage

3. **Suspension of Routine Business Practices Likely to Alter or Destroy Documents or Information.** You should continue to suspend any routine business practice likely to alter or destroy the documents and information described herein. Such business practices may include, but are not limited to, shredding, disposal or other destruction of documents; automatic deletion policies or rules for e-mail, automatic deletion policies or rules for video conference or messaging applications, server backup tape rotation or overwriting; electronic data deletion; scheduled destruction of back up media; re-imaging of drives; drive hardware exchanges; sale, gift or destruction of computer systems; disk defragmentation; and/or other disk maintenance routines.

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

These routine business practices should not be resumed until the parties have taken all necessary, reasonable steps to ensure that discoverable information has been adequately preserved.

Because discoverable ESI may be contained in files that have already been deleted during the normal course of your business, we also ask that you take affirmative steps to preserve drives, devices and storage media in which deleted information is kept. When electronic files are deleted, ordinarily they are not permanently destroyed until the deleted files are actually overwritten. Thus, you should take affirmative steps to prevent deleted electronic information from being overwritten. Until deleted data is adequately preserved by making forensically qualified clones or images of digital storage media containing deleted data, you should shut down hardware and remove it from service.

To the extent that you have retained outside legal counsel to represent you in this matter, please share the contents of this letter with such legal representative.

Sincerely,

/s/ *Richard C. Pedone*

Richard C. Pedone
Partner

cc: Adam Stein-Sapir (via e-mail: adam@pfllc.com)

NIXON PEABODY

Nixon Peabody LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

Richard C. Pedone
Partner

T / 617.345.1305
F / 866.947.1890
rpedone@nixonpeabody.com

July 8, 2026

**VIA EMAIL AND FIRST-CLASS MAIL**

Nils Trosterud
Sissel Trosterud
Dragveien 43
1363 Høvik
Norway
E-mail: nils@cpr.no
ntrosterud@nordcapadvisors.com
info@nordcapadvisors.com
ntrosterud@regentparkadvisors.com

**Re: *In re Jason M Kahan*, Case No. 24-11592-JEB**

*****LITIGATION HOLD NOTICE*****

To whom it may concern:

Nixon Peabody LLP is counsel to PBTC Recovery Partners, LLC ("PBTC") in a case concerning a debtor, Jason M. Kahan ("Kahan"), captioned *In re Jason M Kahan*, Case No. 24-11592-JEB (the "Case") currently pending before the United States Bankruptcy Court for the District of Massachusetts (the "Court"). PBTC is an interested party in the Case as it relates to the sale of certain assets from Kahan's estate, including the Estate Bitcoin (the "Sale").

As used herein, "Kahan Matters" means any and all communications, business relationships, financing, financial support, investments, agreements, partnerships, joint ventures, transactions, or any other dealings or engagements with Kahan, Ryan Moore, or Samara CR Holdings, LLC ("Samara"), whether past, present, or contemplated.

***This letter directs the recipient to preserve all documents and information relating to Kahan Matters.*** The failure to preserve documents and information relating to Kahan Matters may expose you to sanctions.

1. **Preservation of All Documents Related to Kahan Matters.**[1] Please preserve all documents and information, including the originals and all non-identical copies (i.e., different from originals due to notations made on or attached to such copies or otherwise) of the following:

---

[1] Rules governing civil procedure require preservation of all documents and data relating to the Kahan Matters from all sources. "Documents and data" as used here means not only hard copy documents. Instead, courts interpret "documents and data" very broadly to include audio recordings, videotape, e-mail, instant messages, text messages, messages on messaging applications such as Telegram, Signal, WhatsApp, or any other messaging application, video recordings or other data from video conference platforms such as Zoom, Teams, or Ring, search history from artificial intelligence applications such as ChatGPT or Claude, word processing documents, spreadsheets, databases, calendars, phone logs, Internet usage files, and all other electronic information created, received, and/or maintained by the Company on its computer systems. "Sources" include all hard copy files, electronic files, computer hard drives, removable media (e.g., CDs and DVDs), laptop computers, PDAs, Android devices,

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

a. All documents, data and information relating to any communications, business relationships, partnerships, joint ventures, transactions, agreements, financing, financial support, or investments with or for the benefit of Kahan, Ryan Moore, or Samara.

b. All documents, data and information relating to the formation, funding, and corporate governance of any entity or venture in which Kahan or Samara has or had an interest or involvement.

2. **Preservation of Electronically Stored Information (ESI)**. Electronically stored information (ESI) may be an important and irreplaceable source of discovery and/or evidence in this matter. You must continue to take every reasonable step to preserve this information until further notice.

**To comply with your legal obligations, you must continue to preserve all existing documents and data related to Kahan Matters and suspend deletion, overwriting, or any other possible destruction of relevant documents and data on all electronic devices, including but not limited to laptops, computers and cellular devices. Automatic data destruction protocols must be suspended as they relate to materials encompassed by the scope of this notification. Failure to do so could result in sanctions by the court.**

Regarding ESI, you must continue to preserve **all** such information, no matter when it was created, continuing to the present. Your obligation to preserve data is ongoing: You should continue to preserve all newly created documents and data until further notice.

Typically, such ESI may be located in or on one or more of the following:

a. Computer(s), meaning any programmable machine, including network servers, desktops, laptops, notebook computers, home and office computers, mainframes, personal digital assistants (such as iPhone, and other handheld computing devices), tablets, and mobile phones
b. Hard drive(s), meaning the primary hardware that a computer uses to store information (also known as “hard disks”)
c. Network(s), meaning a group of one or more computer systems connected to enable people to share information and equipment (e.g., local area network(s) (“LAN”), wide area network(s) (“WAN”), home area network(s) (“HAN”), metropolitan area network(s) (“MAN”), etc.)
d. Other storage device(s) or media, meaning any component that is used to store data
e. Magnetic storage media, including hard drives, stick drives, Zip drives, thumb drives, and floppy disks
f. Optical storage media, including CD-ROMs and DVD-ROMs
g. Voice-mail and/or voice messaging systems
h. Archive(s) and/or backup tapes, meaning long-term storage area(s) for data and hard copy documents
i. Cloud or internet-based storage

3. **Suspension of Routine Business Practices Likely to Alter or Destroy Documents or Information.** You should continue to suspend any routine business practice likely to alter or destroy the documents and information described herein. Such business practices may include, but are not limited to, shredding, disposal or other destruction of documents; automatic deletion policies or rules for e-mail, automatic deletion policies or rules for video conference or messaging

---

iPhones, smart phones, back up media and any other locations where hard copy or electronic data is or could be stored, including cloud or internet-based storage locations.

applications, server backup tape rotation or overwriting; electronic data deletion; scheduled destruction of back up media; re-imaging of drives; drive hardware exchanges; sale, gift or destruction of computer systems; disk defragmentation; and/or other disk maintenance routines. These routine business practices should not be resumed until the parties have taken all necessary, reasonable steps to ensure that discoverable information has been adequately preserved.

Because discoverable ESI may be contained in files that have already been deleted during the normal course of your business, we also ask that you take affirmative steps to preserve drives, devices and storage media in which deleted information is kept. When electronic files are deleted, ordinarily they are not permanently destroyed until the deleted files are actually overwritten. Thus, you should take affirmative steps to prevent deleted electronic information from being overwritten. Until deleted data is adequately preserved by making forensically qualified clones or images of digital storage media containing deleted data, you should shut down hardware and remove it from service.

To the extent that you have retained outside legal counsel to represent you in this matter, please share the contents of this letter with such legal representative.

Sincerely,

/s/ *Richard C. Pedone*

Richard C. Pedone
Partner

cc: Adam Stein-Sapir (via e-mail: adam@pfllc.com)

**EXHIBIT Q**

NIXON PEABODY

Nixon Peabody LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Richard C. Pedone**
**Partner**

T / 617.345.1305
F / 866.947.1890
rpedone@nixonpeabody.com

July 31, 2026

**VIA EMAIL & OVERNIGHT MAIL**

NordCap Advisors AS
Hegdehaugsveien 31
0352 Oslo
Norway

**Re:** ***In re Jason M. Kahan*, Case No. 24-11592-JEB (Bankr. D. Mass.)**
**Demand for Immediate Turnover and Preservation of Purchased Assets**

To Whom It May Concern:

Nixon Peabody LLP is counsel to PBTC Recovery Partners, LLC ("PBTC" or "Buyer"). Attached hereto as **Exhibit A** is a copy of the *Order (I) Authorizing And Approving The Sale Of Certain Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances And Other Interests, And (II) Granting Related Relief* (the "Sale Order") entered by the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") in the above-captioned chapter 7 case of Jason M. Kahan (the "Debtor").

You are receiving this letter because PBTC believes that you may be in possession of assets that PBTC acquired under the Sale Order including any Bitcoin, private wallet keys and information related to such assets that were owned by Jason Kahan and are more particularly described below. The assets include information and data related to the recovery of the assets. PBTC hereby demands that you immediately turn over any such assets, as required under the Sale Order.

## I. The Purchased Assets Acquired by PBTC

Under the Sale Order, PBTC acquired the "Purchased Assets" of the Debtor's bankruptcy estate, including but not limited to Bitcoin and private wallet keys owned by the Debtor.

Specifically, PBTC acquired the following "Purchased Assets" listed on Exhibit A to the Asset Purchase Agreement dated as of May 26, 2026 (the "APA"), between Donald Lassman, as the Chapter 7 Trustee (the "Trustee") and Pioneer Funding Group, LLC, as assigned to PBTC:

**EXHIBIT A TO AGREEMENT**

**ASSETS**

A. The rights, title and interests of Seller, the Estate and the Debtor in the Bitcoin wallets and Bitcoin addresses, including private keys, in which they hold any interest, including, but not limited to, the below wallets (collectively, the "***BTC Wallets***"):

1. BTC Address 1 (0.00132677 BTC): [redacted]l0hz
2. BTC Address 2 (414.99999583 BTC): [redacted]59df
3. BTC Address 3 (494.22956166 BTC): [redacted]ej6c
4. BTC Address 4 (185.10000000 BTC): [redacted]yrlk
5. BTC Address 5 (100.00010330 BTC): [redacted]gx4x
6. BTC Address 6 (100.00010330 BTC): [redacted]qssr
7. BTC Address 7 (0.00010000 BTC): [redacted]st7y
8. BTC Address 8 (496.89998888 BTC): [redacted]p0ug
9. BTC Address 9 (0 BTC): [redacted]rz5c
10. BTC Address 10 (0 BTC): [redacted]u6pN
11. BTC Address 11 (0 BTC): [redacted]psci

B. The rights, title and interests of Seller, the Estate and the Debtor in any cryptocurrency in which they hold any interest, including, but not limited to (i) currently located in the BTC Wallets, and/or (ii) which have been transferred out of the BTC Wallets since their inception ((i) and (ii) together, the "***Estate Bitcoin***").

## II. Demand for Turnover of Purchased Assets in Your Possession

The sale of the Debtor's assets to PBTC under the APA closed on July 17, 2026. *See* Notice of Closing [Docket No. 347]. Paragraph LL of the Sale Order provides:

> To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS and NordCap Advisors SA, such third parties shall immediately deliver possession, control, and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law.

Sale Order, ¶ LL. Paragraph 15 of the Sale Order similarly provides that to the extent you are "in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets," you "shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." *Id.* ¶ 15.

Accordingly, PBTC hereby demands that to the extent you have access to or control any of the Purchased Assets you immediately:

1. Turn over to PBTC all Purchased Assets in your possession, custody, or control, including without limitation any Bitcoin, cryptocurrency, private keys, seed phrases, wallet files, hardware wallets, account credentials, wallet addresses, transaction

records, proceeds, or other information or property necessary to access, identify, preserve, or recover the Purchased Assets;

2. Provide PBTC with full access to any Purchased Assets to which you have access or over which you have exercised control, directly or indirectly;

3. Identify in writing all Purchased Assets presently or previously in your possession, custody, or control, including the nature of the assets, their current location, any wallet addresses or accounts associated with them, and any transfers, movements, dispositions, or conversions of such assets;

4. Preserve all documents and electronically stored information relating to the Purchased Assets, including communications, wallet records, transaction logs, account records, private-key materials, device records, and any correspondence with Jason Kahan or any other person concerning the Purchased Assets; and

5. Immediately cease and refrain from selling, transferring, moving, converting, concealing, encumbering, dissipating, deleting, destroying, altering, or otherwise disposing of any Purchased Assets or information relating to the Purchased Assets.

For the avoidance of doubt, PBTC demands that you not move, transfer, dispose of, or otherwise interfere with any Purchased Assets in your possession, custody, or control, or any proceeds thereof. Any such conduct after notice of the Sale Order may result in PBTC seeking immediate relief from the Bankruptcy Court or any other court of competent jurisdiction, including turnover, injunctive relief, contempt sanctions, damages, attorneys' fees, and any other available remedies.

Please provide written confirmation by no later than August 6, 2026 that you will comply with the Sale Order and this demand. Please also identify a time and method for immediate turnover of any Purchased Assets in your possession.

Nothing in this letter should be construed as a waiver of PBTC's rights, claims, remedies, or arguments, all of which are expressly reserved.

Do not hesitate to contact me if you have any questions.

Sincerely,

/s/ *Richard C. Pedone*
Richard C. Pedone
Partner

NIXON PEABODY

Nixon Peabody LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Richard C. Pedone**
Partner

T / 617.345.1305
F / 866.947.1890
rpedone@nixonpeabody.com

July 31, 2026

**VIA EMAIL & OVERNIGHT MAIL**

Nils Trosterud
Dragveien 43
1363 Høvik
Norway

**Re:** ***In re Jason M. Kahan*, Case No. 24-11592-JEB (Bankr. D. Mass.)**
**Demand for Immediate Turnover and Preservation of Purchased Assets**

Dear Mr. Trosterud:

Nixon Peabody LLP is counsel to PBTC Recovery Partners, LLC ("PBTC" or "Buyer"). Attached hereto as **Exhibit A** is a copy of the *Order (I) Authorizing And Approving The Sale Of Certain Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances And Other Interests, And (II) Granting Related Relief* (the "Sale Order") entered by the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") in the above-captioned chapter 7 case of Jason M. Kahan (the "Debtor").

You are receiving this letter because PBTC believes that you may be in possession of assets that PBTC acquired under the Sale Order including any Bitcoin, private wallet keys and information related to such assets that were owned by Jason Kahan and are more particularly described below. The assets include information and data related to the recovery of the assets. PBTC hereby demands that you immediately turn over any such assets, as required under the Sale Order.

## I. The Purchased Assets Acquired by PBTC

Under the Sale Order, PBTC acquired the "Purchased Assets" of the Debtor's bankruptcy estate, including but not limited to Bitcoin and private wallet keys owned by the Debtor.

Specifically, PBTC acquired the following "Purchased Assets" listed on Exhibit A to the Asset Purchase Agreement dated as of May 26, 2026 (the "APA"), between Donald Lassman, as the Chapter 7 Trustee (the "Trustee") and Pioneer Funding Group, LLC, as assigned to PBTC:

**EXHIBIT A TO AGREEMENT**

**ASSETS**

A. The rights, title and interests of Seller, the Estate and the Debtor in the Bitcoin wallets and Bitcoin addresses, including private keys, in which they hold any interest, including, but not limited to, the below wallets (collectively, the "***BTC Wallets***"):

1. BTC Address 1 (0.00132677 BTC): [redacted]l0hz
2. BTC Address 2 (414.99999583 BTC): [redacted]59df
3. BTC Address 3 (494.22956166 BTC): [redacted]ej6c
4. BTC Address 4 (185.10000000 BTC): [redacted]yrlk
5. BTC Address 5 (100.00010330 BTC): [redacted]gx4x
6. BTC Address 6 (100.00010330 BTC): [redacted]qssr
7. BTC Address 7 (0.00010000 BTC): [redacted]st7y
8. BTC Address 8 (496.89998888 BTC): [redacted]p0ug
9. BTC Address 9 (0 BTC): [redacted]rz5c
10. BTC Address 10 (0 BTC): [redacted]u6pN
11. BTC Address 11 (0 BTC): [redacted]psci

B. The rights, title and interests of Seller, the Estate and the Debtor in any cryptocurrency in which they hold any interest, including, but not limited to (i) currently located in the BTC Wallets, and/or (ii) which have been transferred out of the BTC Wallets since their inception ((i) and (ii) together, the "***Estate Bitcoin***").

## II. Demand for Turnover of Purchased Assets in Your Possession

The sale of the Debtor's assets to PBTC under the APA closed on July 17, 2026. *See* Notice of Closing [Docket No. 347]. Paragraph LL of the Sale Order provides:

> To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS and NordCap Advisors SA, such third parties shall immediately deliver possession, control, and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law.

Sale Order, ¶ LL. Paragraph 15 of the Sale Order similarly provides that to the extent you are "in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets," you "shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." *Id.* ¶ 15.

Accordingly, PBTC hereby demands that to the extent you have access to or control any of the Purchased Assets you immediately:

1. Turn over to PBTC all Purchased Assets in your possession, custody, or control, including without limitation any Bitcoin, cryptocurrency, private keys, seed phrases, wallet files, hardware wallets, account credentials, wallet addresses, transaction

records, proceeds, or other information or property necessary to access, identify, preserve, or recover the Purchased Assets;

2. Provide PBTC with full access to any Purchased Assets to which you have access or over which you have exercised control, directly or indirectly;

3. Identify in writing all Purchased Assets presently or previously in your possession, custody, or control, including the nature of the assets, their current location, any wallet addresses or accounts associated with them, and any transfers, movements, dispositions, or conversions of such assets;

4. Preserve all documents and electronically stored information relating to the Purchased Assets, including communications, wallet records, transaction logs, account records, private-key materials, device records, and any correspondence with Jason Kahan or any other person concerning the Purchased Assets; and

5. Immediately cease and refrain from selling, transferring, moving, converting, concealing, encumbering, dissipating, deleting, destroying, altering, or otherwise disposing of any Purchased Assets or information relating to the Purchased Assets.

For the avoidance of doubt, PBTC demands that you not move, transfer, dispose of, or otherwise interfere with any Purchased Assets in your possession, custody, or control, or any proceeds thereof. Any such conduct after notice of the Sale Order may result in PBTC seeking immediate relief from the Bankruptcy Court or any other court of competent jurisdiction, including turnover, injunctive relief, contempt sanctions, damages, attorneys' fees, and any other available remedies.

Please provide written confirmation by no later than August 6, 2026 that you will comply with the Sale Order and this demand. Please also identify a time and method for immediate turnover of any Purchased Assets in your possession.

Nothing in this letter should be construed as a waiver of PBTC's rights, claims, remedies, or arguments, all of which are expressly reserved.

Do not hesitate to contact me if you have any questions.

Sincerely,

/s/ *Richard C. Pedone*
Richard C. Pedone
Partner

NIXON PEABODY

Nixon Peabody LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

Richard C. Pedone
Partner

T / 617.345.1305
F / 866.947.1890
rpedone@nixonpeabody.com

July 31, 2026

**VIA EMAIL & OVERNIGHT MAIL**

Quantum Resource Group QRG AS
Harald Hårfagres vei 25
1412 Sofiemyr
Norway

Quantum Resource Group QRG AS
Martin Linges vei 25
1364 FORNEBU
Norway

**Re:** ***In re Jason M. Kahan*, Case No. 24-11592-JEB (Bankr. D. Mass.)**
**Demand for Immediate Turnover and Preservation of Purchased Assets**

To Whom It May Concern:

Nixon Peabody LLP is counsel to PBTC Recovery Partners, LLC ("PBTC" or "Buyer"). Attached hereto as **Exhibit A** is a copy of the *Order (I) Authorizing And Approving The Sale Of Certain Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances And Other Interests, And (II) Granting Related Relief* (the "Sale Order") entered by the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") in the above-captioned chapter 7 case of Jason M. Kahan (the "Debtor").

You are receiving this letter because PBTC believes that you may be in possession of assets that PBTC acquired under the Sale Order including any Bitcoin, private wallet keys and information related to such assets that were owned by Jason Kahan and are more particularly described below. The assets include information and data related to the recovery of the assets. PBTC hereby demands that you immediately turn over any such assets, as required under the Sale Order.

## I. The Purchased Assets Acquired by PBTC

Under the Sale Order, PBTC acquired the "Purchased Assets" of the Debtor's bankruptcy estate, including but not limited to Bitcoin and private wallet keys owned by the Debtor.

Specifically, PBTC acquired the following "Purchased Assets" listed on Exhibit A to the Asset Purchase Agreement dated as of May 26, 2026 (the "APA"), between Donald Lassman, as the Chapter 7 Trustee (the "Trustee") and Pioneer Funding Group, LLC, as assigned to PBTC:

**EXHIBIT A TO AGREEMENT**

**ASSETS**

A. The rights, title and interests of Seller, the Estate and the Debtor in the Bitcoin wallets and Bitcoin addresses, including private keys, in which they hold any interest, including, but not limited to, the below wallets (collectively, the "***BTC Wallets***"):

1. BTC Address 1 (0.00132677 BTC): [redacted]l0hz
2. BTC Address 2 (414.99999583 BTC): [redacted]59df
3. BTC Address 3 (494.22956166 BTC): [redacted]ej6c
4. BTC Address 4 (185.10000000 BTC): [redacted]yrlk
5. BTC Address 5 (100.00010330 BTC): [redacted]gx4x
6. BTC Address 6 (100.00010330 BTC): [redacted]qssr
7. BTC Address 7 (0.00010000 BTC): [redacted]st7y
8. BTC Address 8 (496.89998888 BTC): [redacted]p0ug
9. BTC Address 9 (0 BTC): [redacted]rz5c
10. BTC Address 10 (0 BTC): [redacted]u6pN
11. BTC Address 11 (0 BTC): [redacted]psci

B. The rights, title and interests of Seller, the Estate and the Debtor in any cryptocurrency in which they hold any interest, including, but not limited to (i) currently located in the BTC Wallets, and/or (ii) which have been transferred out of the BTC Wallets since their inception ((i) and (ii) together, the "***Estate Bitcoin***").

## II. Demand for Turnover of Purchased Assets in Your Possession

The sale of the Debtor's assets to PBTC under the APA closed on July 17, 2026. *See* Notice of Closing [Docket No. 347]. Paragraph LL of the Sale Order provides:

> To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS and NordCap Advisors SA, such third parties shall immediately deliver possession, control, and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law.

Sale Order, ¶ LL. Paragraph 15 of the Sale Order similarly provides that to the extent you are "in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets," you "shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." *Id.* ¶ 15.

Accordingly, PBTC hereby demands that to the extent you have access to or control any of the Purchased Assets you immediately:

1. Turn over to PBTC all Purchased Assets in your possession, custody, or control, including without limitation any Bitcoin, cryptocurrency, private keys, seed phrases, wallet files, hardware wallets, account credentials, wallet addresses, transaction

records, proceeds, or other information or property necessary to access, identify, preserve, or recover the Purchased Assets;

2. Provide PBTC with full access to any Purchased Assets to which you have access or over which you have exercised control, directly or indirectly;

3. Identify in writing all Purchased Assets presently or previously in your possession, custody, or control, including the nature of the assets, their current location, any wallet addresses or accounts associated with them, and any transfers, movements, dispositions, or conversions of such assets;

4. Preserve all documents and electronically stored information relating to the Purchased Assets, including communications, wallet records, transaction logs, account records, private-key materials, device records, and any correspondence with Jason Kahan or any other person concerning the Purchased Assets; and

5. Immediately cease and refrain from selling, transferring, moving, converting, concealing, encumbering, dissipating, deleting, destroying, altering, or otherwise disposing of any Purchased Assets or information relating to the Purchased Assets.

For the avoidance of doubt, PBTC demands that you not move, transfer, dispose of, or otherwise interfere with any Purchased Assets in your possession, custody, or control, or any proceeds thereof. Any such conduct after notice of the Sale Order may result in PBTC seeking immediate relief from the Bankruptcy Court or any other court of competent jurisdiction, including turnover, injunctive relief, contempt sanctions, damages, attorneys’ fees, and any other available remedies.

Please provide written confirmation by no later than August 6, 2026 that you will comply with the Sale Order and this demand. Please also identify a time and method for immediate turnover of any Purchased Assets in your possession.

Nothing in this letter should be construed as a waiver of PBTC’s rights, claims, remedies, or arguments, all of which are expressly reserved.

Do not hesitate to contact me if you have any questions.

Sincerely,

/s/ *Richard C. Pedone*
Richard C. Pedone
Partner

NIXON PEABODY

Nixon Peabody LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Richard C. Pedone**
Partner

T / 617.345.1305
F / 866.947.1890
rpedone@nixonpeabody.com

July 31, 2026

**VIA EMAIL & OVERNIGHT MAIL**

Hunter Penn
1153 Elm Street
Apartment 3L
West Springfield, MA 01089

Hunter Penn
42 South St.
Plymouth, CT 06782-2315

**Re:** ***In re Jason M. Kahan*, Case No. 24-11592-JEB (Bankr. D. Mass.)**
**Demand for Immediate Turnover and Preservation of Purchased Assets**

Dear Mr. Penn:

Nixon Peabody LLP is counsel to PBTC Recovery Partners, LLC ("PBTC" or "Buyer"). Attached hereto as **Exhibit A** is a copy of the *Order (I) Authorizing And Approving The Sale Of Certain Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances And Other Interests, And (II) Granting Related Relief* (the "Sale Order") entered by the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") in the above-captioned chapter 7 case of Jason M. Kahan (the "Debtor").

You are receiving this letter because PBTC believes that you may be in possession of assets that PBTC acquired under the Sale Order including any Bitcoin, private wallet keys and information related to such assets that were owned by Jason Kahan and are more particularly described below. The assets include information and data related to the recovery of the assets. PBTC hereby demands that you immediately turn over any such assets, as required under the Sale Order.

## I. The Purchased Assets Acquired by PBTC

Under the Sale Order, PBTC acquired the "Purchased Assets" of the Debtor's bankruptcy estate, including but not limited to Bitcoin and private wallet keys owned by the Debtor.

Specifically, PBTC acquired the following "Purchased Assets" listed on Exhibit A to the Asset Purchase Agreement dated as of May 26, 2026 (the "APA"), between Donald Lassman, as the Chapter 7 Trustee (the "Trustee") and Pioneer Funding Group, LLC, as assigned to PBTC:

**<u>EXHIBIT A TO AGREEMENT</u>**

**ASSETS**

A. The rights, title and interests of Seller, the Estate and the Debtor in the Bitcoin wallets and Bitcoin addresses, <u>including</u> private keys, in which they hold any interest, including, but not limited to, the below wallets (collectively, the "***BTC Wallets***"):

1. BTC Address 1 (0.00132677 BTC): [redacted]l0hz
2. BTC Address 2 (414.99999583 BTC): [redacted]59df
3. BTC Address 3 (494.22956166 BTC): [redacted]ej6c
4. BTC Address 4 (185.10000000 BTC): [redacted]yrlk
5. BTC Address 5 (100.00010330 BTC): [redacted]gx4x
6. BTC Address 6 (100.00010330 BTC): [redacted]qssr
7. BTC Address 7 (0.00010000 BTC): [redacted]st7y
8. BTC Address 8 (496.89998888 BTC): [redacted]p0ug
9. BTC Address 9 (0 BTC): [redacted]rz5c
10. BTC Address 10 (0 BTC): [redacted]u6pN
11. BTC Address 11 (0 BTC): [redacted]psci

B. The rights, title and interests of Seller, the Estate and the Debtor in any cryptocurrency in which they hold any interest, including, but not limited to (i) currently located in the BTC Wallets, and/or (ii) which have been transferred out of the BTC Wallets since their inception ((i) and (ii) together, the "***Estate Bitcoin***").

## II. <u>Demand for Turnover of Purchased Assets in Your Possession</u>

The sale of the Debtor's assets to PBTC under the APA closed on July 17, 2026. *See* Notice of Closing [Docket No. 347]. Paragraph LL of the Sale Order provides:

> To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS and NordCap Advisors SA, such third parties shall immediately deliver possession, control, and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law.

Sale Order, ¶ LL. Paragraph 15 of the Sale Order similarly provides that to the extent you are "in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets," you "shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." *Id.* ¶ 15.

Accordingly, PBTC hereby demands that to the extent you have access to or control any of the Purchased Assets you immediately:

1. Turn over to PBTC all Purchased Assets in your possession, custody, or control, including without limitation any Bitcoin, cryptocurrency, private keys, seed phrases, wallet files, hardware wallets, account credentials, wallet addresses, transaction

records, proceeds, or other information or property necessary to access, identify, preserve, or recover the Purchased Assets;

2. Provide PBTC with full access to any Purchased Assets to which you have access or over which you have exercised control, directly or indirectly;

3. Identify in writing all Purchased Assets presently or previously in your possession, custody, or control, including the nature of the assets, their current location, any wallet addresses or accounts associated with them, and any transfers, movements, dispositions, or conversions of such assets;

4. Preserve all documents and electronically stored information relating to the Purchased Assets, including communications, wallet records, transaction logs, account records, private-key materials, device records, and any correspondence with Jason Kahan or any other person concerning the Purchased Assets; and

5. Immediately cease and refrain from selling, transferring, moving, converting, concealing, encumbering, dissipating, deleting, destroying, altering, or otherwise disposing of any Purchased Assets or information relating to the Purchased Assets.

For the avoidance of doubt, PBTC demands that you not move, transfer, dispose of, or otherwise interfere with any Purchased Assets in your possession, custody, or control, or any proceeds thereof. Any such conduct after notice of the Sale Order may result in PBTC seeking immediate relief from the Bankruptcy Court or any other court of competent jurisdiction, including turnover, injunctive relief, contempt sanctions, damages, attorneys' fees, and any other available remedies.

Please provide written confirmation by no later than August 6, 2026 that you will comply with the Sale Order and this demand. Please also identify a time and method for immediate turnover of any Purchased Assets in your possession.

Nothing in this letter should be construed as a waiver of PBTC's rights, claims, remedies, or arguments, all of which are expressly reserved.

Do not hesitate to contact me if you have any questions.

Sincerely,

/s/ *Richard C. Pedone*
Richard C. Pedone
Partner

**EXHIBIT R**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-11592-JEB |

**SUPPLEMENTAL CERTIFICATE OF SERVICE**

I, Richard C. Pedone, hereby certify that on the 15th day of May, 2026, I caused copies of the following documents to be served via overnight mail upon the parties listed on the attached Service List:

1. *Chapter 7 Trustee's Motion for: (I) Entry of an Order (A) Approving Procedures Governing Trustee's Proposed Sale of Certain of the Debtor's Assets Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving Form and Manner of Notice of Sale, and (C) Granting Related Relief; and (II) Authority to Sell Certain of the Debtor's Assets Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims, Encumbrances and Other Interests* [Dkt. No. 260] and

2. *Order Setting Hearing and Objection Deadline* [Dkt. No. 262]

Dated: May 20, 2026

Respectfully submitted,

/s/ *Richard C. Pedone*

Richard C. Pedone (BBO # 630716)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 345-1000
Email: rpedone@nixonpeabody.com

*Counsel to Pioneer Funding Group LLC*

**Service List**

Hunter Penn
1153 Elm Street
Apartment 3L
West Springfield, MA 01089

NordCap Advisors AS
Hegdehaugsveien 31
0352 OSLO
Norway

Quantum Resource Group QRG AS
Martin Linges vei 25
1364 FORNEBU
Norway

Nils Trosterud
NordCap Advisors AS
Hegdehaugsveien 31
0352 OSLO
Norway

Nils Trosterud
Sissel Trosterud
Dragveien 43
1363 Høvik
Norway

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-11592-JEB |

**CERTIFICATE OF SERVICE**

I, Richard C. Pedone, hereby certify that on the 4th day of June, 2026, I caused copies of the following documents to be served via regular mail upon the parties listed on the attached Service List:

- *Chapter 7 Trustee's Motion For: (I) Entry Of An Order (A) Approving Procedures Governing Trustee's Proposed Sale Of Certain Of The Debtor's Assets Pursuant To Section 363 Of The Bankruptcy Code, Free And Clear Of Liens, Claims, Encumbrances And Other Interests, (B) Approving Form And Manner Of Notice Of Sale, And (C) Granting Related Relief; And (II) Authority To Sell Certain Of The Debtor's Assets Pursuant To Section 363 Of The Bankruptcy Code, Free And Clear Of Liens, Claims, Encumbrances And Other Interests* [Docket No. 260].

- *Order (A) Approving Procedures Governing Trustee's Proposed Sale of Certain of the Debtor's Assets Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving Form and Manner of Notice of Sale, and (C) Granting Related Relief* [Docket No. 274].

Dated: June 23, 2026

Respectfully submitted,

/s/ *Richard C. Pedone*

Richard C. Pedone (BBO # 630716)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 345-1000
Email: rpedone@nixonpeabody.com

*Counsel to Pioneer Funding Group LLC*

**Service List**

Hunter Penn
1153 Elm Street
Apartment 3L
West Springfield, MA 01089

NordCap Advisors AS
Hegdehaugsveien 31
0352 OSLO
Norway

Quantum Resource Group QRG AS
Martin Linges vei 25
1364 FORNEBU
Norway

Quantum Resource Group QRG AS
Harald Hårfagres vei 25
1412 Sofiemyr
NORWAY

Nils Trosterud
NordCap Advisors AS
Hegdehaugsveien 31
0352 OSLO
Norway

Nils Trosterud
Sissel Trosterud
Dragveien 43
1363 Høvik
Norway