**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-11592 |
| PBTC RECOVERY PARTNERS, LLC,<br><br>Plaintiff,<br>v.<br><br>HUNTER PENN aka ALEX COLVIN, NILS TROSTERUD, SISSEL TROSTERUD, QUANTUM RESOURCE GROUP QRG AS, NORDCAP ADVISORS AS, AND JOHN DOES 1-10,<br><br>Defendants. | Adv. Pro. No. ______ |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY PBTC RECOVERY PARTNERS, LLC FOR PRELIMINARY INJUNCTION AND RELATED RELIEF**

NIXON PEABODY LLP
Richard C. Pedone (BBO # 630716)
Morgan C. Nighan (BBO # 679546)
Daniel P. McMonagle (BBO # 713426)
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 345-1000
Email: rpedone@nixonpeabody.com

-and-

Christopher Fong (pro hac vice)
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036
Email: cfong@nixonpeabody.com

*Counsel to PBTC Recovery Partners, LLC*

Dated: October 12, 2026

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ........ 1
II. FACTUAL BACKGROUND ........ 4
A. Defendant Hunter Penn Admits to Control of Bitcoin and Receives Payments. ........ 5
B. Nils Trosterud, NordCap, and Quantum Admit Control ........ 6
C. Transfers of the Bitcoin Assets. ........ 7
D. The Court-Supervised Sale and Sale Order. ........ 8
III. LEGAL STANDARD ........ 9
IV. ARGUMENT ........ 11
A. Plaintiff Is Entitled to Preliminary Injunctive Relief. ........ 11
i. PBTC is Likely to Succeed on the Merits ........ 12
ii. Plaintiff Will Be Irreparably Harmed If an Injunction Is Not Ordered ........ 14
iii. The Balance of Harms Tips Strongly in Plaintiff's Favor ........ 15
iv. The Public Interest Supports Granting the Injunction ........ 16
B. Plaintiff Also Meets the Heightened Standard for a Mandatory Injunction. ........ 17
V. CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Baldiga v. Desai (In re Desai)*,
2012 Bankr. LEXIS 5943 (Bankr. D. Mass. Dec. 28, 2012) ....................9

*Bl(a)ck Tea Soc'y v. City of Bos.*,
378 F.3d 8 (1st Cir. 2004) ....................9

*Braintree Labs., Inc. v. Citigroup Glob. Mkts Inc.*,
622 F.3d 36 (1st Cir. 2010) ....................10, 17, 18

*District 4 Lodge v. Raimondo*,
40 F.4th 36 (1st Cir. 2022) ....................9

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*,
445 F.3d 13 (1st Cir. 2006) ....................9

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*,
4 F.3d 90 (1st Cir. 1993) ....................13

*Fleet National Bank v. Rapid Processing Co., Inc.*,
643 F. Supp. 1065 (D. Mass. 1986) ....................13, 14

*Gaponyuk v. Alferov*,
2023 U.S. Dist. LEXIS 125262 (E.D. Cal. July 20, 2023) ....................14, 16

*Heissenberg v. Doe*,
2021 U.S. Dist. LEXIS 257218 (S.D. Fla. Apr. 22, 2021) ....................14

*Hikmatullaev v. Marco Alessandro Villa*,
2023 U.S. Dist. LEXIS 111619 (S.D. Fla. June 28, 2023) ....................16

*Jacobo v. Doe*,
2022 U.S. Dist. LEXIS 101504 (E.D. Cal. June 7, 2022) ....................14

*Lewis v. GE*,
37 F. Supp. 2d 55 (D. Mass. 1999) ....................10, 18

*Licht v. Ling*,
2023 U.S. Dist. LEXIS 122075 (N.D. Tex. June 20, 2023) ....................14, 16

*Micro Signal Research, Inc. v. Otus*,
417 F.3d 28 (1st Cir. 2005) ....................14

*Together Emps. v. Mass Gen. Brigham Inc.*,
32 F.4th 82 (1st Cir. 2022) ........ 9

*Yogaratnam v. Dubois*,
2024 U.S. Dist. LEXIS 31033 (E.D. La. Feb. 23, 2024) ........ 14, 16

**State Cases**

*Packaging Indus. Group, Inc. v. Cheney*,
380 Mass. 609 (1980) ........ 9

*Weiler v. PortfolioScope, Inc.*,
469 Mass. 75 (2014) ........ 13

**Federal Statutes**

11 U.S.C. § 548 ........ 12

11 U.S.C. § 542(a) ........ 11, 12

**Rules**

Federal Rules of Bankruptcy Procedure Rule 2004 ........ 6

Federal Rules of Bankruptcy Procedure Rule 7065 ........ 8, 9

Federal Rules of Civil Procedure Rule 65 ........ 8, 9

Plaintiff PBTC Recovery Partners, LLC ("PBTC" or "Plaintiff"), by and through its undersigned counsel, submits this memorandum of law (the "Memorandum") in support of the *Motion by PBTC Recovery Partners, LLC for Preliminary Injunction and Related Relief* (the "Motion") filed concurrently herewith. In further support of the Motion, Plaintiff relies upon and incorporates the Complaint, the *Affidavit of Adam D. Stein-Sapir* (the "Stein-Sapir Affidavit"), the *Affidavit of Christopher Fong* (the "Fong Affidavit"), and the *Appendix in Support of Motion by PBTC Recovery Partners, LLC for Preliminary Injunction and Related Relief* ("Appendix") also filed contemporaneously herewith.

# I.
# PRELIMINARY STATEMENT[1]

1. In the Debtor's chapter 7 case, PBTC purchased from the Bankruptcy Trustee certain claims and the right to recover approximately 1,800 Bitcoin, which Bitcoin had a value in excess of $110 million (the "Bitcoin" and with the Access Credentials (as defined herein), the "Bitcoin Assets")[2] and which previously belonged to the Debtor. *See* Appendix, Ex. A (Bill of Sale).

2. Plaintiff brings this action because, despite a clear mandate issued by this Court, Defendants have failed to turn over the Bitcoin Assets. Defendants' conduct compels the Plaintiff's to seek enforcement, namely an injunction from this Court which will allow Plaintiff to compel turnover and to pursue further process in Norway, the jurisdiction in which, upon information and belief, certain Defendants may now be located.

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion, Complaint, Stein-Sapir Affidavit, and/or Fong Affidavit, as applicable.

[2] For the avoidance of doubt, the term "Bitcoin Assets" refers to the Bitcoin and related Access Credentials. The term "Purchased Assets" refers to all assets described in Exhibit A to the Bill of Sale. *See* Appendix, at Ex. A (Bill of Sale).

3. This Court's Sale Order, which specifically retained jurisdiction to hear any turnover requests that were to arise from noncompliance by Defendants, anticipated just this challenge and preserved the Court's enforcement authority.

4. Plaintiff commenced this adversary proceeding against Defendants Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS ("Quantum"), NordCap Advisors AS ("NordCap"), and John Does 1-10 (the "Doe Defendants") (collectively, "Defendants") seeking, among other things: (i) an order enforcing the Sale Order entered by this Court on July 17, 2026; (ii) an order freezing and preserving the Bitcoin Assets; and (iii) an order compelling Defendants to deliver possession, control, and access to the Bitcoin Assets to PBTC.

5. This Court's Sale Order approving the sale of the Purchased Assets to PBTC expressly commanded all parties in possession or control of the Bitcoin Assets, including each named Defendant, to "immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer." Appendix, Ex. B, ¶¶ 15, LL (Sale Order). But, despite the legally binding order, no Defendant has complied with this Court's directive.

6. PBTC seeks expedited injunctive relief because the unique nature of the Bitcoin creates special risks that Defendants' defiance will remain unchecked indefinitely. PBTC currently has no means by which to prevent Defendants from moving these assets on the blockchain, and preservation alone would leave the Bitcoin Assets in the hands of the very parties defying the Sale Order. Accordingly, PBTC seeks to preserve the status quo and to compel turnover of the Bitcoin Assets to PBTC through the following relief:

7. ***First***, PBTC requests a preliminary injunction enjoining the Defendants from transferring, selling, exchanging, converting, spending, using, mixing, concealing, dissipating or

otherwise disposing of, encumbering, or moving the Bitcoin (other than to PBTC) absent further order of this Court.

8. ***Second,*** PBTC requests that each Defendant (i) be restrained and enjoined from destroying, deleting, altering, transferring, or concealing any Access Credentials to the Bitcoin that such Defendant obtained, copied or otherwise acquired, which Access Credentials include, but are not limited to any and all private keys, seed phrases, passwords, recovery phrases, wallet credentials, wallet files, access credentials, cryptographic access information and/or other information thereof related to the Bitcoin or other cryptocurrency assets belonging to Plaintiff, and (ii) preserve all hardware, servers, computing equipment, and electronic devices used in connection with any efforts to access, recover, monitor, or transfer the Bitcoin or the Access Credentials, including without limitation all computers, laptops, desktops, tablets, mobile phones, hardware wallets, external hard drives, thumb drives, SD cards, network-attached storage devices, backup drives, cloud-storage repositories, encrypted containers, memory storage devices, messaging application data, and other electronic storage media.

9. ***Third,*** and most critically, PBTC requests a mandatory injunction compelling each Defendant to (i) immediately turn over and deliver to PBTC all of the specified Bitcoin within their possession, custody or control, as well as all means of accessing them, by transferring the Bitcoin to a wallet address designated in writing by PBTC, and concurrently deliver all Access Credentials, and (ii) disclose any information that each Defendant has regarding any Bitcoin Assets not in that Defendant's possession, custody, or control, as this Court has already ordered.

10. Granting the relief requested is warranted because all four preliminary injunction factors overwhelmingly favor PBTC: (i) PBTC is likely to prevail on the causes of action asserted in the Complaint (notably, turnover has already been ordered); (ii) the unique

characteristics of cryptocurrency create an imminent and irreparable risk of permanent loss; (iii) Defendants cannot claim hardship from returning property they have no right to possess; and (iv) the public interest demands that court-approved bankruptcy sales be honored and that parties who defy judicial orders be held to account.

11. If the Court does not act now and compel turnover, the Bitcoin Assets may vanish beyond the reach of Plaintiff and this Court.

## II.
## FACTUAL BACKGROUND

12. On August 7, 2024, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. In his schedules, the Debtor listed the Bitcoin with a value of approximately $110.4 million, consisting of approximately 1,800 Bitcoin together with associated wallets, private keys, seed phrases, and access credentials. On August 27, 2024, the Bankruptcy Trustee was appointed.

13. Throughout the bankruptcy proceedings, efforts to recover the Bitcoin Assets, including by the Debtor, have been consistently frustrated by Defendants' sustained campaign of misappropriation, concealment, and unauthorized control. As described below:

(i) Defendant Hunter Penn extorted over $1 million from the Debtor and claimed to have unilaterally seized approximately 654 Bitcoin as an unauthorized "fee";

(ii) Defendants NordCap and Quantum charged hundreds of thousands of dollars in purported "recovery" fees while claiming to hold the private keys to the wallets containing the Bitcoin; and

(iii) Defendant Nils Trosterud, acting through NordCap and Quantum, claimed to have obtained the private keys to wallets holding over 1,600 Bitcoin, but has refused to turn over the Bitcoin Assets or related access.

14. This Court's Sale Order in July 2026 directed Defendants to turn over the Bitcoin Assets to Plaintiff, but Defendants have openly flouted that directive. As detailed below, further relief is now required to enforce Plaintiff's rights under the Sale Order.

**A. Defendant Hunter Penn Admits to Control of Bitcoin and Receives Payments.**

15. During 2021 or 2022, the Debtor was the victim of identity theft. In an effort to secure his identity and protect his digital assets, the Debtor hired Defendant Hunter Penn as a cybersecurity consultant. Stein-Sapir Affidavit, at ¶ 13. During the course of this engagement, Penn located cryptocurrency wallet files associated with the Bitcoin Assets on the Debtor's Google Drive. *Id.* ¶ 14. Penn thereafter began to extort the Debtor, demanding money in exchange for purported assistance in recovering and securing the Debtor's cryptocurrency. *Id.* ¶ 14. The Debtor paid Penn in excess of $1 million in exchange for what he believed to be cybersecurity services that would allow him to preserve the value of his digital assets. *Id.* ¶ 14. Despite these payments, Penn did not release the Bitcoin Assets to the Debtor. *Id.* ¶ 14. Over time, Penn represented that he had lost his ability to access the Bitcoin Assets and continued to demand additional money for his ongoing efforts to recover access. *Id.* ¶ 14. In or around April 2023, Penn confirmed in a message via Telegram that "there's no question of ownership at all" regarding Kahan's ownership and original purchase of the Bitcoin Assets. Stein-Sapir Affidavit, ¶¶ 13-14.

16. In September 2024, after the Debtor filed for bankruptcy, the Debtor identified Penn as a "Custodian of the Debtor's bitcoin" in his bankruptcy schedules. Complaint, ¶ 34. Following that disclosure, the Bankruptcy Trustee sought information from Penn regarding his control of the Bitcoin Assets.

17. On November 25, 2024, the Bankruptcy Trustee sent Penn a formal demand for turnover of property of the bankruptcy estate, directing Penn to "immediately turn over . . . all

Bitcoin (including keys and/or passwords and usernames)" by December 6, 2024. Complaint, ¶ 35. Penn did not comply.

18. On December 30, 2024, and January 8, 2025, Penn emailed Special Counsel to the Bankruptcy Trustee using an email address associated with the fictitious name "Alex Colvin," purportedly identifying three wallets containing 1,000 BTC, 100 BTC, and 100 BTC, respectively. Penn represented to Special Counsel that "certain exploits were utilized to facilitate movement without requiring the private key" and claimed that "the keys are no longer in my possession." Complaint, ¶ 36; Appendix, Ex. O (Penn-Cuccinelli Emails).

19. On October 2, 2025, Penn appeared for a Rule 2004 examination. During the examination, Penn confirmed the Debtor's ownership of the approximately 1,800 Bitcoin and acknowledged that he had demanded payment from the Debtor in exchange for moving the Bitcoin and providing access credentials. When asked to verify his testimony, Penn refused and abruptly walked out before the examination was concluded. Stein-Sapir Affidavit, ¶ 19.

**B. Nils Trosterud, NordCap, and Quantum Admit Control.**

20. In approximately July 2024, the Debtor was introduced to Defendant Nils Trosterud, CEO and Chairman of Defendant NordCap. NordCap and its subcontractor, Defendant Quantum, proposed to recover the Bitcoin Assets through technical efforts. On or about December 6, 2024, NordCap and Quantum entered into a Software Recovery Agreement (the "SRA"), pursuant to which Quantum represented in writing that it had "identified a private key associated with the wallet" containing approximately 1,000 Bitcoin. Stein-Sapir Affidavit, ¶¶ 20, 22, 27(b).

21. On December 11, 2024, Nils Trosterud emailed an intermediary claiming that NordCap and Quantum had recovered the private keys for wallets containing approximately 1,810 BTC and would be moving the Bitcoin to "wallets controlled by us." Trosterud wrote:

"We have the private key to the wallet containing 1000.00131470 BTC. . . . At the same time, we will go for the 610 BTC wallet. . . . We will move the 1000.00131470 BTC and the 606 BTC to two new wallets, controlled by us." Stein-Sapir Affidavit, ¶ 23; Appendix, Ex. F (Nils Dec. 2024 Emails).

22. In or around February 2025, the Debtor and NordCap entered into a Contingent Services Agreement (the "CSA"), requiring NordCap to deliver certain portions of the Bitcoin Assets to the Bankruptcy Trustee within days. Appendix, Ex. H (Contingent Services Agreement). NordCap failed to meet the initial deadline, and addenda extended NordCap's performance deadline to February 10, 2025, and February 14, 2025, each time with "time continuing to be of the essence." NordCap failed to meet either of the extended deadlines. Stein-Sapir Affidavit, ¶ 25; Appendix, Ex. I (First Addendum to Contingent Services Agreement); Appendix, Ex. J (Second Addendum to Contingent Services Agreement).

23. On February 27, 2025, Special Counsel sent demand letters to Nils Trosterud and NordCap demanding turnover of all the Bitcoin, private keys, passwords, wallet files, and related access credentials. Appendix, Ex. K (Trustee's Turnover Demand to Nils); Appendix, Ex. L (Trustee's Turnover Demand to NordCap). NordCap did not comply and continued to demand additional payments from the Debtor before turning over any Bitcoin Assets, notwithstanding its representations that it and Quantum already possessed the private keys. Stein-Sapir Affidavit, ¶¶ 20, 23-24, 27.

**C. Transfers of the Bitcoin Assets.**

24. The publicly accessible blockchain record reflects several unauthorized transfers of Bitcoin from late 2023 through July 29, 2026. *See* Stein-Sapir Affidavit, ¶ 28.

**D. <u>The Court-Supervised Sale and Sale Order</u>.**

25. In early January 2026, the Bankruptcy Trustee initiated the process to sell the Purchased Assets, and on May 6, 2026, the Bankruptcy Trustee and Pioneer entered into the APA. Pioneer later assigned its rights under the APA to PBTC.

26. On July 17, 2026, the Court entered the Sale Order. The Sale Order found PBTC to be the successful bidder and provided, among other things, that:

a. The Sale Notice was provided to all parties the Bankruptcy Trustee believed may be in possession or control of the Purchased Assets, including Penn, Nils Trosterud, Sissel Trosterud, Quantum, NordCap, and the Debtor. Appendix, Ex. B, ¶ V (Sale Order).

b. PBTC acquired exclusive ownership and possessory rights to the Purchased Assets, including the right to pursue recovery actions as successor-in-interest to the bankruptcy estate. Appendix, Ex. B, ¶¶ KK, 14 (Sale Order).

c. The Court ordered that "[t]o the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, and NordCap Advisors [AS], such third parties shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." Appendix, Ex. B, ¶ 15 (Sale Order).

d. The Court retained jurisdiction over any turnover action brought by PBTC. Appendix, Ex. B, ¶¶ LL, RR, 22 (Sale Order).

27. On July 31, 2026, PBTC, through its counsel, sent the Turnover Demands to Penn, Nils Trosterud, Quantum, and NordCap by email and overnight mail, demanding immediate turnover of all Bitcoin Assets in their possession, custody, or control. Appendix, Ex. Q (Turnover Demand Letters). As of the date of this Memorandum, PBTC has not received any response from any Defendant.

28. Defendants have escalated from simply ignoring the Debtor's and Plaintiff's demands to openly defying this Court's binding order. That conduct requires injunctive relief and an order compelling turnover of the Bitcoin Assets to protect Plaintiff's rights.

## III.
## LEGAL STANDARD

29. Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), incorporated by Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." FED. R. CIV. P. 65. Bankruptcy Rule 7065 provides that in adversary proceedings, the court may issue a temporary restraining order or preliminary injunction "without compliance with Rule 65(c) for the debtor, trustee or debtor in possession." FED. R. BANKR. P. 7065.

30. The court determines whether to issue a preliminary injunction "by weighing four factors: '(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.'" *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 11 (1st Cir. 2004) (quoting *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). The same four-factor test applies under Massachusetts law. *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616-18 (1980).

31. The moving party bears the burden of establishing the four factors weigh in its favor. *See Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). The First Circuit has recognized that the likelihood of success on the merits and the risk of irreparable harm are the two most important factors. *See District 4 Lodge v. Raimondo*, 40 F.4th 36, 39 (1st Cir. 2022); *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) ("The first two factors are the most important."). "The sine qua non of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits." *Baldiga v.*

*Desai (In re Desai)*, 2012 Bankr. LEXIS 5943, at *14 (Bankr. D. Mass. Dec. 28, 2012) (quoting *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)). "Unless the parties' competing versions of events are 'in sharp dispute such that the propriety of injunctive relief hinges on determinations of credibility,' . . . the Court is free to accept as true 'well-pleaded allegations [in the] complaint and uncontroverted affidavits.'" *Id.* at *14-15 (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 117 (D. Mass. 2010)) (internal quotation omitted).

32. The request for the turnover of assets, known as a "mandatory" injunction, is subject to a heightened standard. "Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" *Braintree Labs., Inc. v. Citigroup Glob. Mkts Inc.*, 622 F.3d 36, 40-41 (1st Cir. 2010) (quoting *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)); *id.* at 41 ("[T]hose exigencies should still be measured according to the same four-factor test, as '[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.'" (quoting *Crowley v. Local No. 82*, 679 F.2d 978, 996 (1st Cir. 1982))). The movant should demonstrate "clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Lewis v. GE*, 37 F. Supp. 2d 55, 62 (D. Mass. 1999) (quoting *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)).

# IV.
# ARGUMENT

## A. Plaintiff Is Entitled to Preliminary Injunctive Relief, Including an Order Requiring Turnover of the Bitcoin Assets.[3]

33. Plaintiff is entitled to a preliminary injunction because the record establishes that one or more of the named Defendants are in possession or control of the Bitcoin Assets and have defied the Sale Order's express directive to "immediately deliver possession, control and access to the Purchased Assets" to PBTC. Appendix, Ex. B, ¶ 15 (Sale Order). Penn extorted over $1 million from the Debtor and claimed to have unilaterally seized approximately 654 Bitcoin as an unauthorized "fee." Stein-Sapir Affidavit, ¶ 14. NordCap and Quantum claimed they recovered the private keys to wallets holding over 1,600 BTC yet refused to turn them over. Stein-Sapir Affidavit, ¶¶ 20-27; Appendix, Ex. F (Nils Dec. 2024 Emails). Nils Trosterud's December 11, 2024 email affirmatively represented that he would move the Bitcoin to "wallets controlled by us." Stein-Sapir Affidavit, ¶ 23; Appendix, Ex. F (Nils Dec. 2024 Emails).

34. Moreover, the unique characteristics of cryptocurrency—ease of transfer, pseudonymity, and potential irreversibility—create an imminent risk of permanent loss, which has already begun to materialize through a sustained pattern of unauthorized Bitcoin transfers from late 2023 through July 29, 2026, including a transfer of approximately 10 Bitcoin to a decentralized exchange just twelve days after entry of the Sale Order. Stein-Sapir Affidavit, ¶ 30. PBTC faces the loss of specific, irreplaceable digital assets worth tens of millions of dollars, while Defendants cannot claim any cognizable harm from being required to return property they

[3] The named Defendants are subject to the personal jurisdiction of this Court. Penn lives in Massachusetts and contracted with the Debtor. Stein-Sapir Affidavit, ¶ 14. Nils Trosterud, Quantum, and NordCap all directly or indirectly contracted with the Debtor in connection with the Debtor's efforts to recover the Bitcoin. Stein-Sapir Affidavit, ¶¶ 20-23, 25.

have no right to possess and that a court order already commands them to deliver. If the Court does not grant the preliminary injunction and compel turnover of the Bitcoin Assets to PBTC, the Bitcoin Assets may vanish beyond the reach of Plaintiff and this Court in violation of this Court's Sale Order.

i. ***PBTC is Likely to Succeed on the Merits***

35. PBTC is likely to succeed on the claims asserted in its Complaint that entitle it to a preliminary injunction providing for delivery of the Bitcoin Assets to it, namely Count I (Enforcement of the Sale Order), Count II (Turnover under 11 U.S.C. § 542(a)), and Count IV (Conversion). The Complaint and Stein-Sapir Affidavit establish that each of the Defendants is in possession of, controls, or has access to the Bitcoin Assets. The ongoing pattern of transfers during the pendency of the Debtor's chapter 7 case also demonstrates that Defendants maintain continued access to the Bitcoin Assets.

36. As set forth below, Plaintiff is certainly likely to succeed on Counts I, II and IV of the Complaint:

a. **Count I (Enforcement of the Sale Order):** The Sale Order expressly provides that all third parties in possession, control, or interfering with PBTC's access to the Purchased Assets–including each of the named Defendants—"shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." Appendix, Ex. B, ¶ 15 (Sale Order). Defendants have defied that order. Complaint, ¶¶ 67-75. PBTC is entitled to a judgment enforcing the Sale Order and requiring all third parties to deliver possession, control and access to the Bitcoin Assets to PBTC.

b. **Count II (Turnover):** PBTC acquired "[a]ll of the [Bankruptcy Trustee's], the Estate's and the Debtor's legal and equitable rights, interests, title, and standing to pursue any and all claims, suits, and causes of action, including but not limited to all causes of action arising under Chapter 5 of the Bankruptcy Code including under 11 U.S.C. §§ 542 and 548, relating to recovering the BTC Wallets and the Estate Bitcoin and access thereto from any party, including, but not limited to Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors [AS] and any other third party who may have access

and/or control over the BTC Wallets and Estate Bitcoin." Appendix, Ex. A (Bill of Sale).

i. Section 542(a) requires an entity in possession, custody, or control of property that the trustee may use, sell, or lease under section 363 to "deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). The Bitcoin Assets were property of the estate sold to PBTC pursuant to a court-approved sale. Defendants are in possession of the Bitcoin Assets. Stein-Sapir Affidavit, ¶¶ 14-15, 23-24, 27. The Bitcoin Assets are not of inconsequential value. Complaint, ¶ 80. Accordingly, PBTC is substantially likely to prevail on Count II of the Complaint because each statutory element is satisfied: the Bitcoin Assets are not of inconsequential value and Defendants possess property of the estate that PBTC acquired as successor to the Bankruptcy Trustee's legal and equitable rights, interests, title, and standing to pursue a turnover action under Section 542.

c. **Count IV (Conversion):** "A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993) (citing *Magaw v. Beals*, 272 Mass. 344 (1930); *Atlantic Finance Corp. v. Galvam*, 311 Mass. 49 (1942)); *see Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 87 (2014) ("To be liable for conversion, a defendant must wrongfully exercise dominion or control over the personal property of the plaintiff." (internal quotation omitted)).

1. PBTC acquired "the [Bankruptcy Trustee's], the Estate's and the Debtor's legal and equitable rights, interests, title, and standing to pursue any and all claims, suits, and causes of action . . . relating to recovering the BTC Wallets and the Estate Bitcoin and access thereto from any party[.]" Complaint, ¶ 70. Defendants intentionally and wrongfully exercised dominion and control over the Bitcoin Assets while they were assets of the estate and after PBTC acquired exclusive ownership. Before and after entry of the Sale Order, the Defendants have withheld, transferred, concealed, used, and interfered with the estate's and PBTC's access to the Bitcoin and the Access Credentials necessary to control them. Stein-Sapir Affidavit, ¶¶ 14-15, 23-24, 27. The continued wrongful possession of the Bitcoin Assets has damaged PBTC, and

> Defendants have failed to respond to PBTC's demands for turnover. Accordingly, PBTC is substantially likely to prevail on Count IV of the Complaint.

37. Based on the foregoing, the Complaint, and the Stein-Sapir Affidavit, Plaintiff has established a substantial likelihood of success on Counts I, II, and IV, and is therefore entitled to preliminary injunctive relief of turnover of the Bitcoin Assets.

ii. ***Plaintiff Will Be Irreparably Harmed Absent an Injunction and Turnover***

38. Absent injunctive relief, Plaintiff will suffer irreparable harm because the Bitcoin—digital assets uniquely susceptible to rapid, anonymous, and irreversible transfer—are in imminent danger of dissipation and permanent loss due to Defendants' demonstrated pattern of unauthorized transfers and refusal to comply with turnover demands. A preliminary injunction is necessary to protect a plaintiff's damages remedy where the assets "are in danger of depletion, dissipation, and disappearance." *Fleet National Bank v. Rapid Processing Co., Inc.*, 643 F. Supp. 1065, 1069 (D. Mass. 1986). The First Circuit has found irreparable harm where a defendant's previous conduct "indicated that defendant may dissipate or conceal assets." *Micro Signal Research, Inc. v. Otus*, 417 F.3d 28, 31 (1st Cir. 2005).

39. Courts have consistently recognized that, where defendants are exercising wrongful possession, the unique characteristics of cryptocurrency–including ease of transfer, anonymity, and potential irreversibility–establish a substantial risk of irreparable harm warranting injunctive relief. In *Song v. Defendant*, the court held that "[p]laintiff will suffer irreparable injury if the TRO is not granted because Defendants can quickly transfer the assets to another untraceable cryptocurrency wallet or to offshore entities organized in unknown locations." 2024 U.S. Dist. LEXIS 148786, at *8 (M.D. Fla. Aug. 19, 2024); *see also Yogaratnam v. Dubois*, 2024 U.S. Dist. LEXIS 31033, at *9 (E.D. La. Feb. 23, 2024) ("Plaintiff has shown that irreparable harm will ensue absent a TRO, considering the speed with which

cryptocurrency transactions are made, as well as the anonymous nature of those transactions."); *Gaponyuk v. Alferov*, 2023 U.S. Dist. LEXIS 125262, at *6-7 (E.D. Cal. July 20, 2023) (significant risk of defendants transferring assets to unknown locations and anonymity of crypto transactions constituted irreparable harm); *Licht v. Ling*, 2023 U.S. Dist. LEXIS 122075, at *8 (N.D. Tex. June 20, 2023) ("The Court finds that freezing the alleged fraudsters' wallets is the proper relief and is the only feasible way to prevent irreparable harm."); *Jacobo v. Doe*, 2022 U.S. Dist. LEXIS 101504, at *10-11 (E.D. Cal. June 7, 2022) ("The fact that the assets at issue here are held in cryptocurrency weighs in favor of the granting of injunctive relief and a freezing of the assets because there is a high risk of asset dissipation with cryptocurrency."); *Heissenberg v. Doe*, 2021 U.S. Dist. LEXIS 257218, at *7 (S.D. Fla. Apr. 22, 2021) ("Because of the speed and potential anonymity of cryptocurrency transactions, the plaintiff is likely to suffer immediate and irreparable injury if a temporary restraining order is not granted.").

40. All of those conditions for irreparable harm are met here. The Bitcoin Assets are in imminent danger of dissipation. Defendants have demonstrated through their conduct, including unauthorized transfers and ignored turnover demands, that they will continue to dissipate and conceal the Bitcoin Assets absent injunctive relief. Without an immediate freeze and turnover of the Bitcoin, wallet addresses, private keys, and access credentials, the Bitcoin Assets are in danger of being irreversibly transferred and liquidated.

iii. ***The Balance of Harms Tips Strongly in Plaintiff's Favor***

41. The balance of harms tips in PBTC's favor. Without an injunction, PBTC faces the loss of specific, irreplaceable assets worth tens of millions of dollars. Once dissipated or liquidated, the Bitcoin Assets may be permanently beyond recovery.

42. By their deeds, admissions, and conduct, Defendants have each conceded that the Bitcoin Assets belonged to Kahan. None has asserted—nor can assert—any right to the Bitcoin Assets. There is no dispute that PBTC purchased these rights in a valid court-approved sale.

43. By contrast, Defendants will suffer no cognizable harm from the requested relief. As to the prohibitory component of the preliminary injunction, Defendants have no legitimate interest in selling, transferring, concealing, or otherwise dissipating property that belongs to PBTC pursuant to the Sale Order. As to the mandatory component, the turnover relief is narrowly tailored to compel Defendants to do what they are already obligated to do under the Sale Order: deliver possession, control, and access to the Bitcoin Assets to PBTC. Defendants cannot claim hardship from being required to return property they have no right to possess. To the extent the Defendants do not have control of or access to the Bitcoin Assets, the injunctive relief harms them in no way.

iv. ***The Public Interest Supports Granting the Injunction***

44. The public interest strongly favors granting the requested relief. The Bitcoin Assets were sold through a court-supervised sale process for the benefit of creditors of the bankruptcy estate. The public has a direct interest in ensuring that assets transferred through court-approved bankruptcy transactions are actually delivered to the purchaser, which only an order compelling turnover can achieve here. A preliminary injunction and turnover order would also serve the public interest in deterring conduct such as that of Defendants here: ignoring turnover demands and failing to comply with this Court's orders.

45. Courts have recognized a broad public interest in preventing the dissipation of cryptocurrency assets involved in fraud. *See, e.g.*, *Gaponyuk*, 2023 U.S. Dist. LEXIS 125262, at *7 ("[A] temporary asset freeze will serve the public's interest in stopping, investigating and remedying frauds"); *Licht*, 2023 U.S. Dist. LEXIS 122075, at *7 ("[A]n injunction would serve

the public interest because it will dissuade would-be fraudsters from stealing, laundering illegal proceeds, and preying on Americans like [plaintiff]"); *Song*, 2024 U.S. Dist. LEXIS 148786, at *8 ("[T]he entry of the relief would serve the public interest because it would promote the rule of law"); *Hikmatullaev v. Marco Alessandro Villa*, 2023 U.S. Dist. LEXIS 111619, at *8 (S.D. Fla. June 28, 2023) (finding public interest served when relief "encourages compliance with the law and disincentivizes and punishes criminal behavior"); *Yogaratnam*, 2024 U.S. Dist. LEXIS 31033, at *9-10.

**B. <u>Plaintiff Also Meets the Heightened Standard for a Mandatory Injunction Compelling Turnover</u>.**

46. Central to the relief requested in the Motion, Plaintiff requests an order requiring that each Defendant immediately turn over and deliver all Bitcoin Assets to PBTC by transferring the Bitcoin to a wallet address designated in writing by PBTC, and inform Plaintiff if it is in possession or control of any Bitcoin Assets (or has information regarding who does), as this Court has already ordered in the Sale Order. As opposed to a preliminary injunction maintaining the status quo, this requested relief is in the nature of a mandatory injunction and is warranted because "the exigencies of the situation demand such relief." *Braintree Labs., Inc.*, 622 F.3d at 41.

47. One or more Defendants are engaged in ongoing unauthorized transfers of the Bitcoin—including a transfer of approximately 10 Bitcoin valued at approximately $650,000 just twelve days after the Sale Order was entered. *See* Stein-Sapir Affidavit, ¶ 30. Defendants have demonstrated a pattern of complete defiance of court orders and PBTC's turnover demands. The Bitcoin can be transferred anonymously and irreversibly across international borders within minutes. Most importantly, Defendants have affirmatively claimed control of the

private keys necessary to effectuate further transfers at any moment. These circumstances present precisely the type of "exigencies" that warrant mandatory injunctive relief.

48. Moreover, a preliminary injunction alone, *i.e.*, freezing the Bitcoin Assets in place, would be insufficient to protect PBTC's interests. Because Defendants currently possess or control the private keys and access credentials necessary to transfer the Bitcoin, a freeze order without a corresponding turnover requirement would leave those assets in the hands of parties who have repeatedly demonstrated their willingness to defy court orders and conceal property belonging to PBTC. The Sale Order already commands Defendants to "immediately deliver possession, control and access to the Purchased Assets" to PBTC. Appendix, Ex. B, ¶ 15 (Sale Order). The requested mandatory relief does not alter the status quo; rather, it enforces a status quo that should already exist under this Court's prior order. *See Braintree Labs., Inc.*, 622 F.3d at 41 ("[T]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." (quoting *Crowley v. Local No*. 82, 679 F.2d 978, 996 (1st Cir. 1982))). Given the ease and speed with which cryptocurrency can be transferred beyond the reach of any court, coupled with Defendants' demonstrated pattern of unauthorized transfers, concealment, and noncompliance, PBTC has "clearly" established its entitlement to the mandatory relief requested. *See Lewis v. GE*, 37 F. Supp. 2d at 62.

## V.
## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court issue a preliminary injunction and order compelling turnover of the Bitcoin Assets to PBTC in the form attached to the Motion as **Exhibit A**.

Dated: October 12, 2026

**NIXON PEABODY LLP**

/s/ *Richard C. Pedone*
Richard C. Pedone (BBO # 630716)
Morgan C. Nighan (BBO # 679546)
Daniel P. McMonagle (BBO # 713426)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 345-1000
Email: rpedone@nixonpeabody.com
mnighan@nixonpeabody.com
dmcmonagle@nixonpeabody.com

-and-

Christopher Fong (*pro hac vice*)
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036
Telephone: (212) 940-3724
Email: cfong@nixonpeabody.com

*Counsel to PBTC Recovery Partners, LLC*